No. 23-1733

In the
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

ADAM KANUSZEWSKI, *et al.*,

     Plaintiffs-Appellees,

v.

MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,

     Defendants-Appellants.

Appeal from the United States District Court
Eastern District of Michigan, Northern Division
Honorable Thomas Ludington

## JOINT BRIEF FOR DEFENDANTS-APPELLANTS

Daniel J. Ping (P81482)
Aaron W. Levin (P81310)
Assistant Attorneys General
Counsel of Record
Attorneys for Defendants-Appellants
State Defendants
Michigan Dep't of Attorney General
Corporate Oversight Division
P.O. Box 30736
Lansing, MI 48909
(517) 335-7632

Jeremy C. Kennedy (P64821)
Jerold Lax (P16470)
Pear Sperling Eggan & Daniels, P.C.
24 Frank Lloyd Wright Drive
Ste. D-2000
Ann Arbor, Michigan 48105
Counsel for Defendants-Appellants
Neonatal BioBank & Christoper Krause
(734) 665-4441

Dated:  November 27, 2023

# TABLE OF CONTENTS

Page

Table of Authorities ............................................................... iv

Statement in Support of Oral Argument ................................... x

Jurisdictional Statement ........................................................ 1

Statement of Issues Presented ................................................ 2

Introduction ........................................................................ 3

Statement of the Case ........................................................... 6

    A.    Michigan's Newborn Screening Program ............................... 6

        1.    The initial screen and storage of infants' dried blood spots ........................................................ 6

        2.    Post-screening use of rDBS and data by the Newborn Screening Program ...................................... 10

    B.    The BioTrust for Health ................................................ 14

        1.    Health research facilitated by the BioTrust for Health ................................................................ 14

        2.    History of consent in BioTrust research .................... 18

    C.    Plaintiff-Children are screened for disorders ..................... 21

    D.    Plaintiffs file suit, the district court grants Defendants' motions to dismiss, and this Court remands for factfinding on a subset of Plaintiffs' claims ........................ 22

    E.    The district court grants summary judgment to Plaintiff-Parents on their Fourteenth Amendment claims ...................................................................... 25

    F.    The district court grants judgment to Plaintiffs on their Fourth Amendment claims ...................................... 27

Summary of Argument ....................................................................... 28

Standard of Review .......................................................................... 30

Argument ......................................................................................... 32

I.  Neither the Newborn Screening Program nor the BioTrust
    violates Plaintiff-Parents' Fourteenth Amendment
    substantive due process rights. ................................................ 32

    A.  Defendants' post-screening storage and use of rDBS
        and data do not interfere with Plaintiff-Parents' right
        to direct their children's medical care. ............................. 33

    B.  The BioTrust for Health's consent processes are
        constitutional. ................................................................... 40

        1.  Compliance with state law is not dispositive of
            constitutionally adequate consent. ........................... 41

        2.  The "opt-in" process that began in May 2010 is
            constitutionally adequate. ........................................ 43

        3.  Waiving consent for health research conducted on
            rDBS collected prior to May 1, 2010, is
            constitutionally adequate. ........................................ 48

    C.  Defendants' programs do not violate any of Plaintiff-
        Parents' substantive due process rights, even under
        strict scrutiny. .................................................................. 49

        1.  NBS's post-screening activity satisfies strict
            scrutiny. .................................................................... 50

        2.  The BioTrust for Health satisfies strict scrutiny. ....... 54

II. Neither the Newborn Screening Program nor the BioTrust
    for Health effected an unconstitutional seizure of Plaintiffs
    or their property. ...................................................................... 57

    A.  Defendants' post-screening storage of rDBS and data is
        not a "seizure." ................................................................. 58

B.    If a seizure occurred, it was reasonable. ................................ 61

C.    Plaintiffs have not alleged a search, but even if they had, none occurred, or it was reasonable. ............................ 62

    1.    Plaintiffs cannot maintain a "search" claim regarding post-screening storage, as no such claim appears in the complaint. .................................... 62

    2.    Defendants' post-screening storage and use of rDBS and data do not effect a "search." ...................... 63

    3.    Any search effected by Defendants' programs was reasonable. ................................................................ 65

Conclusion and Relief Requested ............................................ 72

Certificate of Compliance ........................................................ 73

Certificate of Service .............................................................. 74

Designation of Relevant District Court Documents ............................. 75

# TABLE OF AUTHORITIES

<u>Page</u>

**Cases**

*Arch of Kentucky, Inc. v. Dir., Off. of Workers' Comp. Programs,*
    556 F.3d 472 (6th Cir. 2009) ........................................................ 43, 44

*Arizona Free Enter. Club's Freedom Club PAC v. Bennett,*
    564 U.S. 721 (2011) ............................................................................ 50

*Bd. of Regents v. Roth,*
    408 U.S. 564 (1972) ............................................................................ 59

*Brown v. Texas,*
    443 U.S. 47 (1979) ............................................................................. 61

*California v. Ciraolo,*
    476 U.S. 207 (1986) ............................................................................ 67

*Cash-Darling v. Recycling Equip., Inc.,*
    62 F.4th 969 (6th Cir. 2023) ............................................................. 30

*Castro v. United States,*
    540 U.S. 375 (2003) ............................................................................ 31

*Collins v. Harker Heights,*
    503 U.S. 115 (1992) ............................................................................ 34

*Cruzan by Cruzan v. Dir., Missouri Dep't of Health,*
    497 U.S. 261 (1990) ..................................................................... passim

*Devlin v. Kalm,*
    630 F. App'x 534 (6th Cir. 2015) ..................................................... 31

*Dobbs v. Jackson Women's Health Org.,*
    142 S. Ct. 2228 (2022) ....................................................................... 35

*Doe v. Univ. of Ky.,*
    971 F.3d 553 (6th Cir. 2020) ............................................................. 31

iv

*Does v. Munoz*,
  507 F.3d 961 (6th Cir. 2007) ............................................................... 40

*Farm Labor Org. Comm'n v. Ohio State Hwy. Patrol*,
  308 F.3d 523 (6th Cir. 2002) ............................................................... 66

*Fox v. Van Oosterum*,
  176 F.3d 342 (6th Cir. 1999) ............................................................... 60

*Garcia v. Dykstra*,
  260 F. App'x 887 (6th Cir. 2008) ........................................................ 67

*Gillis v. Miller*,
  845 F.3d 677 (6th Cir. 2017) ............................................................... 30

*Globe Newspaper Co. v. Superior Court for Norfolk County*,
  457 U.S. 596 (1982) .............................................................................. 50

*GMAC Mortg., LLC v. McKeever*,
  651 F. App'x 332 (6th Cir. 2016) ........................................................ 31

*Griffin v. Wisconsin*,
  483 U.S. 868 (1987) .............................................................................. 68

*Guertin v. State*,
  912 F.3d 907 (6th Cir. 2019) ............................................................... 38

*Howe v. City of Akron*,
  801 F.3d 718 (6th Cir. 2015) ............................................................... 31

*Illinois v. Caballes*,
  543 U.S. 405 (2005) .............................................................................. 64

*Jenkins v. Rock Hill Local School District*,
  513 F.3d 580 (6th Cir. 2008) ............................................................... 37

*Knox v. Serv. Emps. Int'l Union, Loc. 1000*,
  567 U.S. 298 (2012) .............................................................................. 44

*L.W. by & through Williams v. Skrmetti*,
  73 F.4th 408 (6th Cir. 2023) ......................................................... 35, 40

v

*Maryland v. King,*
    569 U.S. 435 (2013) ............................................................... 65

*Maryville Baptist Church, Inc. v. Beshear,*
    957 F.3d 610 (6th Cir. 2020) ............................................... 55

*McKenzie v. BellSouth Telecomm., Inc.,*
    219 F.3d 508 (6th Cir. 2000) ............................................... 31

*Rakas v. Illinois,*
    439 U.S. 128 (1978) ......................................................59, 60

*Reno v. Flores,*
    507 U.S. 292 (1993) ............................................................. 35

*Rochin v. California,*
    342 U.S. 165 (1952) ............................................................. 34

*Sanborn v. Zollman,*
    40 F. App'x 916 (6th Cir. 2002) ....................................... 41

*Schmerber v. California,*
    384 U.S. 757 (1966) ......................................................58, 68

*Seal v. Morgan,*
    229 F.3d 567 (6th Cir. 2000) ............................................... 35

*Skinner v. Ry. Lab. Executives' Ass'n,*
    489 U.S. 602 (1989) ................................................... passim

*Sullinger v. Sullinger,*
    849 F. App'x 513 (6th Cir. 2021) ..................................... 65

*United States v. $31,000.00 in U.S. Currency,*
    774 F. App'x 288 (6th Cir. 2019) ..................................... 39

*United States v. Brandon,*
    158 F.3d 947 (6th Cir. 1998) ............................................... 52

*United States v. Comprehensive Drug Testing, Inc.,*
    621 F.3d 1162 (9th Cir. 2010) ........................................... 60

vi

*United States v. Jacobsen,*
    466 U.S. 109 (1984) ................................................................58, 59, 64

*United States v. Knights,*
    534 U.S. 112 (2001) ...........................................................................65

*United States v. Montoya de Hernandez,*
    473 U.S. 531 (1985) ...........................................................................68

*United States v. Place,*
    462 U.S. 696 (1983) ...............................................................64, 66, 68

*United States v. Sharpe,*
    470 U.S. 675 (1985) ...............................................................61, 66, 68

*Vernonia Sch. Dist. 47J v. Acton,*
    515 U.S. 646 (1995) ...............................................................66, 67, 68

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ...........................................................................35

*Whalen v. Roe,*
    429 U.S. 589 (1977) ....................................................................36, 37

*Wheat v. Fifth Third Bank,*
    785 F.3d 230 (6th Cir. 2015) .......................................................30, 31

*Winston v. Lee,*
    470 U.S. 753 (1985) ...........................................................................66

*Wittman v. Personhuballah,*
    578 U.S. 539 (2016) ...........................................................................39

*Wlosinski v. Cohn,*
    713 N.W.2d 16 (Mich. Ct. App. 2005) ...............................................46

*Wyoming v. Houghton,*
    526 U.S. 295 (1999) ...........................................................................65

**Statutes**

28 U.S.C. § 1291...................................................................................1

42 U.S.C. § 1983.................................................................... 1

Mich. Comp. Laws § 333.17020...................................26, 45

Mich. Comp. Laws § 333.17020(8)(b) ........................... 45

Mich. Comp. Laws § 333.17020(9) ................................. 45

Mich. Comp. Laws § 333.17520...................................26, 45

Mich. Comp. Laws § 333.17520(8)(b) ........................... 45

Mich. Comp. Laws § 333.17520(9) ................................. 45

Mich. Comp. Laws § 333.5431(1) ..................................... 6

Mich. Comp. Laws § 333.5431(2) .................................. 6, 9

Mich. Comp. Laws § 333.5431(3) ..................................... 8

Mich. Comp. Laws § 333.5431(7) ..................................... 9

Mich. Comp. Laws § 333.5431(7)(b) ..........................14, 45

Mich. Comp. Laws § 333.5431(8) ..................................... 9

## Rules

Fed. R. App. P. 4(a)(1)(A) ............................................... 1

Fed. R. Civ. P. 25(d)....................................................... 23

Fed. R. Civ. P. 56(a)....................................................... 30

## Regulations

45 C.F.R. § 46.101(l)(3)................................................. 19

45 C.F.R. § 46.102(d) ..................................................... 14

45 C.F.R. § 46.116(d) ...............................................19, 48

## Constitutional Provisions

U.S. Const. amend. IV .......................................................................59, 61

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Defendants-Appellants request oral argument.  This case presents complex constitutional issues of first impression.

Moreover, resolution of Plaintiffs' claims could have profound implications for the vitality of lifesaving public-health programs like Michigan's Newborn Screening Program, versions of which are operated by states nationwide.

Accordingly, oral argument will assist this Court in reaching a full understanding of the issues and underlying facts.

## JURISDICTIONAL STATEMENT

This Court has subject-matter jurisdiction.  The appeal raises federal questions under the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

Appellate jurisdiction exists under 28 U.S.C. § 1291.  On July 31, 2023, the district court entered its final order closing the case.  (ECF No. 263, PageID.7024-7025.)  Defendants filed their Notice of Appeal on August 16, 2023.  *See* Fed. R. App. P. 4(a)(1)(A).

## STATEMENT OF ISSUES PRESENTED

1.   State action violates one's fundamental right to direct their child's medical care if (1) that action implicates or hinders decision-making regarding the child's medical care and, (2) absent consent, the action fails to satisfy strict scrutiny. Here, the challenged action lacked any connection to, or impact on, any child that might constitute medical care, and, regardless, satisfies strict scrutiny. Did the district court err by finding a Fourteenth Amendment violation?

2.   State action violates one's right to be free from unreasonable seizures if it meaningfully interferes with one's possessory interest in property. Here, the plaintiffs never established that the storage of dried blood spots and data implicates a possessory interest in property. Even if they had, any interference was reasonable. Did the district court err by finding a Fourth Amendment violation?

## INTRODUCTION

Michigan's Newborn Screening Program is a paragon of good government.  It collects dried blood spots from newborn infants and screens them for life-threatening disorders that must be identified in short order.  As a direct result, each year, hundreds of families are spared the agony of a newborn's irreversible disability or death.  It is difficult to conceive of a more compelling state interest.

Defendants' subsequent, *post-screening* use of the blood spots and data are the sole activities before this Court.  First and foremost, that activity meets the needs of the Newborn Screening Program—its need to calibrate equipment, implement screens for new disorders, and investigate how to improve existing screening protocols—and it only occurs subject to strict privacy protections.  Post-screening activity is therefore inextricably linked to, and in furtherance of, the same compelling purpose advanced by the initial screen.

Blood spots or data may also be used for health research, as permitted by Michigan law.  The prerequisites to receiving spots or data are strict.  By law, the research must advance public health, and it cannot result in a medical diagnosis or any conclusions about a

particular individual.  Even when these prerequisites are met, only the bare minimum information germane to the project is provided, and all potentially identifying information is withheld.

Plaintiffs' complaint, however, painted a picture of a sinister scheme to sell babies' leftover blood—at a profit—for medical procedures, and without any meaningful privacy protections at that. The complaint survived a motion to dismiss only because, at that stage, this Court accepted its theme of "medical procedures for profit" as true. But on remand, the district court misconstrued this Court's opinion as requiring it to adopt certain allegations in the complaint.  As a consequence, it declined to consider strong evidence refuting those allegations.  In fact, none of this activity intrudes on citizens' rights— whether to direct medical care or to be free from unreasonable seizures.

Plaintiff-Parents first alleged that Defendants' post-screening activity violated their Fourteenth Amendment right to direct their children's medical care, alleging the activity occurred without "informed consent."  The district court erred by interpreting this Court's decision as *requiring* informed consent—regardless of whether the programs actually facilitate medical testing or procedures.  In fact, discovery

revealed no implication for medical decision-making at all. The right Plaintiffs invoke simply does not apply. Even if it did, however, Defendants' post-screening activity did not violate the right.

In their second claim, Plaintiff-Children alleged that Defendants violated their Fourth Amendment right to be free from unreasonable seizures. But the challenged activity does not implicate a protected possessory interest. Even if a "search" claim is grafted onto the complaint, the challenged activity is replete with safeguards— including, but not limited to, robust de-identification. Yet, contrary to this Court's holding that "injuries" attributable to speculative risks (*e.g.*, mishandling of information or changes in policy) do not establish standing, the district court found a search based on such speculation.

This Court should draw two sharp lines that the district court blurred. First, this Court should view its prior opinion in the proper motion-to-dismiss context. Second, it should set aside the *initial* screen's clinical objectives, which are tied to individuals, and recognize that *post-screening* activities have no such objectives (or effects) with respect to any plaintiff. Doing so will reveal that Plaintiffs failed to carry their burden, and reversal is required.

5

**STATEMENT OF THE CASE**

A.    **Michigan's Newborn Screening Program**

1.    **The initial screen and storage of infants' dried blood spots**

The Michigan Department of Health and Human Services (MDHHS) operates the Newborn Screening Program (NBS) to screen newborn infants for a panel of rare, insidious medical disorders shortly after birth. *See* Mich. Comp. Laws §§ 333.5431(1) (mandating screens), (2) (authorizing MDHHS to conduct screens). If these disorders are not clinically diagnosed and treated quickly, they can result in irreversible disability, illness, or death. (1/31/23 Trial Tr. (TT), p. 63, PageID.6191; *see* NBS Q&A, PageID.4243.)[1] Each year, more than 250 Michigan babies—one in every 400 to 500 births—are found to have a disorder detected by newborn screening. (NBS Q&A, PageID.4243.)

The screening process begins 24 to 36 hours after birth, when a newborn's heel is pricked by a healthcare provider and blood is transferred to a paper card, resulting in five to six dried blood spots

---

[1] The Newborn Screening Program also tests infants for congenital heart defects and hearing disorders, neither of which involve blood samples and are therefore not part of this lawsuit. (Lyon-Callo Dep. Tr., p. 34, PageID.4365.)

(DBS).  (1/31/23 TT, p. 64, PageID.6191.)  The DBS are then sent to Michigan's Bureau of Laboratories and screened for nearly 60 disorders.  (*Id.*; 2/1/23 TT, p. 5, PageID.6286.)  This screen entails the collection of some data (such as the parents' names, the birth hospital, and whether the child was admitted to the neonatal intensive care unit), as well as the creation of some data (such as the technical results of the screening for disorders).  (*See, e.g.*, MDHHS Retention Schedule, Pls.' Tr. Ex. 7 [App'x pp. 40–45].)

Performing an effective screen—let alone nearly 60 of them—is no simple task.  Central to screening are analyte "cutoffs": the presence or amount of one or more biomarkers (analytes) in the blood that tend to indicate the presence of a disorder.  (1/31/23 TT, p. 126, PageID.6254.)  The Bureau of Laboratories must set the cutoffs precisely, to minimize both false negatives (which risk leaving a disorder to fester undiagnosed) and false positives (which risk unnecessary stress to families spurred to emergency follow-up visits and testing).  (*Id.* at 127–30, PageID.6255-6258.)  Cutoffs are modified over time, and they can be adjusted to account for known "covariants," such as a baby's

birthweight, which might dictate a more accurate cutoff for that individual.  (2/3/23 TT, pp. 69–70, PageID.6664-6665.)

NBS's task is further complicated by its need to account for Michigan's specific demographics.  (1/31/23 TT, pp. 144–45, PageID.6272-6273; 2/3/23 TT, p. 110, PageID.6705.)  The prevalence of a given disorder within Michigan—and, in turn, the appropriate screening cutoffs for Michigan's population—depends on Michigan's demographic makeup.  For example, Michigan's above-average North African and Mediterranean populations warrant more sensitive cutoffs for disorders that occur more frequently in those populations.  (1/31/23 TT, p. 144–45, PageID.6272-6273.)  If Michigan set its cutoffs without regard to its unique demographics, it could yield unacceptably high false-negative rates.

If a screen indicates a child might have a disorder, the NBS follow-up team contacts the family, usually via their physician, for additional testing, diagnosis, and potential treatment.  (1/31/23 TT, pp. 125–26 (screening result does not equate to diagnosis), PageID.6253-6254; 2/2/23 TT, p. 69, PageID.6507.)  *See also* Mich. Comp. Laws § 333.5431(3).

The principal statute governing NBS expressly exempts this screening process from consent requirements that otherwise would apply to clinical pre-symptomatic genetic testing.  Mich. Comp. Laws § 333.5431(2).  The statute further requires MDHHS to: (1) develop a schedule for the retention and disposal of DBS after newborn screening is completed; (2) make the DBS available for medical research during the established retention period; and (3) publish a pamphlet explaining the NBS program and statutory requirements, including the potential that DBS may be used for medical research.  *See* Mich. Comp. Laws §§ 333.5431(7), (8).

After screening is completed, parents may require MDHHS to destroy or return their child's DBS.  (rDBS Directive, PageID.4252.; Lyon-Callo Dep. Tr., p. 67, PageID.4398.)  These options are presented at the time of sample collection by parents' healthcare providers.  (Lyon-Callo Dep. Tr., p. 67, PageID.4398.)

Following the conclusion of the initial screen and follow-up, the remaining DBS—known as residual DBS, or "rDBS"—are either destroyed or, if no destruction request was received, sent to the Michigan Neonatal BioBank for storage.  (*Id.* at 33, PageID.4364; NBS

Q&A, ECF No. 147-2, PageID.4244.)  The BioBank's exclusive role is to catalog and maintain rDBS in a secure, climate-controlled environment, and to dispatch them at MDHHS's direction—nothing more.  (*Id.* at 58–59, PageID.4389-4390.)  The BioBank receives *only* the rDBS, which has been de-identified and bears only a unique "accession" number assigned by MDHHS permitting it to locate the sample if needed. (Lyon-Callo Dep. Tr., p. 58, PageID.4389.)  In other words, one cannot obtain any information about an individual from the BioBank.  Roughly four million individuals' rDBS are stored in the BioBank. (Confidentiality App., p. 3, Pls.' Tr. Ex. 6, [App'x, pp. 35–39].)

### 2.    Post-screening use of rDBS and data by the Newborn Screening Program

The primary reason rDBS are stored is to benefit NBS.  (Lyon-Callo Dep. Tr., p. 60, PageID.4391; 2/1/23 TT, pp. 15–16, PageID.6296-6297; MDHHS APF 111, PageID.4249.)  NBS's mission to save *individual* infants' lives through DBS screening is inextricable from its need to maintain and improve the accuracy and precision of its existing screens, and to bring new tests and new instrumentation online. Although these are general, programmatic efforts, they provide direct

benefits to future newborns, as well to those whose rDBS are stored; but they cannot be accomplished without a repository of rDBS.  (Seeterlin Decl. ¶¶ 4, 8, PageID.4322, 4323-4324.)

The district court found that garden-variety routine maintenance and calibration of NBS laboratory instruments requires about 145,000 rDBS.  (7/29/21 Op. & Order, p. 24, PageID.5592.)  But this describes only a fraction of the uses of rDBS—and the number of rDBS— necessary to the program.  (*See id.* at 7, PageID.5575.)

Adding a new disorder, instrument, or methodology to NBS requires far more rDBS than does annual calibration, and potentially requires more rDBS than Defendants maintain even now.  NBS adds about two or three new disorders to its panel per year, (Shah Dep. Tr., p. 44, PageID.2438; 2/1/23 TT, p. 69, PageID.6350), and it frequently updates instrumentation or implements a new screening methodology, (2/1/23 TT, pp. 129–130, PageID.6409-6410).  Activities like these require a minimum number of samples—ideally 20—known to originate from individuals clinically diagnosed with the disorder.  (*Id.* at 101, PageID.6382; *see also* Seeterlin Decl. ¶ 9, PageID.4324.)  One rare disease (guanidinoacetate methyltransferase deficiency, or GAMT)

11

might result in only one "positive" sample per 500,000 births—requiring five years of Michigan births to generate one positive sample. (2/1/23 TT, p. 102, PageID.6383.) In other words, at the current birthrate, rDBS from approximately 100 years' worth of Michigan births would be required to supply the ideal 20 positive samples; currently, the program "live[s] with only eight [positive] spots" for GAMT. (*Id.* at 101, PageID.6382.)[2] Positive samples are so rare, and so valuable to NBS, that their preservation has been "given priority" in the event of an emergency. (MDHHS APF 114, PageID.4269.)

Thus, consistent with unrebutted evidence that new disorders, new instruments, and new methodologies will continue to be added to NBS with life-saving effect, Defendants retain rDBS for as long as possible.[3]

---

[2] Positive samples theoretically exist in other states' DBS repositories, but, in practice, attempts to reach out to other states to help meet a need for certain rDBS are "usually not very successful," owing to a combination of (1) the conditions' rarity, (2) many states' shorter retention schedules, and (3) the incompatibility of most states' demographic makeups. (2/3/23 TT, pp. 121–22, PageID.6716-6717.)

[3] Although the precise retention schedule for rDBS may be adjusted to account for the age of the oldest viable rDBS in storage (currently 35 years), rDBS may be stored for "up to 100 years." (MDHHS APF 111, PageID.4249.) Demographic data are stored for 10 years, and screening

Retaining rDBS and data proves invaluable for other reasons. Generally speaking, year over year, NBS's access to an ever-increasing amount of rDBS and data results in an ever-increasing refinement of cutoffs and a corresponding increase in accuracy, *i.e.*, a reduction in false negatives and false positives.  (2/3/23 TT, pp. 104–05, PageID.6699-6700; Seeterlin Decl. ¶ 12, PageID.4325.)  Similarly, an individual who screened negative for a disorder might later be clinically diagnosed with that disorder; retaining that spot permits an *ad hoc* "method validation," *i.e.*, to evaluate why the screen returned a "false negative" and take corrective action.  (Seeterlin Decl. ¶¶ 10-11, PageID.4324; 2/1/23 TT, pp. 125–26, PageID.6406-6407; *see also* 2/1/23 TT, p. 113, PageID.6394.)  In two instances, this occurred 15 and 19 years after the initial screen.  (*Id.*; 2/2/23 TT, p. 73, PageID.6511.)

Retaining rDBS also benefits the families of infants whose rDBS are stored.  (Shah Dep. Tr., p. 50, PageID.2440; 2/1/23 TT, pp. 13, 25, PageID.6294, 6306.)  For example, it might be requested by the parent for help with a diagnosis. (Seeterlin Decl. ¶ 14, PageID.4326.)

---

results for 22 years.  (MDHHS Retention Schedule, Pls.' Tr. Ex. 7 [App'x pp. 40–45].)

## B.     The BioTrust for Health

Pursuant to Michigan Compiled Laws § 333.5431(7)(b), MDHHS is mandated to allow rDBS "to be used for medical research . . . , as long as the medical research is conducted in a manner that preserves the confidentiality of the test subjects and is consistent to protect human subjects from research risks[.]"  Accordingly, MDHHS established the Michigan BioTrust for Health (not to be confused with the BioBank, the entity that stores rDBS), which exists to facilitate such health research, subject to strict protections in furtherance of privacy and medical ethics.  (2/2/23 TT, p. 32, PageID.6470.)

### 1.     Health research facilitated by the BioTrust for Health

As distinct from newborn screening, the BioTrust for Health exists to facilitate "health research" using rDBS and data.  (2/2/23 TT, p. 34, PageID.6472.)  In this context, "health research" means "a systematic investigation, including research development, testing and evaluation, designed to develop or contribute to generalizable knowledge."  45 C.F.R. § 46.102(d) (2005).[4]

---

[4] NBS—whether it is screening individuals for disorders or undertaking activities to support the program—is not engaged in "research," because

14

Although the BioTrust is distinct from NBS, the health research it facilitates is invaluable to supporting, improving, and expanding NBS and other states' newborn screening programs.  Residual DBS and data represent "an important resource . . . for researchers to be able to develop new tests that would enable the detection of severe disorders of the newborn period through the newborn screening process or other medical process at time of birth."  (Lyon-Callo Dep. Tr., p. 60, PageID.4391.)[5]  For example, "use of dried blood spots through the BioTrust has been instrumental in developing NBS tests for the debilitating disorders Spinal Muscular Atrophy and Niemann-Pick C Disease."  (NBS & BioTrust FAQs, PageID.2187.)

Such research also furthers the public health in different ways, through studies that seek to understand, *e.g.*, "prenatal, childhood or adult-onset disorders" and "environmental exposures."  (MDHHS APF

_____

none of its activities seeks "generalizable knowledge" that could be applied elsewhere.  (2/2/23 TT, pp. 34–35, PageID.6472-6473.)  Rather, these activities are useful only insofar as they provide specific conclusions relevant to NBS.

[5] NBS generally relies on third-party research for development of new tests.  (2/1/23 TT, pp. 129–30, PageID.6410-5411.)  Its involvement with new tests is limited to bringing them online, which can entail new instrumentation and new methods.  (*Id.* at 128–30, PageID.6409-6411.)

114, PageID.4266; Lyon-Callo Dep. Tr., p. 59, PageID.4390 (stating that BioTrust is a "very important resource for understanding exposures and conditions that babies were in during one of the most sensitive periods of development in terms of gestation"); Shah Dep. Tr., pp. 35–36, PageID.2436.)  Research facilitated by the BioTrust has contributed to advancements in the study of cancers and exposure to carcinogens and contaminants in the environment.  (*See* NBS & BioTrust FAQs, PageID.2187.)  Research is prohibited regarding "chemical, biological or nuclear warfare," "cosmetics," and any "other non-health related ventures unless for purposes related to injury or medical conditions." (MDHHS APF 114, PageID.4266.)  Whole genome sequencing, for any purpose, is expressly prohibited, as is any attempt at identification. (*Id.*, PageID.4268.)

When a research partner seeks BioTrust support for a project, they might begin by contacting MDHHS, whose staff can help the researcher tailor their formal request.  (Lyon-Callo Dep. Tr., p. 46, PageID.4377.)  That formal request needs review and approval by a number of entities within MDHHS.  (*See id.* at 46–47, PageID.4376-4377.)  Relevant here, the BioTrust is overseen by the 14-member

16

Institutional Review Board (IRB), an independent ethics committee
that scrutinizes the BioTrust's policies and procedures, as well as third
parties' proposed research projects.  (*Id.* at 32, PageID.6470; *id.* at 46–
47, PageID.6484-6485; *id.* at 54, PageID.6492; *id.* at 59–60,
PageID.6497-6498.)[6]  Where appropriate, the IRB would consider any
constitutional implications posed by research.  (2/2/23 TT, pp.55,
PageID.6493.)  If the project is approved, a "data use agreement" is
prepared (which sets forth the researcher's limitations on use of data, as
well as the fact that they do not own the data), as well as a "material
transfer agreement" (a similar document covering the rDBS).  (Lyon-
Callo Dep. Tr., p. 46, PageID.4378.)

Once all approvals are in hand and agreements are signed, the de-
identified rDBS and limited, project-specific data may be furnished to a
researcher.  Residual DBS supplied to a researcher might be correlated
with one or more demographic data points relevant to the project.  (*E.g.*,

---

[6] The IRB exists within MDHHS but comprises both MDHHS
employees and third-party stakeholders.  (2/2/23 TT, p. 47, ECF No.
245, PageID.6485.)  With the exception of the IRB administrator, IRB
members are not specially compensated, and none may vote on any
matter that presents a conflict of interest.  (*Id.* at 48–49, PageID.6486-
6487.)

MDHHS APF 114, p. 3, PageID.4267; 2/3/23 TT, p. 6, PageID.6601.)

For a descriptive list of all approved BioTrust research projects up to

and including 2020, see Research Use of Michigan's Residual Newborn

Screening Blood Spots (PageID.5471).

Definitively, research conducted through the BioTrust cannot

comprise or impact medical care.  (*See* 2/2/23 TT, p. 43 ("For the

BioTrust research itself, there is no further interaction or intervention

with subjects, so there's . . . no welfare risk [that] would impact a

subject's physical well-being in any way."), PageID.6481.)

Research partners do pay a fee to the BioTrust to obtain rDBS or

data, but the fee is intended only to recoup some of the cost.  The

district court correctly found that Defendants "clearly demonstrated

that the DBS are not sold to third-party researchers" and "Plaintiffs'

argument that DBS are sold has no merit."  (7/29/21 Op. & Order, p. 41,

PageID.5609; *see id.* at 31 n.11, PageID.5599; 2/1/23 TT, p. 44,

PageID.6325.  *But see* 9/13/22 Order, p. 3, PageID.5813.)

## 2.    History of consent in BioTrust research

Prior to 2010, parents' explicit consent was not sought for

participation in health research.  (Lyon-Callo Dep. Tr., p. 20,

PageID.4351.)  Rather, pursuant to the federal "Common Rule," the

source for ethical standards in research, 45 C.F.R. § 46.116(d) (2005),

the IRB has waived consent for research for pre-2010 rDBS.

(PageID.4778; Lyon-Callo Dep. Tr., p. 20, PageID.4351).[7]  Specifically,

the Common Rule permits an IRB to "waive the requirements to obtain

informed consent" if it deems the following criteria are met:

> (1) The research involves no more than minimal risk to the
> subjects;
>
> (2) The waiver or alteration will not adversely affect the
> rights and welfare of the subjects;
>
> (3) The research could not practicably be carried out without
> the waiver or alteration; and
>
> (4) Whenever appropriate, the subjects will be provided with
> additional pertinent information after participation.  [*Id.*]

For rDBS obtained from Michigan births prior to May 1, 2010, the IRB

has concluded that the Common Rule's prerequisites to the consent

waiver are met.  (2/2/23 Trial. Tr., pp. 39–40, PageID.6477-6478;

BioTrust Consent Options, PageID.4284; IRB Approval, PageID.4288.)

---

[7] Because de-identified research under the BioTrust was approved prior
to January 21, 2019, it is subject to the "pre-2018 Common Rule", *i.e.*,
the 2005 version.  *See* 45 C.F.R. § 46.101(l)(3).  The complete pre-2018
Common Rule is available at https://www.hhs.gov/ohrp/regulations-and-
policy/regulations/regulatory-text/index.html.

These rDBS are therefore held pursuant to an "opt-out" procedure, by which an individual may request that their rDBS be either withheld from research or destroyed.  (BioTrust Consent Options, PageID.4284.)

MDHHS implemented an "opt-in" informed consent process for the BioTrust program, effective May 1, 2010.  (*Id.*)  Under that process, parents may permit that rDBS may be used for research, and they may change this decision later by completing the directive form.  (*E.g.*, BioTrust Consent Form, PageID.4287.)  The consent process is administered by parents' healthcare providers, who are trained in both that process and the BioTrust for Health generally, which enables them to answer questions.  (Lyon-Callo Dep. Tr., pp. 27–33, PageID.4358-4364.)

In summary, rDBS collected from children born on or after May 1, 2010, may be used for deidentified research through the BioTrust only if a parent or legal guardian returns a signed consent form allowing it.[8]  (*Id.*)  Parents are expressly informed that their child's DBS will be stored even if they say "no" to research unless they complete the

---

[8] Research using *identified* rDBS can be performed only if parents or guardians provide study-specific consent, which is sought on a case-by-case basis.  (MDHHS APF 114, p. 4, PageID.4268.)

directive form to destroy.  (*Id.*)  (Additional details regarding the consent materials are discussed in Part I.B.2, *infra*.)  De-identified rDBS of children born *before* May 1, 2010, are available for health research under the waiver of the informed-consent requirement available under the Common Rule, subject to opt-out request.  (*See* IRB Approval, PageID.4288.)

### C.    Plaintiff-Children are screened for disorders

Plaintiffs are parents and their nine children, whom NBS screened for disorders at birth.  Adam and Ashley Kanuszewski are parents of DWL (born January 17, 2018), RFK (born April 22, 2013), and CKK (born February 10, 2016).  Shannon LaPorte is mother to MTL (born October 19, 2008) and EMO (born February 6, 2017).  Lynette Wiegand is mother to LRW (born November 21, 2011), CJW (born July 17, 2013), HJW (born December 24, 2014), and MLW (born January 30, 2017).  (Am. Compl. ¶¶ 16–18, PageID.304-305.)

For purposes of BioTrust research, each child falls into one of three categories:  In the first category, the parents of RFK, CKK, LRW, CJW, and HJW all returned consent forms authorizing BioTrust research.  (*See* 7/29/21 Op. & Order, p. 21, PageID.5589.)  In the second,

the parents of EMO and MLW declined authorization for BioTrust research, which Defendants honored.  (*Id.*)  In the third, consent requirements were waived as to DWL and MTL, as each was born prior to May 1, 2010.  (*Id.*)

As to anyone's rDBS, storage and use internal to NBS occur pursuant to an opt-out consent scheme.  Throughout the litigation, no Plaintiff opted to ask Defendants to return or destroy their rDBS.

### D.   Plaintiffs file suit, the district court grants Defendants' motions to dismiss, and this Court remands for factfinding on a subset of Plaintiffs' claims

Plaintiffs' amended complaint was filed on April 30, 2018.  (ECF No. 26.)  It brought five counts.  Count I challenged the initial blood draw and screen as violative of substantive due process.  (*Id.*, PageID.322.)  Count II challenged all post-screening activity as violative of substantive due process.  (*Id.*, PageID.323.)  Count III alleged that the initial blood draw and screen comprised a search or seizure in violation of the Fourth Amendment.  (*Id.*, PageID.325.)  And combined Counts IV and V alleged that post-screening storage comprised an unlawful seizure, as well as conspiracy.  (*Id.*, PageID.327.)

Plaintiffs alleged that post-screening activity, in particular, comprised "medical test[s] and/or medical procedure[s]," or storage in furtherance of the same.  (*Id.* ¶ 92, PageID.323.)

Plaintiffs named as Defendants MDHHS, its director (currently Elizabeth Hertel), Dr. Sandip Shah (Director of MDHHS's Bureau of Laboratories), Dr. Sarah Lyon-Callo (Senior Deputy Director of the MDHHS Public Health Administration), Mary Kleyn (former Manager of the Newborn Screening Section) (collectively, the State Defendants), and the BioBank and its director (currently Christopher Krause).[9]

On May 29, 2018, the State Defendants moved to dismiss the Amended Complaint.  (Defs.' 5/29/18 Mot. to Dismiss, PageID.477.)  The district court granted that motion in full and dismissed Plaintiffs' claims with prejudice. (8/8/18 Op. & Order, PageID.825.)

Plaintiffs appealed.  This Court affirmed the dismissal of Plaintiffs' claims regarding the initial blood draw and screen. *Kanuszewski*, 927 F.3d 396.  However, it remanded aspects of Plaintiffs'

---

[9] The directors of MDHHS and the BioBank were automatically substituted as parties in lieu of their predecessors.  Fed. R. Civ. P. 25(d).

claims under the Fourth and Fourteenth Amendments regarding post-screening storage and use of rDBS and data for discovery. *Id.*

Specifically, regarding the substantive due process claim, this Court reversed the dismissal of Plaintiff-Parents' claim that post-screening use and storage violated their fundamental right to direct their children's medical care, assuming the truth of Plaintiffs' allegations that such use comprised "medical test[s] and/or medical procedure[s]," (Am. Compl. ¶ 92, PageID.323). This Court remanded for presentation of "evidence related to Defendants' actions and the legal implications of those actions." *Kanuszewski*, 927 F.3d at 421. "Specifically," it held, "the questions on remand will be whether the evidence demonstrates that Defendants' actions interfered with the parents' right to direct their children's medical care; and, to the extent they did interfere with the parents' fundamental rights, whether those actions survive strict scrutiny." *Id.*; *see also id.* (noting fact question regarding sufficiency of "opt out" consent procedure).

This Court also reversed the dismissal of Plaintiff-Children's Fourth Amendment seizure claim regarding post-screening storage of their rDBS and data. It remanded for discovery to permit the parties to

24

"produce evidence of the state's purposes for retaining, storing, and using the children's blood samples after they have been screened for diseases," and to explore the scope of consent that Plaintiffs may have given.  *Id.* at 425.

### E.    The district court grants summary judgment to Plaintiff-Parents on their Fourteenth Amendment claims

On remand and after discovery, the parties filed cross-motions for summary judgment.  (ECF Nos. 135, 147, 149.)  In the first of three opinions resolving Plaintiff-Parents' Fourteenth Amendment claims, the district court concluded that use of rDBS internal to NBS satisfied strict scrutiny.  (7/29/21 Op. & Order, p. 28, PageID.5596.)  The district court reserved a decision on *storage* for internal NBS purposes, denying both sides' motions and holding that "there is a genuine question of material fact regarding the necessity of storing all DBS from 1984 for calibration and furtherance of the newborn screening program and whether the program is narrowly tailored to that compelling interest." (PageID.5602; *see also id.*, PageID.5610.)  It denied summary judgment on the "Fourth Amendment data and DBS storage claims," citing similar questions of fact.  (*Id.*, PageID.5610.)

25

As to BioTrust research, the district court held that five of nine Plaintiff-Children's parents had affirmatively consented, and two more had no claim because Defendants had honored their decision not to consent. (*Id.*, PageID.5589.) As to the two children born prior to the 2010 implementation of the opt-in consent process (DWL and MTL), the district court applied strict scrutiny and held that BioTrust research was neither compelling nor narrowly tailored, because it had public-health goals additional to newborn screening. (*Id.* at 29–30, PageID.5597-5598.) As such, the availability of DWL and MTL's rDBS and data for BioTrust research was deemed unconstitutional. (*Id.*)

Following cross-motions for reconsideration, the district court revised its holdings. Whereas its original decision upheld BioTrust research for the parents who consented, the district court changed course, holding that the consent prompt was insufficient to elicit "informed consent" to storage. (9/13/22 Order, p. 26, PageID.5836.) To reach this conclusion regarding the BioTrust's facilitation of *research*, the district court applied two Michigan statutes that are limited to *clinical* (non-research) pre-symptomatic genetic testing. (9/13/22 Order, pp. 16–17 (citing Mich. Comp. Laws §§ 333.17020, 333.17520).)

26

Seemingly on the basis of its BioTrust-specific holding regarding consent, the court also reversed its prior conclusions that (1) internal NBS use *does* satisfy strict scrutiny and (2) storage to facilitate NBS use *might* satisfy strict scrutiny.  In place of those conclusions, it stated:

> [A]s the Sixth Circuit emphasized, Defendants' posttesting conduct is not necessary to effectuate [NBS's] interest because "the health of the child is no longer at stake."  That is, after the DBS is tested, Defendants no longer need to test the DBS.  [*Id.* at 28 (citation omitted), PageID.5853.]

On October 20, 2022, the district court denied Defendants' motion for a certificate of appealability, which had challenged the applicability of the two Michigan statutes invoked in its prior opinion.  (10/20/22 Order, p. 5, PageID.5962.)  *Sua sponte*, the court granted yet more relief to Plaintiffs, concluding that the BioTrust consent forms were insufficient even as to research—not just as to storage, as it had previously held.  (*Id.* at 6, PageID.5963.)

### F.   The district court grants judgment to Plaintiffs on their Fourth Amendment claims

Finally, following a five-day bench trial, the district court held that the post-screening storage of Plaintiffs' rDBS and data violated the Fourth Amendment.  In so doing, it recast this Court's evaluation of the complaint (which alleged a profit-motivated *seizure*) into a legal

27

conclusion that a *search* must be found if informed consent was lacking. (7/31/23 Am. Op. & Order, p. 8, PageID.7001.)

Although the district court heard Defendants' unrebutted evidence regarding their programs, it nevertheless concluded that retention "raises concerns about unwarranted government intrusion into individual privacy." (*Id.* at 10, PageID.7005.) The district court supported its holding citing "legitimate questions about the duration of retention," (*id.*)—the very questions trial was intended to answer.

The district court declined to issue declaratory relief, confirming that relief was limited to Plaintiffs. (7/31/23 Am. Op. & Order, p. 26, PageID.7019; *see also id.* at 28, PageID.7021.) It issued an injunction requiring Defendants to mail Plaintiffs a request for instruction whether to retain, return, or destroy their rDBS and data. (*Id.* at 28–29, PageID.7021-7022.) Defendants mailed that notice on November 17, 2023. This appeal followed.

## SUMMARY OF ARGUMENT

Plaintiff-Parents alleged that post-screening storage of their children's rDBS and data threatens to result in "medical tests and/or medical procedures" and therefore violates their fundamental due-

process right to make medical care and treatment decisions on behalf of their children.  Plaintiff-Children also alleged that storage of rDBS represents an unconstitutional seizure.

This Court's prior opinion accepted as true Plaintiff-Parents' allegation regarding "medical procedures"—but discovery has revealed it to be untrue.  After the initial screen, no Defendant conducts or permits any activity that can be called "medical," as that term is contemplated by case law recognizing the relevant fundamental right. That right is intended to protect autonomous "medical" decision-making, bodily autonomy, and self-determination, but nothing of the sort is at risk.  Apart from screening, and absent case-specific consent, no one is tested, diagnosed, or otherwise involved by the challenged activities.

Even if the right applies, adequate consent processes were in place as to health research.  And, regardless of consent, strict scrutiny is satisfied when the foregoing privacy protections are measured against the value to public health served by the programs, as well as the articulable need for the quantity of rDBS and data that are stored.

Similarly, Plaintiffs' Fourth Amendment seizure claim fails because post-screening storage of rDBS does not implicate a possessory right in property. Even if retention of rDBS and data constitute a seizure, such a seizure is reasonable for the same basic reasons that inform the Fourteenth Amendment analysis.

## STANDARD OF REVIEW

This Court reviews de novo a district court's grant of summary judgment. *Cash-Darling v. Recycling Equip., Inc.*, 62 F.4th 969, 974 (6th Cir. 2023) (citing *Wheat v. Fifth Third Bank*, 785 F.3d 230, 236 (6th Cir. 2015)). Summary judgment is appropriate "'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). "'When evaluating a summary judgment motion, the reviewing court must construe the facts in the light most favorable to the non-movant.'" *Id.* (quoting *Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017)). In particular, this Court asks "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of

law." *Id.* (quoting *Doe v. Univ. of Ky.*, 971 F.3d 553, 557 (6th Cir. 2020)).

Relevant here, this Court's prior "decision 'on a motion to dismiss does not establish the law of the case for purposes of summary judgment, when the complaint has been supplemented by discovery.'" *Devlin v. Kalm*, 630 F. App'x 534, 539 (6th Cir. 2015) (quoting *McKenzie v. BellSouth Telecomm., Inc.*, 219 F.3d 508, 513 (6th Cir. 2000)); *see also Castro v. United States*, 540 U.S. 375, 384 (2003) (stating that law-of-the-case doctrine "simply expresses common judicial practice" and "does not limit the court's power" or "prohibit a court from disregarding an earlier holding in an appropriate case" (quotations and citation omitted)); *GMAC Mortg., LLC v. McKeever*, 651 F. App'x 332, 340 (6th Cir. 2016) (noting doctrine's inapplicability to pronouncements that were "assumed without decision" (quoting *Howe v. City of Akron*, 801 F.3d 718, 739 (6th Cir. 2015))).

## ARGUMENT

### I.    Neither the Newborn Screening Program nor the BioTrust violates Plaintiff-Parents' Fourteenth Amendment substantive due process rights.

Plaintiff-Parents allege that Defendants' public-health initiatives violate their Fourteenth Amendment right to direct the medical care of their children.

But neither of Defendants' two distinct programs—NBS or the BioTrust for Health—interferes with one's right to direct their children's *medical care*.  The post-screening programs are designed to have no bearing on medical care, let alone parental decision-making in that regard.  (*E.g.*, 2/2/23 TT, p. 44, PageID.6482.)  Plaintiffs would have this Court expand the right into new territory.

Regardless, the informed-consent procedures for research that began in 2010 were constitutionally sufficient, and the waiver of consent applicable to pre-May 2010 rDBS is constitutionally sufficient, too.

### A.    Defendants' post-screening storage and use of rDBS and data do not interfere with Plaintiff-Parents' right to direct their children's medical care.

Again, the initial withdrawal and screening of infant blood—which were concededly "medical" in nature—are no longer before this Court.  It is necessary to take stock of whether the remaining, distinct claims regarding *post-screening* storage and use of the rDBS and data sufficiently implicate Plaintiffs' right to direct their children's *medical care*.  Now that the record reflects the purposes and procedures of NBS and the BioTrust for Health, it is apparent that the fundamental right in question does not apply.

A parent's Fourteenth Amendment right to direct their child's medical treatment is the logical result of aggregating (1) an individual's right to make their own medical decisions and (2) a parent's right to the care and custody of their child.  *See Kanuszewski*, 927 F.3d at 418–19.  Relevant here, the right to make one's child's medical decisions invokes the right to bodily integrity and autonomy.  *Cruzan by Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 279 (1990).

Extending that fundamental right to these facts—mere analysis of *someone's* rDBS or data, severed from any individual's identity, medical

record, or medical decision-making—would be improper.  When screening is set aside, there remains no implication for Plaintiffs' children's medical records—let alone their *physical bodies*.  Defendants' activity does not comprise medical care of any of Plaintiff's children, it wrests no control from a parent, and it does not seek to draw any conclusions about anyone.  Although "whether to permit post-screening storage and use" might describe a *decision*, it is not a *medical* one implicating concepts like bodily integrity; concluding otherwise would expand the right beyond the scope of the interests it protects.[10]

And courts must exercise judicial restraint before breaking new ground in expanding the scope of what rights are "fundamental." *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992); *Rochin v. California*, 342 U.S. 165, 169 (1952).  This Court has acknowledged "the uniquely destructive potential of overextending substantive due process protection" and cautioned against translating any superficially articulable substantive due process claim into one resting on a

---

[10] In this regard, the non-medical character of Defendants' activities is analogous to de-identified data regarding a school district's test scores or county residents' de-identified income—potentially "private" information in the abstract, but not capable of affecting individuals.

fundamental right. *Seal v. Morgan*, 229 F.3d 567, 574–75 (6th Cir. 2000) (citing *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)); *see also Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2258, 2253 (2022) (confirming impropriety of "attempts to justify [a specific right] through appeals to a broader right to autonomy," particularly when specific right at issue is not demonstrably "deeply rooted in the Nation's history and traditions").

To invoke a fundamental right requires "a careful description of the asserted fundamental liberty interest." *L.W. by & through Williams v. Skrmetti*, 73 F.4th 408, 417 (6th Cir. 2023) (quotation omitted); *see also Glucksberg*, 521 U.S. at 722 ("[W]e have a tradition of carefully formulating the interest at stake in substantive-due-process cases."). No Supreme Court case law permits the inference that the uses alleged here offend substantive due process. *See, e.g.*, *Reno v. Flores*, 507 U.S. 292, 303 (1993) ("The mere novelty of . . . a claim is reason enough to doubt that 'substantive due process' sustains it."); *Kanuszewski*, 927 F.3d at 418 (noting that the Supreme Court has "never specifically defined the scope of a parent's right to direct her child's medical care" (quotation omitted)).

In a case analogous to this one, the Supreme Court, in rejecting
the plaintiffs' claim, carefully distinguished between *decision-making*
claims and *privacy* claims under the Fourteenth Amendment. *Whalen
v. Roe*, 429 U.S. 589 (1977). In so doing, it upheld a law that required
doctors to furnish the state with copies of patients' drug prescriptions.
*Id.* Relevant here, the Court assumed *arguendo* that "the statute
threatens to impair . . . [the plaintiffs'] interest in making important
[medical] decisions independently" by discouraging the prescription and
use of certain drugs. *Id.* at 600. Crucially, the contents of the
electronically stored data could have been revealed only upon the state's
violation of its own self-imposed security provisions. *Id.*

The Court rejected plaintiffs' attempt to conflate privacy and
decision-making, *see id.* at 589–90 & n.26, observing that "[t]here is no
support in the record . . . for an assumption that the security provisions
of the statute will be administered improperly," *id.* at 601. As a result,
"neither the immediate nor the threatened impact of the patient-
identification requirements . . . [was] sufficient to constitute an invasion
of any right or liberty protected by the Fourteenth Amendment." *Id.* at
603–04. Ultimately, the relevant question was whether the state's

activity had an effect on decision-making.  *See id.*  Because it did not, the Court held that the allegations were insufficient to invoke the claimed right.  *Id.*

In *Jenkins v. Rock Hill Local School District*, 513 F.3d 580, 590 (6th Cir. 2008), this Court recognized a similar shortcoming.  There, school staff retaliated against plaintiff-parents, leading to a court complaint for child neglect and an interview by a Child Services investigator.  Notwithstanding the *threat* to parental rights these proceedings posed—a threat absent here—this Court disagreed that the plaintiffs' fundamental right to direct the care of their child had been implicated, acknowledging that "[n]either [parent] lost care, custody, or control of her child nor the right to raise her child."  *Id.*

So too here.  Factfinding has failed to uncover any link between Defendants' activity and Plaintiffs' ability to make their children's medical decisions.  To date, Plaintiffs have not articulated even a theoretical impact on their fundamental right, such as the inference rejected in *Whalen.*  (*Accord* 7/29/21 Op. & Order, p. 19, PageID.5587 (acknowledging parents' testimony that their ability to direct their children's medical care had not been affected).)

37

Nor can Plaintiffs' claim be shoehorned into the fundamental right to bodily integrity, on which the right to make medical decisions is based in part. *See Cruzan*, 497 U.S. at 269. Cases recognizing violations of such a right in the context of experimentation uniformly address offenses *against the body itself*. *E.g.*, *Guertin v. State*, 912 F.3d 907, 919–21 & n.4 (6th Cir. 2019) (collecting "numerous cases involving government experiments on unknowing and unwilling patients," which involve "[i]nvoluntarily subjecting nonconsenting individuals to foreign substances").

The foregoing analysis is absent from the district court opinion. Instead, as a critical (but faulty) premise to its summary judgment decision, the district court held that "the Sixth Circuit's order require[d] [it] to apply strict scrutiny to any of Defendants' conduct that lacked informed consent under Michigan law." (9/13/22 Order, p. 7, PageID.5817; *see also* 7/31/23 Am. Op. & Order, p. 2 ("The Sixth Circuit already had its say: under the Fourteenth Amendment, *any conduct related to the blood spots and data* without informed consent is subject to strict scrutiny." (emphasis added)), PageID.6995.) In fact, this Court stated only that strict scrutiny was triggered *if* the truth of the

38

allegations in the complaint was assumed. *Kanuszewski*, 927 F.3d at 421.

If this Court had indeed held that strict scrutiny must apply in the absence of informed consent, that would deny Defendants their right to disprove the very allegations that purportedly triggered an informed-consent requirement. After all, in a motion to dismiss, *even the movant* takes the allegations as true. Yet the district court repeatedly declined to analyze the threshold issue: whether the evidence supported Plaintiffs' allegations. In fact, Plaintiffs offered no evidence creating—let alone resolving—a question of fact regarding medical decision-making.

The foregoing supports reversal solely by reference to summary-judgment standards of decision; but it also translates to Plaintiffs' failure to show an injury-in-fact—a prerequisite to Article III standing that persists throughout the life of a lawsuit. *See Wittman v. Personhuballah*, 578 U.S. 539, 543 (2016) (citations omitted); *see also United States v. $31,000.00 in U.S. Currency*, 774 F. App'x 288, 293 (6th Cir. 2019) (affirming that claimants lacked standing at summary-

judgment stage, notwithstanding prior decision that claimants had

standing at motion-to-dismiss stage).

In conclusion, this Court should not delay undertaking "a careful

description of the asserted fundamental liberty interest." *Williams*, 73

F.4th at 417 (quotation omitted).  Comparing the contours of that

interest against the record will reveal that Plaintiffs never established

an injury to their medical decision-making rights.  If anything remains

of Plaintiffs' claim after that, rational-basis review applies. *Does v.*

*Munoz*, 507 F.3d 961, 966 (6th Cir. 2007).

### B.    The BioTrust for Health's consent processes are constitutional.

The foregoing analysis obviates a need to analyze "informed

consent." *See Cruzan*, 497 U.S. at 269.  Regardless, the informed

consent sought for BioTrust research is constitutionally sufficient, as is

the waiver of informed consent that applies to rDBS collected before

May 2010.

### 1.    Compliance with state law is not dispositive of constitutionally adequate consent.

Michigan's consent procedures must be viewed through the lens of the Constitution; a proper inquiry does not include asking whether a state agency correctly applied state law.  The district court correctly observed that the scope of constitutionally sufficient informed consent is dictated by the relevant standard of care, and a plaintiff has the burden of proof.  (9/13/23 Order, pp. 15–16, PageID.5825-5826.)  *See, e.g.*, *Sanborn v. Zollman*, 40 F. App'x 916, 920 (6th Cir. 2002).  Yet the district court ultimately examined only whether a portion of Michigan's consent procedure conformed to an inapplicable state statute, rather than whether the complete consent procedure conformed to the standard of care embodied in the Common Rule.

In *Cruzan*, the plaintiffs challenged a state-law requirement that an incapacitated individuals' informed consent to withdraw life-sustaining treatment must be proved by "clear and convincing evidence."  497 U.S. at 280.  When pinning down the constitutional adequacy of a state's consent scheme, the Court noted that "[s]tate courts have available to them for decision a number of sources-state constitutions, statutes, and common law-which are not available to

us. . . . [T]he question is simply and starkly whether the United States Constitution prohibits [the state] from choosing the rule of decision which it did." *Id.* at 277, 280. The Court went on to evaluate the clear-and-convincing standard as it related to the state's interest and the finality of the decision, all through the lens of the liberty interest the plaintiffs invoked. *Id.* at 280–84.

Under *Cruzan*, then, the correct inquiry is limited to (1) identifying Michigan's consent scheme and (2) evaluating its constitutionality. But the district court instead searched state law for informed-consent standards and evaluated whether Defendants had complied with those laws. (*See* 9/13/22 Order, pp. 10–12, PageID.5820-5822; *id.* at 19 ("Simply put—under the Sixth Circuit's opinion remanding the case—if Defendants did not comply with Michigan's informed-consent statutes . . . . , then they violated Plaintiff-parents' substantive-due-process rights[.]"), PageID.5829; 10/20/22 Order, p. 8 (holding that adequacy of consent dictated exclusively by "Michigan law or 45 C.F.R. § 46.116"), PageID.5965.) This was not an inquiry into the constitutional sufficiency of consent, but rather a version of the arbitrary-and-capricious test, and an improper foray into state law.

## 2. The "opt-in" process that began in May 2010 is constitutionally adequate.

Five children's parents opted in to BioTrust research by signing a form indicating consent. (PageID.4307; PageID.4309; PageID.4313; PageID.4315; PageID.4317). Each form indicated, on its face, that opting in was voluntary. (*Id.*) Each provided information about the nature of the consent, and each directed the signatory to an additional writing containing more detail. (*Id.*) Together, the writings indicated: (1) that the child's rDBS will be stored, why, and for how long; (2) the right to direct destruction of rDBS; (3) the nature of any risk, and its degree; and (4) further information about BioTrust health research. (*Id.*; Your Baby's Blood Spots Pamphlet, PageID.4278-4279; Shah Dep. Tr., pp. 32–33, PageID.2435; Lyon-Callo Dep. Tr., pp. 24–25, PageID.4355-4356.) These materials, taken together, show that Plaintiffs who opted into health research did so on an informed basis.

"It is a long-standing rule of law that one is presumed to have read what he signs." *Arch of Kentucky, Inc. v. Dir., Off. of Workers' Comp. Programs*, 556 F.3d 472, 480 (6th Cir. 2009) (citations omitted). Relevant here, this presumption applies "not only to the contents of the signed form but also to its attachments, especially when those

43

attachments are specifically referenced in the form." *Id.*; *see also Cruzan*, 497 U.S. at 284 (noting appropriateness of parol evidence rule in consent context).

At first, the district court held Plaintiffs to their decision to sign a document that incorporated by reference the pamphlet containing the rest of the relevant information.  (7/29/21 Op. & Order, pp. 20–21 ("[E]ven if the hospital employee did not adequately explain the process, the form instructs new parents to ask for a pamphlet before signing the form.  However, Plaintiffs still chose to sign the form."), PageID.5588-5589.)  Puzzlingly, the district court later disregarded the pamphlet because, signature aside, there was no proof Plaintiffs had "*actually read*" the pamphlet, and because Plaintiffs had no "opportunity to confirm their understanding of the [pamphlet]'s contents."  (9/13/22 Order, p. 27, PageID.5837.)  The first finding is not germane to whether the consent materials were insufficient as a matter of law.  The second observation, as borne out by the record, is inaccurate.  (*See, e.g.,* PageID.4278).

Again, for post-May 2010 births, this was an *opt-in* process.  *See Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 312 (2012)

44

("[T]he difference between opt-out and opt-in schemes is important.").
Any parent's confusion, or simple unreadiness, would have resulted in a
decision not to sign, especially given the reassurance of "no penalty."
Nothing is alleged to have affirmatively misled a plaintiff toward
signing or suggested an incentive to sign.  At bottom, nothing in the
record permits doubt that consent was willful, knowing, and voluntary.

Separately, the district court held that the consent materials were
inadequate for failure to comply with Michigan Compiled Laws
§§ 333.17020 and 333.17520.  (9/13/22 Order, pp. 16–17, PageID.5826-
5827.)  This was error; each statute is limited to analyses performed
"for clinical purposes" and expressly excludes "research that is
conducted pursuant to the federal common rule."  Mich. Comp. Laws
§§ 333.17020(8)(b), (9) & 333.17520(8)(b), (9).  As to health research,
Michigan Compiled Laws § 333.5431(7)(b) incorporates the federal
Common Rule as the source for standards Defendants must follow "to
protect human subjects from research risks."  As a binding regulation,

45

the Common Rule represents the prevailing ethical standard of care for

health research.  (*See* 2/2/23 TT, p. 33, PageID.6471.)[11]

To the extent the Common Rule requires informed consent, its

strictures are met:

- Section 116(a)(1) requires an indication that research
  is involved, as well as its purpose and duration.  The
  consent materials indicate that research will occur, as
  well as the storage term.  (*E.g.*, PageID.4309, 4278.)
  They explain that research occurs only "for studies to
  better understand diseases or improve the public's
  health" and provide illustrative examples.
  (PageID.4279.)

- Section 116(a)(2) requires a description of any
  reasonably foreseeable risks.  As explained above,
  there are none; this is the premise behind the waiver of
  informed consent.  Nevertheless, the materials express
  the minimal risk.  (PageID.4278.)

- Section 116(a)(3) requires a description of any benefits
  to the subject or to others.  The materials state that
  research "may not directly help you, your child or your
  family" but provides indirect benefits to research that
  "aims to improve the health of communities."
  (PageID.4278.)

---

[11] Indeed, the district court suggested an even lower standard of
constitutionally sufficient consent, albeit in the clinical context.
(9/13/22 Order, p. 15 (citing *Wlosinski v. Cohn*, 713 N.W.2d 16 (Mich.
Ct. App. 2005), for proposition that Michigan's doctrine of informed
consent requires notice of "risks and consequences of a medical
procedure"), PageID.5825.)

- Section 116(a)(4) requires a disclosure of alternative courses of treatment and therefore does not apply.

- Section 116(a)(5) requires a description of how confidentiality is maintained.  The materials contain a heading entitled, "What steps are taken to protect privacy?" outlining de-identified storage and the HHS Certificate of Confidentiality.  (PageID.4278.)  They also explain steps taken to withhold identifying information from researchers.  (PageID.4279.)

- Section 116(a)(6) dictates compensation information for research "involving more than minimal risk," and is therefore inapplicable; regardless, the materials state that opting in entails no compensation.  (PageID.4279.)

- In pertinent part, § 116(a)(7) requires a contact for questions, which is provided.  (PageID.4278.)

- Finally, § 116(a)(8) requires statements of voluntariness, non-penalty for declining to consent, and an ability to discontinue participation at any time.  The materials contain these criteria.  (PageID.4278; *see also* PageID.4319.)

Accordingly, under the opt-in scheme, all potentially relevant information is provided to parents, the voluntariness of opting in is assured, and parents' understanding is memorialized by a tried-and-true signature requirement.

### 3. Waiving consent for health research conducted on rDBS collected prior to May 1, 2010, is constitutionally adequate.

The foregoing describes the BioTrust's "opt-in" consent procedure, effective May 1, 2010.  For births occurring *prior* to that date, the minimal risk presented by de-identified research, coupled with the impracticability of seeking opt-in consent retroactively, permitted the IRB to waive consent under the federal Common Rule.  (45 C.F.R. § 46.116(d) (2005), PageID.4780; *see also* Lyon-Callo Dep. Tr., p. 52, PageID.4383.)  Again, Michigan law incorporates the Common Rule by reference, including the IRB's judgment of when its waiver provision should apply.

The basis for applying the Common Rule's "minimal risk" rationale essentially comprises a restatement of the analysis of Part I.B, *supra*, which explains why health research is no threat to due-process:  No medical care, treatment, or diagnosis is possible, and, related, no reidentification is possible (let alone contemplated).

Thus, under both state law and the federal law it incorporates by reference, consent properly was waived by the IRB regarding pre-2010 rDBS and data.  This constitutional procedure reflects the Michigan

Legislature's judgment that the federal Common Rule represents the prevailing ethical standards in the field and is sufficient to balance the State's interest in protecting and advancing public health against the risks posed by research.  The flexibility built into the regulation permitted recognition of the minimal risk attendant to de-identified health research.  Based on the totality of the circumstances, the existence of an accessible opt-out procedure was constitutionally sufficient.

### C.  Defendants' programs do not violate any of Plaintiff-Parents' substantive due process rights, even under strict scrutiny.

Even assuming Defendants' programs implicate Plaintiff-Parents' substantive due process right to direct the medical care of their children, the programs survive strict scrutiny.

A court cannot declare that an imposition on one's fundamental right violates the Fourteenth Amendment before "balancing [the plaintiff's] liberty interests against the relevant state interests." *Cruzan*, 497 U.S. at 279.  Here, that balancing entails rational-basis review, but each of Defendants' programs satisfies strict scrutiny, too.

Strict scrutiny "requires the Government to prove that the [action] furthers a compelling interest and is narrowly tailored to achieve that interest." *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011) (quotation omitted).  Defendants discuss each of the distinct programs in turn.

### 1.    NBS's post-screening activity satisfies strict scrutiny.

In operating NBS, the compelling nature of Defendants' interest in retaining rDBS and data is difficult to overstate.  In particular, states have a compelling interest in "safeguarding the . . . well-being of a minor." *Globe Newspaper Co. v. Superior Court for Norfolk County*, 457 U.S. 596, 607–08 (1982).  Defendants have a compelling interest in protecting citizens' lives and minimizing their suffering, which they accomplish here by performing analyses needed to empower parents to seek diagnoses and treatment.[12]

---

[12] The district court's decisions were animated by its belief that NBS has "eugenic ends."  (7/31/23 Am. Op. & Order, p. 3 n.3, PageID.6996.) But NBS seeks to *preserve* the lives of those with disorders.  The accusation that NBS is engaged in eugenics is palpably incorrect.

50

And if something is worth doing, it is worth doing *well*.  Post-screening retention and use is necessary to maintain and improve the NBS program.  (*E.g.*, Seeterlin Decl. ¶¶ 4, 8, PageID.4322, 4323-4324.)  The retention of rDBS and data subsequent to the initial screen directly furthers this compelling interest as it relates to Michigan-born infants.  (*E.g.*, 2/1/23 TT, p. 125, PageID.6406 ("We use [rDBS] for calibration, quality control, method validations.  We use them for investigational purposes for false negatives[.]"); *id.* at 131–32, PageID.6412-6413 ("Being able to refine the cutoffs [is] going to help all the future population[.]").)

The district court initially agreed, stating that Defendants' post-screening activities "to expand and strengthen the newborn screening program . . . advance[] a compelling state interest."  (7/29/21 Op. & Order, p. 28, PageID.5596.)  And this Court has already opined, albeit in dicta, that a "program" like NBS may survive strict scrutiny if it has "purely benevolent motives." *Kanuszewski*, 927 F.3d at 419–20.

Furthermore, the Newborn Screening Program is narrowly tailored with respect to both use and storage.  Notably, the narrow-tailoring standard considers not only whether the program furthers its

interest in a targeted way, but also the extent to which it incorporates harm-reduction measures. *See United States v. Brandon*, 158 F.3d 947, 960 (6th Cir. 1998) (holding that narrow tailoring "will turn on whether it is the least restrictive and least harmful means of satisfying the government's goal").

Crucially, Defendants' internal efforts to maintain and improve NBS assiduously avoid harm—reputational, medical, or otherwise—to any parent or child.  Defendants never re-identify rDBS for programmatic use, they use only data necessary to the task at hand, and conclusions drawn from those tasks are kept and applied internally (and are untethered to any individual besides).  The same is true of storage; rDBS are stored in de-identified form and procedurally protected from re-identification.  Finally, destruction of rDBS may be requested at any time.

In addition to the impossibility of non-speculative harm, NBS's use and storage of rDBS and data are as limited as needs permit.  The district court correctly acknowledged that NBS's post-screening use of rDBS and data "focuses exclusively on improving accuracy with test results or discovering new ways to identify life-threatening conditions."

(7/29/21 Op. & Order, p. 28, PageID.5596.)  Moreover, adult or synthetic blood spots cannot be used for this purpose.  (*Id.* at 32, PageID.5600; Seeterlin Supp. Decl. ¶ 4, PageID.5529.)  Due to the "needle in a haystack" nature of specimens for particularly rare diseases—which continue to be added to the NBS screening panel—Defendants have established why even the current repository is inadequate for all purposes.  Indeed, sharp restrictions on the availability of rDBS and data for NBS purposes would significantly undermine NBS, and screening programs nationwide.  *Cruzan*, 497 U.S. at 279 (noting that "dramatic consequences" of result urged by plaintiff should "inform the inquiry").  Finally, if NBS's quality-improvement activities were restricted to only rDBS from individuals who opted into BioTrust research, that would lead to underrepresentation of certain groups, (*see* 2/2/23 TT, p. 94, PageID.6532), frustrating the need for a demographically representative sample population.  Thus, retention of all rDBS and data, for purposes specific to NBS, furthers the State's compelling interest by the least harmful and least restrictive means available.

The district court purported to consider Defendants' argument, but it abandoned its analysis.  Despite first acknowledging Defendants' compelling interest in "improving accuracy with test results or discovering new ways to identify life-threatening conditions," (7/29/21 Op. & Order, p. 28, PageID.5596), the district court ultimately rested its scope-of-storage analysis on *only one* of Defendants' uses for rDBS and data: to conduct annual testing of 29 laboratory instruments.  (*Id.* at 33, PageID.5601.)

As explained, Defendants' interests in newborn screening—improving the program's accuracy and precision, *as well as* discovering and implementing new ways to identify life-threating conditions—dictate Defendants' storage scheme.   The district court erred by abandoning this inquiry, and this Court should reverse.

### 2.    The BioTrust for Health satisfies strict scrutiny.

For a subset of the same reasons, the BioTrust for Health satisfies strict scrutiny.

Although a state's interest in public health "is at its zenith when the life of the child is at stake," *Kanuszewski*, 927 F.3d at 419, the improvement of public health is a "compelling purpose" even absent

acute life-or-death situations. *E.g.*, *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 613 (6th Cir. 2020); *see Regents of Univ. of California v. Bakke*, 438 U.S. 265, 310 (1978).

As set forth above, the BioTrust for Health provides de-identified rDBS, de-identified data, or both, to third-party researchers working to promote the public health. (MDHHS APF 114, PageID.4266.) Although not its exclusive purpose, BioTrust research frequently is the source of knowledge that leads to the expansion or improvement of newborn screening. (Lyon-Callo Dep. Tr., p. 60, PageID.4391; NBS & BioTrust FAQs, PageID.2187; *see also* MDHHS APF 114, PageID.4269 (noting "vast potential in future research" into rDBS associated with NBS screening results).) It therefore shares, in part, the compelling purpose motivating NBS. Reciprocally, NBS would be hamstrung without it.

Other BioTrust research is no less compelling.[13] It occurs "only . . . for studies to better understand diseases or improve the

---

[13] Below, the district court held that BioTrust research could never be compelling "[t]o the extent that research is conducted for public health purposes not directly connected to the care of the newborn children." (7/29/21 Op. & Order, p. 29, PageID.5597.) Defendants are aware of no legal reason why two distinct programs must share identical compelling purposes.

public's health," (Your Baby's Blood Spots Pamphlet, PageID.4279),
such as those investigating "prenatal, childhood or adult-onset
disorders," (MDHHS APF 114, PageID.4266; Lyon-Callo Dep. Tr., p. 59,
PageID.4390; Shah Dep. Tr., pp. 35–36, PageID.2436).  Research
facilitated by the BioTrust has contributed to advancements in the
study of cancers and exposure to environmental carcinogens and
contaminants.  (*See* NBS & BioTrust FAQs, PageID.2187.)

Notably, profit is *not* one of the BioTrust's purposes; although it
charges a fee, the fee results in only a 20% recoupment of costs and is
not "profit."  (7/29/21 Op. & Order, p. 31 n.11, PageID.5599 (*citing*
PageID.3280, 3327, 2094, 2107, 2168).)

The BioTrust for Health is also narrowly tailored.  Again,
Defendants have taken all possible measures to minimize the risk of
effecting "medical care" through, *e.g.*, some combination of diagnosis
and re-identification.  Prospective projects seeking to access rDBS or
data are subject to close review for scientific rigor, significance to
medical science and public health, human subjects' protections, and
ethical standards.  (MDHHS APF 114, PageID.4266.)  "Data . . . will
only be linked to DBS and released if the data is de-identified or

accompanied by written informed consent." (*Id.*, PageID.4267.)

Research partners must sign data and materials use agreements

limiting the scope of use and acknowledging lack of ownership and

dispositional authority. (Lyon-Callo Dep. Tr., p. 46, PageID.4378.)

Furthermore, "DBS will not be released for research using whole

genome or whole exome sequencing technology unless specific informed

consent is obtained." (*Id.*, PageID.4268.)

For these reasons, the BioTrust for Health is narrowly tailored to

advance its compelling interests in a manner that is least intrusive to

the alleged right to direct one's child's medical care.

## II.    Neither the Newborn Screening Program nor the BioTrust for Health effected an unconstitutional seizure of Plaintiffs or their property.

Plaintiff's Fourth Amendment seizure claim is not premised on

"medical care or treatment." But this claim has its own fundamental

flaw: It does not describe a "seizure" of the person or their property. No

seizure occurred because Plaintiffs have no possessory interest in the

rDBS or data their complaint alleges should have been "destroyed."

(Am. Compl. ¶ 113, PageID.328.) Even if a seizure occurred, the same

basic facts set forth in Part I, *supra*, render that seizure reasonable; and

57

even if a "search" claim is grafted onto the complaint, no unreasonable

search occurred for much the same reasons.

### A.    Defendants' post-screening storage of rDBS and data is not a "seizure."

A seizure is a question of tangible freedom—freedom of movement,

or freedom of disposition over one's property.  A seizure of a *person*

occurs when government action causes "a meaningful interference with

[a person's] freedom of movement."  *Skinner v. Ry. Lab. Executives'*

*Ass'n*, 489 U.S. 602, 616 (1989) (citations omitted).  A seizure of *property*

occurs "when there is some meaningful interference with an individual's

possessory interests in that property."  *United States v. Jacobsen*, 466

U.S. 109, 113 (1984).

Plaintiffs' amended complaint alleged that rDBS were

unconstitutionally seized.  (Am. Compl. ¶ 112, PageID.328.)  Whereas a

challenge to the *initial* blood draw, and testing of that blood, "depend[s]

antecedently upon seizures of 'persons,' " *Schmerber v. California*, 384

U.S. 757, 767 (1966), the alleged seizure here arose at the moment the

rDBS and data became "leftover" from the NBS program:  Plaintiffs

alleged a seizure occurred precisely when Defendants "caus[ed] the

leftover blood from the Newborn Screening Program to be not destroyed but instead seized and stored indefinitely by the Michigan BioTrust for Health [*sic*; BioBank][.]" (*Id.* ¶ 113, PageID.328; *see also id.* ¶ 111, PageID.327-328.)

Of course, there was no seizure of Plaintiffs' persons. They allege no restriction on their movement, and recognizing a seizure here would effectively permit a "person" to be in two places at once. This claim is properly analyzed in terms of personal property.

But Plaintiffs never supported their implied claim to a possessory interest in property. The burden rests on the plaintiff to establish that interest, *see Rakas v. Illinois*, 439 U.S. 128, 143 (1978), and it must be "possessory," *Jacobsen*, 466 U.S. at 113. *See* U.S. Const. amend. IV (extending security to "their . . . effects"). Property interests "are not created by the Constitution," but rather "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). "The Supreme Court has only applied the 'meaningful interference with possessory interests' definition of seizure to cases where there is no debate that the challenged act is one of

taking property away from an individual and the issue is whether that act of taking property away constitutes a meaningful interference with possessory interests." *Fox v. Van Oosterum*, 176 F.3d 342, 351 (6th Cir. 1999).

Plaintiffs offered no basis for extending the definition of one's "effects" to cover an item that, according to them, Defendants should have destroyed. (Am. Compl. ¶ 113, PageID.328; *see also id.* ¶ 10, PageID.302; *id.* ¶ 14, PageID.304.)[14] To date, Plaintiffs have not acknowledged their burden to establish a property interest. (*See, e.g.*, Pls.' Concluding Merits Br., PageID.6795.) This is fatal. *Rakas*, 439 U.S. at 148. On this point, the district court improperly placed the burden on Defendants, faulting them for failing to *disprove* a property interest. (7/29/21 Op. & Order, p. 36, PageID.5604.)

Accordingly, there having been no meaningful interference with Plaintiffs' property interests or their freedom of movement, no seizure has been established.

---

[14] Although destruction of property can be an appropriate remedy for a Fourth Amendment claim, it is appropriate when it vindicates an interest in *privacy*, not *possession*. *E.g.*, *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1174 (9th Cir. 2010) (en banc).

**B.    If a seizure occurred, it was reasonable.**

The Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]"  U.S. Const. amend. IV.  The constitutionality (*i.e.*, the reasonableness) of a seizure turns upon "a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty."  *Brown v. Texas,* 443 U.S. 47, 50–51 (1979).

Assuming Plaintiffs *do* have some property interest in the rDBS or data, this interest is minimal, as is the alleged restraint on that interest.  Again, Plaintiffs alleged the Defendants should have taken the initiative to destroy their rDBS after the initial screen, which is inconsistent with a possessory interest in property.

Further, any nominal possessory interest in rDBS or data, and the minimal intrusion on that interest, is far outweighed by the State's objective in furthering its interests in NBS and public health.  *Skinner*, 489 U.S. at 619; *United States v. Sharpe*, 470 U.S. 675, 685 (1985).  Storage occurs to facilitate NBS; BioTrust research occurs merely to

61

make use of storage that already occurs.  (2/1/23 TT, pp. 15–16, PageID.6296-6297.)  Michigan's newborns are best served by a larger repository of rDBS and data.  (*See* Part I.C.1, *supra*.)  Accordingly, there is no narrower form or scope of storage that would not frustrate NBS's public health goals in newborn screening.  *Skinner*, 489 U.S. at 623.

At bottom, "in the present context," imposing Plaintiff's suggested warrant requirement "would add little to the assurances of certainty and regularity already afforded" by Defendants' procedures, "while significantly hindering [or] frustrating" Defendants' objectives.  *Id.* at 624.  Any seizure was reasonable.

### C.    Plaintiffs have not alleged a search, but even if they had, none occurred, or it was reasonable.

#### 1.    Plaintiffs cannot maintain a "search" claim regarding post-screening storage, as no such claim appears in the complaint.

Plaintiffs' Count IV exclusively alleges that Defendants effected a seizure—not a search—by retaining rDBS after screening (Am. Compl. ¶¶ 108–117, PageID.327-329.)

The relevant Count IV ("indefinite seizure and storage") alleges no search, and is amenable only to a seizure.  (*Id.* ¶ 112 ("Defendants'

actions . . . deprived the Infants of their right to be free from unlawful and ongoing seizures[.]"), PageID.328.)  For the majority of this case's lifespan, the courts recognized this claim's boundaries.  (*E.g.*, 7/29/21 Op. & Order, p. 2, PageID.5570; *id.* at 35 ("The [Fourth Amendment claim involves . . . Plaintiff-children's right to be free from unreasonable seizures[.]"), PageID.5603; *id.* at 36 ("Plaintiffs articulate two unconstitutional seizure theories."), PageID.5604.)  *See also Kanuszewski*, 927 F.3d at 425 ("[W]hether Plaintiffs consented . . . will also affect whether there is an ongoing seizure[.]"); *id.* at 424 (positing that, "if drawing and screening the blood was constitutional, it may still have become an illegal seizure").  Plaintiffs cannot, therefore, maintain a search claim that was never pleaded; the history of the case confirms that Defendants were not on notice as to the need to defend against any such claim.

## 2.    Defendants' post-screening storage and use of rDBS and data do not effect a "search."

Plaintiffs' non-pleaded Fourth Amendment search claim presents a novel but simple issue: whether an alleged search that is *completely*

*divorced* from an identifiable individual can be a "search" that threatens their privacy.  It cannot.

"A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *Jacobsen*, 466 U.S. at 113.  In other words, an infringement is one that frustrates a "legitimate expectation that information . . . will *remain private*." *Illinois v. Caballes*, 543 U.S. 405, 410 (2005) (emphasis added).  When an alleged search poses no danger of revealing anything an individual holds private, it is not a search.  *E.g.*, *United States v. Place*, 462 U.S. 696, 707 (1983) (use of trained drug-sniffing dog was not a Fourth Amendment "search" because its only possible revelation was the presence or absence of narcotics); *Skinner*, 489 U.S. at 616 (noting that chemical analysis of blood for evidentiary purposes invades one's privacy because it "can reveal a host of private medical facts *about an [individual]*, including whether he or she is epileptic, pregnant, or diabetic" (emphasis added)).

As explained above, Defendants' post-screening activities do not reveal facts *about an individual*.  The district court reached a contrary result—but only by disregarding this Court's holding that speculative

64

fears of re-identification and discrimination do not describe an injury-in-fact. *Kanuszewski*, 927 F.3d at 410. (*See* 7/31/23 Am. Op. & Order, pp. 17–18 (citing "potential for misuse . . . or abuse"), PageID.7010-7011; *id.* at 20 (deeming material limitations on use of rDBS and data irrelevant absent "a guarantee of future practice"), PageID.7013.)

### 3.    Any search effected by Defendants' programs was reasonable.

Much like the reasonableness test applicable to a seizure, "the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *United States v. Knights*, 534 U.S. 112, 118–19 (2001) (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)). This balancing test considers the totality of the circumstances, *Sullinger v. Sullinger*, 849 F. App'x 513, 522 (6th Cir. 2021), and "[t]he government interest must outweigh the degree to which the search invades an individual's legitimate expectations of privacy." *Maryland v. King*, 569 U.S. 435, 461 (2013). As such, many of the same considerations relevant to strict scrutiny will be as relevant here, if not

more so. *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 663 (1995) ("We have repeatedly refused to declare that only the 'least intrusive' search practicable can be reasonable under the Fourth Amendment."); *Sharpe*, 470 U.S. at 687.

First, the magnitude of the intrusion felt by a plaintiff is relevant. *Winston v. Lee*, 470 U.S. 753, 761 (1985) ("A crucial factor . . . is the extent to which the procedure may threaten the safety or health of the individual." (cleaned up)); *Place*, 462 U.S. 696; *Farm Labor Org. Comm'n v. Ohio State Hwy. Patrol*, 308 F.3d 523, 546 (6th Cir. 2002) (seizure of green cards deemed unreasonable in part because of their "significant role in [people's] daily lives"). Here, collection of rDBS is not before the Court, so there is no relevant physical intrusion. Nor is there an intrusion on Plaintiffs' privacy or their medical decision-making for reasons already stated.

In addition to the layers of confidentiality agreements, approvals, and vetting set forth above, the BioTrust for Health, in particular, takes additional steps to ensure that an individual cannot be identified. One such procedure—called "uniqueness testing"—precludes release of any de-identified rDBS and data to a third party unless there are at least

five other individuals who match each and every demographic data point requested by the researcher.  (*See* 2/3/23 TT, pp. 5–6, PageID.6600-6601.)  Another safeguard entails never giving out data points, such as a mother's age, that are amenable to grouping.  (Lyon-Callo Dep. Tr., pp. 50–51 ("You wouldn't get a blood spot that says, you know, 'This is from a 35-year-old mother from,' you know, '2004 births at zip code such-and-such.'  [T]hat would not happen."), PageID.4381-4382.)

The fact of storage—as opposed to use—is properly addressed as a seizure, *supra*, but in any event the relevant privacy safeguards built into the BioBank, as well as NBS or BioTrust use of rDBS or data, reflect the reasonableness of any search.  *Acton*, 515 U.S. at 658–59.

It is also relevant whether the plaintiff manifested an expectation of privacy.  *California v. Ciraolo*, 476 U.S. 207, 211 (1986); *see also Garcia v. Dykstra*, 260 F. App'x 887, 897 (6th Cir. 2008) (noting actions that "demonstrated" an expectation of privacy).  Here, no plaintiff sought to destroy their rDBS once they claimed to learn of that option.

The State's purpose in the alleged "search," and what is required to effect that purpose, are also key to reasonableness.  *Sharpe*, 470 U.S.

at 685; *see also Place*, 462 U.S. at 709–10; *United States v. Montoya de Hernandez*, 473 U.S. 531, 542 (1985) (asking whether challenged action was "reasonably related in scope to the circumstances which justified it initially"); *Schmerber*, 384 U.S. at 770.  As already elaborated, Defendants' purpose in using rDBS and data internal to NBS is to improve and expand that program.  Their purpose in storing that rDBS and data is identical.  Their purpose in operating the BioTrust for Health is similar: to facilitate invaluable public-health research, much of which bolsters NBS itself.

Finally, it is relevant that Defendants have no law-enforcement purpose.  *Acton*, 515 U.S. at 658; *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987); *Skinner*, 489 U.S. at 621.  On this point, the record is clear and unequivocal:  If rDBS are ever furnished to law enforcement in connection with a crime, that occurs *exclusively* (1) to identify victims and (2) with consent.  (2/3/23 TT, p. 13, PageID.6608.)  Not only will Defendants not *cooperate* with efforts at perpetrator identification; they will actively *resist* such efforts.  (*E.g.*, NBS Pamphlet ("The BioTrust can use this Certificate to legally refuse to disclose information that may identify you in any federal, state, or local civil, *criminal*,

administrative, legislative, or other proceedings, for example, if there is a court subpoena. The BioTrust *will use* the Certificate to resist any demands for information that would identify you[.]" (emphases added)), PageID.4278; *see id.* (establishing exception for consent); Shah Dep. Tr., pp. 38–40, PageID.2437; 2/3/23 TT, pp. 6–7, PageID.6601-6602; see also 6/23/09 App. for Designation as Medical Research Project, p. 3 (seeking most secure legal protection available under Michigan's Public Health Code in part to frustrate "requests [for rDBS] that are contrary to the intent of storage," such as "development of crime agency DNA libraries or insurance eligibility and rate setting"), PageID.4273.))

Despite this, the district court erroneously found that Defendants store rDBS with the intent "to identify victims *and suspects* of crimes." (7/31/23 Am. Op. & Order, p.4 (emphasis added) (citing PageID.6296–97), ECF No. 263, PageID.6997; *see id.* at 5 (same), PageID.6998; *id.* at 10–11, PageID.7003-7004; *see also id.* at 11 (applying Fourth Amendment "dual-purpose" doctrine), PageID.7004.) But not a single one of the district court's citations to the record supports an intent to facilitate perpetrator identification. Most of its record citations plainly refer to other, unrelated assertions made in the same breath. (*E.g.*, *id.*

at 4 (citing PageID.6296–97), PageID.6997.)  Others refute the district

court's conclusions outright.  (*Id.* at 10–11 (citing PageID.6608-6609),

PageID.7003-7004.)  Two citations merit discussion:

- The court stated that MDHHS can reidentify rDBS, "*which it has done . . .* under court order." (*Id.* at 4 (emphasis added) (citing 2/1/23 TT, pp. 53–54, PageID.6334–35), PageID.6997.)

  - **Response on appeal:** The cited portion of the transcript reflects the witness's response to a *hypothetical* court order; unless judicially "compelled," the witness would "refuse" to comply.  (2/1/23 TT, p. 54, PageID.6335.)

- The court stated that "Michigan indefinitely stores babies' blood . . . to identify victims and suspects of crimes[.]" (7/31/23 Am. Op. & Order, p. 5 (citing Subpoenas & Warrants, PageID.2180-2185), PageID.6998.)

  - **Response on appeal:** The citation points to six purported law-enforcement subpoenas or search warrants.  (PageID.2180-2185.)  Each is heavily redacted.  With the exception of the two search warrants—which explicitly seek *victim* identification— the documents' purpose is inscrutable.  (*Id.*) Defendants' response to these documents is not in evidence.  These documents were admitted at trial as Plaintiffs' Exhibit 30 [App'x, p. 46], and the only witness to whom they were shown denied personal knowledge.  (1/31/23 TT, p. 117, PageID.6245.)

At bottom, none of these record materials settles a genuine dispute as to

a material fact in Plaintiffs' favor.  To the contrary, they are consistent

with Defendants' proofs that suspect identification neither occurs nor is intended.

For these reasons, any post-screening "search" of rDBS or data is reasonable. Its intrusion is vanishingly minimal at best; its objectives are benevolent and not suspicion-based; and its benefit to public health is both vast and proven.

## CONCLUSION AND RELIEF REQUESTED

Defendants ask this Court to vacate the district court's decisions granting judgment to Plaintiffs and remand for entry of an order granting judgment to Defendants or, in the alternative, to remand this case for further proceedings.

Respectfully submitted,

*/s/ Daniel J. Ping* (P81482)
Aaron W. Levin (P81310)
Assistant Attorneys General
Counsel of Record
Attorneys for Defendants-Appellants
State Defendants
Michigan Dep't of Attorney General
Corporate Oversight Division
P.O. Box 30736
Lansing, MI 48909
(517) 335-7632

Jeremy C. Kennedy (P64821)
Jerold Lax (P16470)
Pear Sperling Eggan & Daniels, P.C.
24 Frank Lloyd Wright Drive
Ste. D-2000
Ann Arbor, Michigan 48105
Counsel for Defendants-Appellants
Neonatal BioBank & Christoper Krause
(734) 665-4441

Dated:  November 27, 2023

# CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the part of the document exempted by Federal Rule of Appellate Procedure 32(f), this brief contains no more than 13,000 words.  This document contains 12,993 words.

2.    This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word 2013 in 14-point Century Schoolbook.

/s/ Daniel J. Ping (P81482)
Assistant Attorney General
Counsel of Record
Attorney for Defendants-Appellants
State Defendants
Michigan Dep't of Attorney General
Corporate Oversight Division
P.O. Box 30736
Lansing, MI 48909
(517) 335-7632

# CERTIFICATE OF SERVICE

I certify that on November 27, 2023, the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

/s/ Daniel J. Ping (P81482)
Assistant Attorney General
Counsel of Record
Attorney for Defendants-Appellants
State Defendants
Michigan Dep't of Attorney General
Corporate Oversight Division
P.O. Box 30736
Lansing, MI 48909
(517) 335-7632

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Defendants-Appellants, per Sixth Circuit Rule 28(a), 28(a)(1)-(2),

30(b), hereby designated the following portions of the record on appeal:

| Description of Entry | Date | Record Entry No. | Page ID No. Range |
|---|---|---|---|
| Am. Compl. | 4/30/2018 | R. 26 | 300-333 |
| State Defs.' 5/29/18 Mot. To Dismiss | 5/29/2018 | R. 32 | 477-532 |
| 8/8/18 Op. & Order | 8/8/2018 | R. 50 | 825-846 |
| Pls.' 2/22/21 Mot. For Summary Judgment | 2/22/2021 | R. 135 | 1895-1950 |
| Subpoenas & Warrants | 2/22/2021 | R. 135-12 | 2180-2185 |
| NBS & BioTrust FAQs | 2/22/2021 | R. 135-13 | 2186-2188 |
| Shah Dep. Tr. | 2/22/2021 | R. 135-42 | 2427-2441 |
| State Defs.' 4/5/21 Mot. For Summary Judgment | 4/5/2021 | R. 147 | 4178-4241 |
| NBS Q&A | 4/5/2021 | R.147-2 | 4242-4244 |
| NBS Pamphlet | 4/5/2021 | R. 147-3 | 4245-4247 |
| MDHHS APF 111 | 4/5/2021 | R. 147-4 | 4248-4250 |
| rDBS Directive | 4/5/2021 | R. 147-5 | 4251-4252 |
| MDHHS APF 114 | 4/5/2021 | R. 147-8 | 4264-4270 |
| App. for Designation as Research Project | 4/5/2021 | R. 147-9 | 4271-4276 |

| | | | |
|---|---|---|---|
| Your Baby's Blood Spots Pamphlet | 4/5/2021 | R. 147-10 | 4277-4279 |
| BioTrust Consent Options | 4/5/2021 | R. 147-12 | 4283-4285 |
| BioTrust Consent Form | 4/5/2021 | R. 147-13 | 4286-4287 |
| IRB Approval | 4/5/2021 | R. 147-14 | 4288-4305 |
| 4/22/13 BioTrust rDBS Directive | 4/5/2021 | R. 147-15 | 4306-4307 |
| 2/10/16 BioTrust rDBS Directive | 4/5/2021 | R. 147-16 | 4308-4309 |
| 11/22/11 BioTrust rDBS Directive | 4/5/2021 | R. 147-18 | 4312-4313 |
| 7/18/13 BioTrust rDBS Directive | 4/5/2021 | R. 147-19 | 4314-4315 |
| 12/25/14 BioTrust rDBS Directive | 4/5/2021 | R. 147-20 | 4316-4317 |
| Seeterlin Decl. | 4/5/2021 | R. 147-22 | 4320-4326 |
| Lyon-Callo Dep. Tr. | 4/5/2021 | R. 147-24 | 4331-4418 |
| 45 C.F.R. § 46.116 (2005) | 4/5/2021 | R. 147-33 | 4777-4780 |
| Research Use of Michigan's Residual Newborn Screening Dried Blood Spots | 5/7/2021 | R. 160-10 | 5471-5497 |
| Seeterlin Supp. Decl. | 5/21/2021 | R. 162-1 | 5528-5529 |
| BioBank's 4/5/21 Mot. For Summary Judgment | 4/5/2021 | R. 149 | 4851-4896 |
| 7/29/21 Op. & Order | 7/29/2021 | R. 171 | 5569-5613 |

| 9/13/22 Order | 9/13/2022 | R. 214 | 5811-5842 |
|---|---|---|---|
| 10/22/22 Order | 10/22/2022 | R. 221 | 5958-5969 |
| 1/31/23 Trial Tr. | 3/29/2023 | R. 243 | 6129-6281 |
| 2/1/23 Trial Tr. | 3/29/2023 | R. 244 | 6282-6438 |
| 2/2/23 Trial Tr. | 3/29/2023 | R. 245 | 6439-6595 |
| 2/3/23 Trial Tr. | 3/29/2023 | R. 246 | 6596-6719 |
| Pls.' Concluding Merits Br. | 4/17/2023 | R. 249 | 6781-6811 |
| 7/31/23 Am. Op. & Order | 7/31/2023 | R. 263 | 6994-7025 |