No. 23-1733

In the
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

ADAM KANUSZEWSKI, *et al.*,

　　Plaintiffs-Appellees,

v.

MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,

　　Defendants-Appellants.

Appeal from the United States District Court
Eastern District of Michigan, Northern Division
Honorable Thomas Ludington

**DEFENDANTS-APPELLANTS' BRIEF IN OPPOSITION TO
PLAINTIFFS' MOTION TO DISMISS AS MOOT
OR, IN THE ALTERNATIVE,
MOTION TO VACATE ANY DISTRICT COURT DECISIONS
DECIDING CLAIMS THAT ARE NOW MOOT**

Daniel J. Ping (P81482)
Aaron W. Levin (P81310)
Assistant Attorneys General
Counsel of Record
Attorneys for Defendants-Appellants
State Defendants
Michigan Dep't of Attorney General
Corporate Oversight Division
P.O. Box 30736
Lansing, MI 48909
(517) 335-7632

Jeremy C. Kennedy (P64821)
Jerold Lax (P16470)
Pear Sperling Eggan & Daniels, P.C.
24 Frank Lloyd Wright Drive
Ste. D-2000
Ann Arbor, Michigan 48105
Counsel for Defendants-Appellants
Neonatal BioBank & Christoper Krause
(734) 665-4441

Dated:  December 26, 2023

# TABLE OF CONTENTS

<u>Page</u>

Table of Authorities ................................................................. iii

Introduction ............................................................................. 1

Background .............................................................................. 2

Argument ................................................................................. 5

I.    The appeal is not moot. ...................................................... 5

    A.    Plaintiffs did not plead distinct "blood spot claims" and "data claims," and data is relevant to the Fourteenth Amendment claim. ................................................ 7

    B.    Even after the return of rDBS, the appeal permits meaningful relief as to both data and rDBS, which are factual components of each claim, not claims themselves. ......................................................... 10

    C.    Notwithstanding the foregoing, Defendants maintain a "legal stake" in the allegedly moot claims. .......................... 15

II.    If any portion of this case is moot, this Court should vacate the relevant district court decisions. ............................... 17

    A.    Under *United States v. Munsingwear*, the present circumstances require vacatur of the district court's decisions. ........................................................ 17

    B.    *Munsingwear*'s exception does not apply. ........................... 21

        1.    Plaintiffs' unilateral action caused the alleged mootness. ................................................... 22

        2.    The stipulated partial stay is not relevant to *Munsingwear*. ............................................. 24

Conclusion and Relief Requested ......................................... 27

Certificate of Compliance ..........................................................................28

Certificate of Service ...............................................................................29

# TABLE OF AUTHORITIES

Page

## Cases

*Alvarez v. Smith,*
  558 U.S. 87 (2009) ................................................. 18

*Arizonans for Official English v. Arizona,*
  520 U.S. 43 (1997) ............................................. 18, 19

*Barker v. Goodrich,*
  649 F.3d 428 (6th Cir. 2011) ................................. 20

*Burke v. Barnes,*
  479 U.S. 361 (1987) ............................................. 18

*Burnett v. Griffith,*
  33 F.4th 907 (6th Cir. 2022) ................................. 20

*Camreta v. Greene,*
  563 U.S. 692 (2011) ............................................. 17

*Church of Scientology v. United States,*
  506 U.S. 9 (1992) ........................................ 6, 11, 13

*Cleveland Branch, N.A.A.C.P. v. City of Parma,*
  263 F.3d 513 (6th Cir. 2001) .............................. 6, 15

*Constangy v. N.L.R.B.,*
  851 F.2d 839 (6th Cir. 1988) ................................. 14

*County of Los Angeles v. Davis,*
  440 U.S. 625 (1979) ........................................ 6, 15

*Duke Power Co. v. Greenwood Cnty.,*
  299 U.S. 259 (1936) ............................................. 18

*Great W. Sugar Co. v. Nelson,*
  442 U.S. 92 (1979) ............................................. 18

*Hope v. Pelzer,*
  536 U.S. 730 (2002) ................................................................ 20

*Kanuszewski v. Michigan Dep't of Health & Hum. Servs.,*
  927 F.3d 396 (6th Cir. 2019) ....................................... 9, 20, 21

*Karcher v. May,*
  484 U.S. 72 (1987) ............................................................ 18, 21

*L. W. by & through Williams v. Skrmetti,*
  83 F.4th 460 (6th Cir. 2023) ............................................... 20

*Libertarian Party v. Husted,*
  497 Fed. App'x 581 (6th Cir. 2012) .................................... 18

*McPherson v. Michigan High School Athletic Ass'n, Inc.,*
  119 F.3d 453 (6th Cir. 1997) ........................................... 6, 16

*Parklane Hosiery Co. v. Shore,*
  439 U.S. 322 (1979) .............................................................. 20

*Ramsek v. Beshear,*
  989 F.3d 494 (6th Cir. 2021) ................................. 22, 24, 26

*Trump v. Hawaii,*
  583 U.S. 941 (2017) .............................................................. 18

*U.S. Bancorp Mortg. Co. v. Bonner Mall,*
  513 U.S. 18 (1994) ......................................................... 17, 21

*United States v. Munsingwear,*
  340 U.S. 36 (1950) ....................................................... passim

**INTRODUCTION**

Plaintiffs' motion for partial dismissal of Defendants' appeal as moot misconstrues the scope of their own claims.

Primarily, Plaintiffs argue that there are "blood spots" claims and "data" claims, and that the former are moot because their children's blood spots have been returned to them. They say that the appealed Fourteenth Amendment decision relates *only* to blood spots, rendering that claim totally moot, whereas the Fourth Amendment appeal still implicates data in some form. But Defendants' actions regarding blood spots *and* data are factual components of each claim, not separate claims. If the supposed "data claims" are live, all claims are live. What is more, Defendants have a demonstrable stake in the allegedly moot claims, insofar as the claims have implications for pending cases and inform Defendants' ongoing conduct for purposes of qualified immunity.

Regardless, if the "blood spot claims" are moot and unreviewable, Defendants are entitled to vacatur of the pertinent district court judgments under *United States v. Munsingwear*, 340 U.S. 36 (1950).

## BACKGROUND

Plaintiffs brought a five-count amended complaint against Defendants in connection with Defendants' operation of two programs, both of which are intended to promote the public health. The Newborn Screening Program ("NBS") collects dried blood spots from Michigan newborns to screen them for a panel of disorders and, if a disorder is suspected, to facilitate follow-up for diagnosis and treatment. This screen entails the collection of some data (such as the parents' names, the birth hospital, and whether the child was admitted to the neonatal intensive care unit), as well as the creation of some data (such as the technical results of the screening for disorders).

NBS retains the leftover (*i.e.*, "residual") dried blood spots ("rDBS"), as well as the data, primarily for its own internal use intended to maintain and expand its operations. To make efficient use of rDBS and data, the Michigan BioTrust for Health facilitates third-party researchers' access to de-identified data and/or de-identified rDBS in furtherance of important health research, much of which inures to the benefit of state newborn screening programs like NBS.

Plaintiffs alleged that the initial screens, as well as Defendants'
"post-screening" retention, storage, and use of rDBS and data, were
unconstitutional.  Following the district court's dismissal on the
pleadings, this Court remanded aspects of the two "post-screening"
claims, under the Fourth and Fourteenth Amendments, for discovery.

The district court stated that this Court's decision required it to
"search for informed consent to Defendants' actions and, if absent, then
apply strict scrutiny."  (10/20/22 Order, p. 4, ECF No. 221,
PageID.5961.)  It concluded that informed consent was lacking, and
that Defendants could not satisfy the narrow-tailoring prong of strict
scrutiny, believing this Court to have made the factual finding that
"Defendants' [post-screening] conduct is not necessary to effectuate
[their] interest because 'the health of the child is no longer a stake.'"
(9/13/22 Order, p. 28, ECF No. 214, PageID.5838.)  Regarding the
Fourth Amendment claims, it held for Plaintiffs based on a similar
conclusion that there were "less intrusive alternatives," and noted that
a "threat of an infringement on privacy looms over the infants" while
the "potential intrusion" of "misuse or abuse" of "blood spots and data."
(7/31/23 Op. & Order, pp. 17–19, ECF No. 263, PageID.7010-7012.)

Consistent with its conclusion that "sufficient" informed consent procedures would have obviated both of Plaintiffs' claims, the district court issued one narrow form of relief: an injunction requiring Defendants to mail Plaintiffs a letter with court-approved language describing their programs and soliciting Plaintiffs' wishes regarding both rDBS and data. (*See* 7/31/23 Op. & Order, p. 32, ECF No. 263, PageID.7025.) The district court denied Plaintiffs' request for declaratory relief. (*Id.* at 26, PageID.7019.)

The parties entered into a stipulated partial stay of this injunctive term (or, more accurately, its unstated implication), which partial stay permitted Defendants to maintain custody of Plaintiffs' data until all appeals concluded, regardless of Plaintiffs' instructions regarding that data. (ECF No. 269, PageID.7051-7052.) Consistent with Defendants' preexisting policy—and Plaintiffs having decided against *permitting* continued retention of their children's rDBS—Defendants confirmed they would "return, destroy, or retain [the rDBS] at each Plaintiff's instruction." (*Id.*, PageID.7051; *id.*, PageID.7050 ("Plaintiffs, by counsel, indicated that . . . they are unwilling to stipulate to Defendants' continued storage of any rDBS[.]").)

4

Plaintiffs ultimately returned the court-approved form to Defendants, requesting the return of their rDBS. Defendants complied, and the rDBS have been returned to Plaintiffs' custody.

Data, however, remains in Defendants' custody. Meanwhile, Defendants appealed the district court's Fourth and Fourteenth Amendment decisions.

Invoking their successful request for their children's rDBS to be returned to them, Plaintiffs now argue that Defendants' appeal of the Fourteenth Amendment decision is moot because that claim pertained *only* to rDBS, not data. They state that only the Fourth Amendment claims remain live, but only to the extent that those claims involve data. For the reasons that follow, these arguments are either meritless or, if they have merit, require vacating the district court's decisions below, which vacatur will address Defendants' inability to challenge the correctness of those decisions.

## ARGUMENT

### I.    The appeal is not moot.

The portions of Defendants' appeal that Plaintiffs claim are moot are in fact live. The allegedly moot claim shares common issues of law

and fact with the concededly non-moot claim, and the two cannot be analyzed separately.  Furthermore, Defendants have a legally cognizable interest in obtaining review of the district court's decisions.

Although "[a] federal court has no authority to render a decision upon moot questions or to declare rules of law that cannot affect the matter at issue," *Cleveland Branch, N.A.A.C.P. v. City of Parma*, 263 F.3d 513, 530 (6th Cir. 2001) (citing *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992)), a case becomes moot only "'when the issues presented are no longer live or parties lack a legally cognizable interest in the outcome," *id.* (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)).  Generally, mootness depends on "whether the relief sought would, if granted, make a difference to the legal interests of the parties . . . ." *McPherson v. Michigan High School Athletic Ass'n, Inc.*, 119 F.3d 453, 458 (6th Cir. 1997) (en banc) (internal quotation marks and citation omitted).

"The heavy burden of demonstrating mootness rests on the party claiming mootness." *Cleveland Branch, N.A.A.C.P.*, 263 F.3d at 531.

A.    **Plaintiffs did not plead distinct "blood spot claims" and "data claims," and data is relevant to the Fourteenth Amendment claim.**

Plaintiffs argue that there are severable "blood spot" claims and "data" claims. They state that, because their rDBS were returned, "[a]ll that remains for this Court to adjudicate is the Fourth Amendment data claims, which are not moot." (Pls.' Mot. to Dismiss, pp. 6–7.) Plaintiffs therefore suggest that the entirety of their Fourteenth Amendment claim had nothing to do with stored data, *i.e.*, that review of that claim does not entail review of the constitutionality of data-retention conduct.

This distinction lacks any basis in Plaintiffs' amended complaint. Count II—the relevant due-process claim—alleged that Defendants sought informed consent that was insufficient "to authorize *all the activities undertaken by Defendants* under the guise of the Newborn Screening Program." (Am. Compl. ¶ 27 (emphasis added), ECF No. 26, PageID.324.) In a paragraph incorporated into Count II, Plaintiffs alleged as follows:

> *In addition to the blood spot samples*, Defendants, individually or collectively, required the conscripted healthcare profession[al] to submit certain data about the blood spots and also other private personal information

7

> including the Infants' names, genders, weight, gestation
> time, and whether transfused with red blood cells and
> whether part of a single or multiple-newborn birth (i.e.
> twins, triplets). [*Id.* ¶ 50 (emphasis added), PageID.313.]

Likewise, Plaintiffs made a general (disproved) allegation, which was central to their case, that the BioBank renders it "easily possible to request and break the blind causing the private medical and genetic information of the infants to be revealed." (*Id.* ¶ 63, PageID.317; *see also id.* ¶ 64.)[1]

At summary judgment, Plaintiffs proceeded to invoke Defendants' retention, storage, and use of *data* when making their Fourteenth Amendment arguments. (Pls.' 2/22/21 Mot. for S.J., p. 38 ("[P]ractices that result the non-consensual retention, storage, and use of bodily material . . . *and deeply-private medical and genetic information/data* fails to be a sufficient interest. . . . [S]uch ongoing retention, storage, and available uses violates substantive due process." (emphasis added)),

---

[1] The organization of Plaintiffs' amended complaint is clear enough, and it belies their new interpretation. The amended complaint comprises two Fourteenth Amendment claims—one contesting the screening at birth (Count I), and one contesting the post-screening conduct (Count II)—and three Fourth Amendment claims—one contesting the screening at birth (Count III) and two contesting the post-screening conduct (Counts IV and V, Count V being conspiracy).

ECF No. 135, PageID.1941; *id.* at 40 ("[P]arents traditionally are not given enough information about the post-testing retention, storage, and uses of blood *and* deeply-private medical and genetic information[.]" (emphasis added)), PageID.1943; *id.* (alleging that Defendants' consent processes make "no mention of how samples can be selected based on data like zip code, age, gender, or more[.]").)

The district court also telegraphed that data was a subject of Plaintiffs' Fourteenth Amendment claim, stating that, according to this Court, "under the Fourteenth Amendment, *any conduct* related to the blood spots *and data* without informed consent is subject to strict scrutiny," and, "[i]n that realm, the State's conduct was found lacking" in the district court's prior decisions. (7/31/23 Op. & Order, p. 2 (emphasis added), ECF No. 263, PageID.6995.) *See also Kanuszewski v. Michigan Dep't of Health & Hum. Servs.*, 927 F.3d 396, 423–24 (6th Cir. 2019) (failing to acknowledge "data claims" of any sort, as distinct from claims pertaining to rDBS).

Accordingly, there is no basis for Plaintiffs' premise that the Fourteenth Amendment claim is purely a "blood spot" claim that was rendered moot by the return of their rDBS. Rather—as Plaintiffs'

9

pleadings plainly reflect—the Fourteenth Amendment claim encompassed data as well as rDBS.  As set forth in the following subsection, while Defendants' practices with regard to rDBS and data presented subsidiary *fact questions*, those fact questions are intertwined, and they do not give rise to separate *claims*.  It is simply not possible to extricate facts regarding rDBS from facts regarding data within the confines of either the Fourth or Fourteenth Amendment claims.

### B. Even after the return of rDBS, the appeal permits meaningful relief as to both data and rDBS, which are factual components of each claim, not claims themselves.

Even if Plaintiffs acknowledge that the indisputably "live" data questions are woven into *both* claims on appeal, they might still argue that there are moot "blood spot" claims and non-moot "data" claims within each Count.  But it would be untenable to deem a subset of the material facts "moot" and sever them from the unified legal analysis required by the factual inquiry the claims require.

A question on appeal is not moot—even when the plaintiff achieves a significant injunction below that results in the return of an

item they claimed was improperly retained—when "a court can fashion
*some* form of meaningful relief" under the circumstances.  *Church of
Scientology of California*, 506 U.S. at 12.  Here, meaningful relief is
available as to both the Fourth and Fourteenth Amendment claims,
insofar as this Court may agree with Defendants' arguments regarding
the constitutionality of their programs.  Even if only the data remains
in Defendants' possession, the constitutionality of either program is not
readily amenable to a ruling that, *e.g.*, approves of Defendants'
retention, storage, or use of data while having an opposite effect on the
retention, storage, or use of rDBS.

On appeal, Defendants make threshold arguments regarding both
claims, neither of which claim can be analyzed *only* by reference to data.
For instance, Defendants assert that the Fourteenth Amendment
claims cannot lie because Defendants do not effectuate "medical care or
treatment," and that the Fourth Amendment claims do not describe a
cognizable seizure or search.  (*See, e.g.*, Defs.' Appeal Br., pp. 33, 58, 62.)
Likewise, Defendants' arguments regarding strict scrutiny (or,
similarly, Fourth-Amendment reasonableness) invoke their programs'
indivisible purposes in advancing public health, and the narrow

11

tailoring that occurs, in part, by virtue of segregating rDBS from data. (*See, e.g.*, *id.* at 51 ("The retention of rDBS and data subsequent to the initial screen directly furthers this compelling interest as it relates to Michigan-born infants."); *id.* at 53 ("[S]harp restrictions on the availability of rDBS and data for NBS purposes would significantly undermine NBS, and screening programs nationwide.").) These are significant components of Defendants' theory on appeal, and they permit no distinction between rDBS and data—let alone a distinction that can be practically severed by a mootness determination.

Even as to those arguments that do appear to discuss the separate roles of rDBS and data (such as the need for a large repository of rDBS to access positive cases of rare diseases being added to the screening panel), the factual makeup of those arguments cannot be tinkered with by operation of mootness. As used here, "data" is a catch-all term encompassing everything that is not the physical rDBS—be it a name, the hospital of birth, a screening result, or anything else. (*See* Am. Compl ¶ 50, ECF No. 26, PageID.313.) Although rDBS and data are conceptually distinct, rDBS and data are indelibly linked in the way they provide value to NBS and the BioTrust; rDBS are most useful to

those programs when combined with data, in so far as that combination allows NBS and the BioTrust to select appropriate specimens for use in machine calibration, newborn screening methodology investigations, and other important tasks that share the same basic compelling purpose.

To understand the unworkability of Plaintiffs' proposal, one only needs to consider the bizarre consequence of severing this case in the manner they suggest. If rDBS "claims" are deemed moot, how, exactly, can Defendants support their remaining argument that large repositories of rDBS and data are necessary to achieve their compelling purpose in public health? Could they invoke the stored data that enables them to contextualize a given rDBS, while being precluded from leveraging the equally critical importance of the rDBS themselves? Could Defendants invoke the compelling need for data necessary to identify an rDBS when an individual's clinical diagnosis confirms that NBS reached a "false negative" result, while being precluded from accessing that rDBS to learn from that false negative? More to the point under *Church of Scientology*, as for a final judgment, could Defendants prevail on their "claims" regarding data—perhaps

vindicating their compelling purpose and narrow tailoring, their broadly applicable threshold defenses, or both—but still be under the shadow of an inconsistent federal-court judgment?

The nature of the interconnected roles of rDBS and data thus reveals that Plaintiffs' principal authority in support of their motion, *Constangy v. N.L.R.B.*, 851 F.2d 839 (6th Cir. 1988), is inapplicable to this situation. In *Constangy*, the district court had ordered the NLRB "to produce two intra-agency memoranda pursuant to a request for records by . . . plaintiff-appellee." *Id.* at 840. The appeal by the NLRB (the party resisting production) was deemed moot because *both memoranda* had been produced. *Id.* at 842. Here, the two subjects of the litigation (rDBS and data) are analytically joined; the instant appeal is more akin to a hypothetical situation in which the NLRB in *Constangy* produced only one of two memoranda, when both had been obtained under a shared rationale—in which case the matter would not have been moot, because the validity of that shared rationale would have presented a live controversy.

Due to the interconnectedness of rDBS and data, it will be impossible for this Court to perform a comprehensive strict-scrutiny

analysis or a Fourth Amendment reasonableness analysis only as to the data in Defendants' custody. Attempting to do so will entail taking a hacksaw to Defendants' application of the law to the facts, leaving an incomplete picture full of ragged holes. A full and fair review of the common questions of law and fact is required, and it can lead to meaningful relief in the form of a comprehensive judgment regarding the programs' constitutionality.

### C.    Notwithstanding the foregoing, Defendants maintain a "legal stake" in the allegedly moot claims.

Related, Defendants retain a "legal stake" in the correctness of the allegedly moot "blood spot claims" because any decision regarding the retention, use, or storage of data will inform their ongoing conduct regarding rDBS. The set of facts comprising the two "claims" is, again, indivisible; each is a critical component of the same two programs serving the same compelling interest.

Again, a case only becomes moot "'when the issues presented are no longer live *or* [the] parties lack a legally cognizable interest in the outcome.'" *Cleveland Branch, N.A.A.C.P.*, 263 F.3d at 530 (quoting *Davis*, 440 U.S. at 631) (emphasis added); *see also McPherson*, 119 F.3d

15

at 458 (holding that mootness depends on "whether the relief sought would, if granted, make a difference to the legal interests of the parties").

Defendants have a legally cognizable interest in the constitutionality of their practices regarding rDBS. Adopting Plaintiffs' position and granting their motion would permit a decision *approving* of data retention or use, to whatever extent, but leaving in place a slate of district court decisions *disapproving* of rDBS retention or use—even though both activities occur in furtherance of the same compelling state interest, and even though neither activity has meaning without the other. As set forth more fully below, such decisions, if left unreviewed, raise the specters of collateral estoppel and Defendants' qualified immunity. (*But see* Part II, *infra* (asserting that any mootness finding requires vacatur of district court decisions pursuant to *Munsingwear*).) Denying the motion, on the other hand, will permit consideration of all pertinent facts and a judgment that affords meaningful relief that extends to all relevant forms of Defendants' conduct. Accordingly, the matter is not moot.

II.    **If any portion of this case is moot, this Court should vacate the relevant district court decisions.**

If Plaintiffs are correct that portions of Defendants' appeal are moot, Defendants' inability to appeal the affected portions of the judgment should result in vacatur—the normal procedure in the event of mootness.

A.    **Under *United States v. Munsingwear*, the present circumstances require vacatur of the district court's decisions.**

Where an appeal becomes moot "while on its way [to this Court] or pending [a] decision on the merits," the established practice is to "vacate the judgment below and remand with a direction to dismiss." *United States v. Munsingwear, Inc.*, 340 U.S. 36, 39 (1950). Such a vacatur "rightly strips the decision below of its binding effect." *Camreta v. Greene*, 563 U.S. 692, 713 (2011) (internal citation omitted). This is the "normal" procedure in the event of mootness. *Id.*

And it makes sense. "A party who seeks review of the merits of an adverse ruling, but is frustrated by the vagaries of circumstance, ought not in fairness be forced to acquiesce in the judgment." *U.S. Bancorp Mortg. Co. v. Bonner Mall*, 513 U.S. 18, 25 (1994). Equally important, "[v]acatur 'clears the path for future relitigation' by eliminating a

17

judgment the loser was stopped from opposing on direct review." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 71 (1997) (*quoting Munsingwear*, 340 U.S. at 40).

The U.S. Supreme Court has followed this approach in numerous cases. *E.g.*, *Munsingwear*, 340 U.S. at 39; *Trump v. Hawaii*, 583 U.S. 941 (2017); *Alvarez v. Smith*, 558 U.S. 87, 97 (2009); *Karcher v. May*, 484 U.S. 72, 82 (1987); *Burke v. Barnes*, 479 U.S. 361, 365 (1987); *Great W. Sugar Co. v. Nelson*, 442 U.S. 92, 93 (1979) (per curiam); *Duke Power Co. v. Greenwood Cnty.*, 299 U.S. 259, 267 (1936) (per curiam).

Following the Supreme Court's lead, the *Munsingwear* doctrine is well-established in this Court as well. *See Libertarian Party v. Husted*, 497 Fed. App'x 581, 582 (6th Cir. 2012) (citing *Arizonans for Official English*, 520 U.S at 71 (1997)) ("When a civil case becomes moot pending appellate adjudication, the well-established *Munsingwear* doctrine directs us to dismiss all claims in this case.").

As the U.S. Supreme Court explained in *Munsingwear*, "a judgment, unreviewable because of mootness," should not be permitted to "spawn[ ] any legal consequences." 340 U.S. at 41. Legal consequences do threaten to flow from the district court's three opinions

refining its due-process ruling (not to mention the opinion regarding the

Fourth Amendment, which incorporates some of that analysis by

reference).[2]

Although Defendants succeeded below in persuading the district

court that a declaratory judgment was inappropriate, (*see* Am. 7/31/23

Op. & Order, pp. 25–26, ECF No. 263, PageID.7018-7019), the fact

remains that there now exists a published federal decision deeming

Defendants' course of conduct unconstitutional.  This threatens to

undermine Defendants' qualified immunity.  Although traditionally

such immunity is set aside only when the right was "clearly

established" by authority higher than that of a district court, *see Barker*

---

[2] Although it is immaterial to *Munsingwear*'s equitable inquiry
whether such "legal consequences" might be speculative, they are not
speculative here:  Plaintiffs' counsel is the self-represented plaintiff in a
substantially similar action pending in Michigan's Court of Claims.
(*See* Am. Compl., *Ellison v. MDHHS*, Mich. Ct. of Claims No. 18-
000011-MZ, attached as **Exhibit 1**.)  Notably, that action has been held
in abeyance *pending the outcome of this very case*.  [*See, e.g.*, 9/5/23
Order Denying Pl.'s Mot. to Lift Stay, *Ellison v. MDHHS*, Mich. Ct. of
Claims No. 18-000011-MZ, attached as **Exhibit 2**.)  The Court of
Claims, therefore, has indicated its openness to considering any
opinions or judgments in the instant case that are both relevant and
valid.  This squarely implicates the principle that vacatur is
appropriate in order to "clear[] the path for future relitigation."
*Arizonans for Official English*, 520 U.S. at 71 (*quoting Munsingwear*,
340 U.S. at 40).

*v. Goodrich*, 649 F.3d 428, 435 (6th Cir. 2011), other authority may be considered, *id.* (citing *Hope v. Pelzer*, 536 U.S. 730, 744 (2002)), and the similarities between the decision below and any future case against Defendants would be compelling, *see, e.g.*, *Burnett v. Griffith*, 33 F.4th 907, 912 (6th Cir. 2022).  Vacatur of the district court's decisions would remove the need for Defendants to conform their conduct—at great cost to public health—in reliance on untested analysis.  For the same basic reasons, the district court's decisions also could implicate offensive collateral estoppel.  *See, e.g.*, *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979).[3]

---

[3] On both counts, the unappealed, post-discovery posture of this case is already working harm:  Recently, this Court misconstrued its own 2019 decision in this case, describing *Kanuszewski*, 927 F.3d 396, conclusively as follows:

> A Michigan law required healthcare organizations to collect blood samples from newborns and to store the samples for future use, all without parental consent and all without any explanation why the law advanced the health of the babies. This compulsory storage program, we held, violated nonconsenting parents' rights "to make decisions concerning the medical care of their children." . . .  The Michigan program *compelled* medical care . . . . [T]he laws at issue here, in marked contrast to the Michigan law, rest on the legislative judgment that they will protect the health of the child.  [*L. W. by & through Williams v. Skrmetti*, 83 F.4th 460, 476 (6th Cir. 2023) (citing *Kanuszewski*, 927 F.3d 396).]

20

Accordingly, given the fact that Plaintiffs are satisfied by the judgment they received and vacatur can therefore work no prejudice on them, *Munsingwear* instructs that this Court should remove the potential for those opinions to "spawn[] any legal consequences," 340 U.S. at 41, and vacate the pertinent district court decisions, (ECF Nos. 171, 214, 221).

### B.    *Munsingwear*'s exception does not apply.

Under *Munsingwear*, "vacatur must be decreed" whenever review of the district court's judgment is "prevented through happenstance" or "where mootness results from the unilateral action of the party who prevailed in the lower court." *U.S. Bancorp Mortg. Co.*, 513 U.S. at 23 (citing *Karcher v. May,* 484 U.S. 72, 82 (1987)).  But that normal practice is not applied mechanically.  A party who fails to prevail below cannot invoke *Munsingwear* after gratuitously "mooting" the

---

It bears repeating that *Kanuszewski* evaluated *only* whether Plaintiffs' amended complaint stated a claim under Federal Rule of Civil Procedure 12(b)(6).  *L. W.*'s summary of that opinion was inaccurate, and there are open questions (1) whether the challenged activity constituted medical care, (2) whether parental consent was constitutionally insufficient, and (3) whether the challenged activity reflects a legislative attempt to further the health of children.

controversy.  *E.g.*, *id.* at 24 ("The principal condition to which we have looked is whether the party seeking relief from the judgment below caused the mootness by voluntary action.").  Recently, this principle was applied in *Ramsek v. Beshear*, 989 F.3d 494, 501 (6th Cir. 2021), where this Court held that, "[h]aving lost in the district court, Governor Beshear then withdrew the Order before his appeal could be resolved . . . .  With that in mind, it would be unfair to then reward Governor Beshear by vacating the district court's preliminary injunction ruling, which the Governor asserts is harmful to his interests.").  This exception to *Munsingwear*—and the principle it implies—is not at issue here.

### 1.  Plaintiffs' unilateral action caused the alleged mootness.

Here, the mootness Plaintiffs invoke is attributable only to themselves.  The fact that Plaintiffs obtained an injunction regarding a written notice is beside the point; Plaintiffs *always* had the ability to obtain the "relief" comprising return of their children's rDBS—no lawsuit required.  As noted in Defendants' brief on appeal, at all relevant times it has been true that "[a]fter screening is completed,

parents may require MDHHS to destroy or return their child's DBS."
(Defs' Appeal Br., p. 9 (citations omitted).)

Stated differently, Defendants returned Plaintiffs' rDBS to them
pursuant to preexisting policy, which was triggered by Plaintiffs'
request; it did *not* occur pursuant to, and was not compelled by, the
district court's injunction. The injunction required only the
furnishment of a more robust prompt for "informed consent."
Subsequent to that court-ordered mailing, the parties' actions
comprised (1) Plaintiffs' request that the rDBS be returned to them,
followed by (2) Defendants' compliance with that request. But, again,
both Plaintiff's request and Defendants' compliance could have occurred
in the same way absent the injunction.

Accordingly, the equitable remedy of vacatur is not just
appropriate here. It is compelling. Plaintiffs have maintained a
peculiar power to effectuate "mootness" at their exclusive option,
regardless of a judgment. They could have exercised that option before,
during, or after the lawsuit. They chose to exercise it now, thereby
"locking in" a favorable judgment (absent vacatur). On that point,
Plaintiffs' counsel, Attorney Ellison, has been reported as stating:

23

"[Judge Ludington has] set a template for millions of others whose blood samples are in the Detroit biobank unknowingly," Ellison told The Associated Press. "I think it's going to force the state to change the entire program—and change it for the better." . . .

"The judge did a really unique thing. He changed the balance here," Ellison said. "It's going to highly incentivize the state to change the process so moms and dads have all the information and can make an informed choice." [Ed White, *Judge's decision could force change in Michigan's handling of newborn blood samples*, AP NEWS (Aug. 4, 2023).[4]]

For these reasons, the orders should not be left in place, unexamined, and they should be vacated.

## 2.    The stipulated partial stay is not relevant to *Munsingwear*.

Plaintiffs say that Defendants' decision to agree to a stipulated partial stay below effected "voluntary mootness." (Pls.' Mot. to Dismiss, p. 1.) The implication seems to be that Defendants could have avoided mootness, either by seeking a total stay or no stay at all. But that does not convert Defendants' return of Plaintiffs' rDBS into Defendants' "voluntary" action under *Ramsek*. Properly understood, the partial stay

---

[4] Available at https://apnews.com/article/michigan-newborn-blood-spots-constitution-d3db6a3d09ae65d7c7054a0f483c6833.

is immaterial to the equities that inform whether to vacate an unreviewable lower court decision under *Munsingwear*.

Unlike the Fourteenth or Fourth Amendment judgments, the partial stay did have distinct effects on rDBS versus data. Pursuant to the partial stay, Defendants agreed to send the court-ordered mailing described in the July 31, 2023, order. (8/23/23 Partial Stay, p. 3, ECF No. 269, PageID.7051.) Defendants also indicated they would comply with Plaintiffs' ensuing instructions regarding rDBS (*as they would have done regardless of any lawsuit*). (*Id.*)

The operative piece of the partial stay pertained only to Plaintiffs' instructions as to data. Whereas rDBS *are* subject to return or destruction at parental request, data *are not* subject to such a parental request for return or destruction. (*See* 2/1/23 Trial Tr., pp. 30–31, ECF No. 244, PageID.6311-6312.)

Defendants' agreement to a partial stay reflects this dichotomy. It would be incoherent for Defendants to request a stay regarding parental requests for the return or destruction of *rDBS*, because *it is Defendants' policy to honor such requests.* Defendants have no basis for resisting such a request in Plaintiffs' case, by stay or otherwise. In

contrast, absent a stay of the injunction regarding *data*, Defendants could be required to violate their policy not to honor a request for destruction of data.[5]

Accordingly, seeking a stay regarding the data, but not the rDBS themselves, was consistent with (if not required by) preexisting MDHHS policy. *Munsingswear* will not afford relief to a party who *causes* the mootness that prevents appellate review, while also seeking relief from the adverse judgment below. *E.g.*, *Ramsek*, 989 F.3d at 501. But it would be a strange result, under *Munsingswear*'s equitable inquiry, to require the party seeking relief from an unreviewable decision below to betray their own principles in order to avoid mootness. Here, that would have entailed withholding from Plaintiffs the choice that Defendants afford to all parents. Defendants were—and remain— unwilling to do that. And, doubtless, had Defendants taken such action, it would have been leveraged against them in the appeal as evidence of arbitrariness and hypocrisy.

---

[5] Notwithstanding, the partial stay reflects that "Plaintiffs, by counsel, indicated that . . . they are unwilling to stipulate to Defendants' continued storage of any rDBS[.]" (ECF No. 269, PageID.7050.) It is inaccurate to suggest that Defendants "voluntarily" did anything via the partial stay.

## CONCLUSION AND RELIEF REQUESTED

Defendants respectfully ask this Court to deny Plaintiff's motion for dismissal based on mootness.  In the alternative, Defendants ask this Court to vacate all of the district court decisions evaluating the constitutionality of Defendants' conduct with respect to blood spots.

Respectfully submitted,


*/s/ Daniel J. Ping* (P81482)
Aaron W. Levin (P81310)
Assistant Attorneys General
Counsel of Record
Attorneys for Defendants-Appellants
State Defendants
Michigan Dep't of Attorney General
Corporate Oversight Division
P.O. Box 30736
Lansing, MI 48909
(517) 335-7632



Dated:  December 26, 2023

27

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type Style Requirements

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2) because, excluding the part of the document exempted by Federal Rule of Appellate Procedure 32(f), this brief contains no more than 5,200 words.  This document contains 5,103 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word 2013 in 14-point Century Schoolbook.  *See also* Fed. R. App. P. 27(d)(1)(E) (applying preceding requirements to motions).

*/s/ Daniel J. Ping*
Daniel J. Ping (P81482)
Assistant Attorney General
Counsel of Record
Attorney for Defendants-Appellants
State Defendants
Michigan Dep't of Attorney General
Corporate Oversight Division
P.O. Box 30736
Lansing, MI 48909
(517) 335-7632

28

## CERTIFICATE OF SERVICE

I certify that on December 26, 2023, the foregoing document was served on all parties or their counsel of record through the CM/ECF system, as all are registered users.

<div style="text-align: right">

*/s/ Daniel J. Ping*
Daniel J. Ping (P81482)
Assistant Attorney General
Counsel of Record
Attorney for Defendants-Appellants
State Defendants
Michigan Dep't of Attorney General
Corporate Oversight Division
P.O. Box 30736
Lansing, MI 48909
(517) 335-7632

</div>

# EXHIBIT 1

**STATE OF MICHIGAN**
**IN THE COURT OF CLAIMS**

PHILIP L. ELLISON, as legal guardian of
PATTON JUSTUS ELLISON,

    and

KATHERINE E. ELLISON, individually
and as legal guardian of PATTON
JUSTUS ELLISON,
    Plaintiffs,

      v.

MICHIGAN DEPARTMENT OF HEALTH
AND HUMAN SERVICES, formerly known
as Michigan Department of Community
Health,
    Defendant
_____/

Case No.: 18-000011-MZ
Honorable Michael J. Talbot

**FIRST AMENDED COMPLAINT**

OUTSIDE LEGAL COUNSEL PLC
PHILIP L. ELLISON (P74117)
Counsel for Plaintiffs
PO Box 107
Hemlock, MI 48626
(989) 642-0055
(888) 398-7003 - fax
pellison@olcplc.com

SANTIAGO RIOS (P48199)
MICH DEPT OF ATTORNEY GENERAL
Assistant Attorney General
Corporate Oversight Division
Counsel for Defendant
PO Box 30755
Lansing, MI 48909
(517) 373-1160
rioss3@michigan.gov

## FIRST AMENDED VERIFIED COMPLAINT

     NOW COMES Plaintiffs PHILIP L. ELLISON and KATHERINE E. ELLISON, by and through counsel, and complains as follows:

### PARTIES

     1.    Plaintiff PHILIP L. ELLISON is a resident of the State of Michigan and is bringing claim(s) as legal guardian to his son, PATTON JUSTUS ELLISON.

     2.    Plaintiff KATHERINE E. ELLISON is a resident of the State of Michigan and is bringing claims both in her individual capacity and as legal guardian to her son, PATTON JUSTUS ELLISON.

1

3.     Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES, formerly known as Michigan Department of Community Health, is a state agency formed under the laws of the State of Michigan and is a public body as that term is defined by Michigan's *Freedom of Information Act*, MCL 15.232(d)(i).

## JURISDICTION

4.     This Court has jurisdiction by statute pursuant to MCL 15.240(1)(b) and MCL 600.6419(1)(a).

5.     This Court must advance this matter expeditiously as MCL 15.240(5) requires that "[a]n action commenced under this section… shall be assigned for hearing and trial or for argument at the earliest practicable date and expedited in every way."

## GENERAL ALLEGATIONS

6.     On September 12, 2017, PATTON JUSTUS ELLISON was born.

7.     Plaintiff PHILIP L. ELLISON and Plaintiff KATHERINE E. ELLISON are his parents.

8.     Plaintiff PHILIP L. ELLISON is a duly licensed attorney with the State of Michigan having obtained his juris doctor from Michigan State University and his Master of Business Administration from Central Michigan University.

9.     Plaintiff KATHERINE E. ELLISON is holds a Ph.D. from Western Michigan University and her Master's degree from Central Michigan, and works as in college administration at one of Michigan's public universities.

10.     Unknown to either of the parents of PATTON JUSTUS ELLISON, individuals working as agents or at the direction of Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES extracted and seize six[1] samples or spots of blood belonging to PATTON JUSTUS ELLISON shortly after being born while at a local hospital.

11.     At the direction and command of Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES, the blood samples were couriered to a state laboratory for testing without the knowing, intelligent, informed, and/or voluntary consent of or authorization from Plaintiff PHILIP L. ELLISON and Plaintiff KATHERINE E. ELLISON for what has been explained is for testing for various diseases.

---

[1] See **Exhibit H** ("Six spots are usually collected to be sure there are enough for all the tests. Sometimes not all the spots are suitable for testing, so it helps to have more than are needed. In the event there is a positive (abnormal) test, the lab can double check the result with the extra spots. Having six spots available limits the number of newborns who need to have their blood drawn again.").

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

12.    Plaintiff PHILIP L. ELLISON and/or Plaintiff KATHERINE E. ELLISON did not request or consent to these medical tests being conducted by Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES.

13.    Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES has not obtained any judicial warrant before seizing and testing the blood of PATTON JUSTUS ELLISON.

14.    The results of any undertaken medical tests were never transmitted to Plaintiff PHILIP L. ELLISON and/or Plaintiff KATHERINE E. ELLISON.

15.    However, once those tests were completed, Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES had left over blood samples.

16.    Rather than destroying the same, Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES retained the samples consisting of the blood of PATTON JUSTUS ELLISON without knowing, intelligent, informed, and/or voluntary consent of and/or authorization from Plaintiff PHILIP L. ELLISON or Plaintiff KATHERINE E. ELLISON.

17.    According to records and documents of Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES, it keeps all blood samples seize and extracted from newborns indefinitely unless destroyed.

18.    One set of one or more samples is kept at a warehouse in Lansing and a second set is transmitted to an entity known as the "Michigan Neonatal Biobank" under contract[2] with Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES.

19.    According to general information given by the Michigan Neonatal Biobank, Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES claims title to or holding in trust the blood samples of PATTON JUSTUS ELLISON.

20.    Plaintiff PHILIP L. ELLISON or Plaintiff KATHERINE E. ELLISON did not provide any knowing, intelligent, informed, and/or voluntary authorization or consent to Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES or its third-party contractees to indefinitely hold and/or use the blood samples of PATTON JUSTUS ELLISON.

21.    On October 25, 2017, Plaintiff PHILIP L. ELLISON demanded all blood samples of his son, PATTON JUSTUS ELLISON, be destroyed in accordance with the form created by Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES entitled *Directive to Destroy Residual Newborn Screening Blood Specimen*, see **Exhibit A**.

---

[2] See **Exhibits J, K, and L.**

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

22.    Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES has represented it will destroy all blood samples of newborns when demanded by legal guardians, see **Exhibit B**.

23.    Since making that demand for PATTON JUSTUS ELLISION, there has been no response from Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES confirming the complete destruction of all existing blood samples of PATTON JUSTUS ELLISON has occurred for samples held by Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES and/or the Michigan Neonatal Biobank on behalf of Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES.

24.    On lack of information and on belief therefrom, Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES has failed to destroy all blood samples belonging to PATTON JUSTUS ELLISON.[3]

25.    Plaintiff PHILIP L. ELLISON or Plaintiff KATHERINE E. ELLISON, as the parents of PATTON JUSTUS ELLISON, do not wish the state government or any entity thereof to have, hold, convey, or use the blood (and all information gatherable therefore) belonging to PATTON JUSTUS ELLISON.

26.    Plaintiff PHILIP L. ELLISON or Plaintiff KATHERINE E. ELLISON, as the parents of PATTON JUSTUS ELLISON, never received any letter, notification, confirmation, or communication from Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES.

27.    By receiving no response or written confirmation, it is unclear whether Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES actually fulfilled its promise to destroy the blood samples belonging to PATTON JUSTUS ELLISON.

28.    Actual or putative legal ownership of the extracted blood of PATTON JUSTUS ELLISON is held by and/or belongs to Plaintiff PHILIP L. ELLISON and/or Plaintiff KATHERINE E. ELLISON, as the parents of PATTON JUSTUS ELLISON, and not Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES or the Michigan Neonatal Biobank.

29.    On October 24, 2017, Plaintiff KATHERINE E. ELLISON, by counsel, made various separate *Freedom of Information Act* requests seeking certain records from Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES [hereinafter "October 24, 2017 FOIA Requests"].

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

---

[3] Despite its veracity being questionable given disjointed language, Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES has revealed in its original answer that it only destroyed two of the six blood spots if the unsigned letter from Harry Hawkins is taken at face value. See **Exhibit I**. This does not account for the remaining four blood spots.

4

30.    A fair and accurate copy of the October 24, 2017 FOIA Requests is attached as **Exhibit C**.

31.    Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES took an extension but did so one day late warranting a five percent (5%) reduction in costs, see **Exhibit D**.

32.    In its response, Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES purposely excessively listed a global set of records to make the estimated cost of production $5,913.00 and demand one-half thereof as a deposit, see **Exhibit E.**

33.    Plaintiff KATHERINE E. ELLISON, by counsel, corrected the mis-desigiation of the global set of records by Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES to only those records actually sought and as Request No. 15 sought "[r]ecord(s) showing [] all requests from any or all law enforcement agency or agencies seeking blood sample(s) or spot(s) and/or information deriving/extracted from blood sample(s) or spot(s0 held by the Michigan BioTrust for Health.

34.    The Michigan BioTrust for Health is a program of Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES to oversee the State of Michigan's stored blood spots of newborns and their use in health research, see www.michigan.gov/biotrust.

35.    To produce these records, including making necessary copies, Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES claim to need three (3) hour of time and charged accordingly.

36.    In its response to Request No. 15, Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES singularly produced a self-generated MS word document stating "Twenty two forensic request processed," see **Exhibit G**.

37.    Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES did not produce any of the records related to Request No. 15.

<div align="center">

**COUNT I**
**CLAIM AND DELIVERY – MCL 600.2920**
**(ASSERTED BY BOTH PLAINTIFFS AGAINST DEFENDANT)**

</div>

38.    The previous allegations are re-alleged within this Court as if pled word for word herein.

39.    Plaintiff PHILIP L. ELLISON and/or Plaintiff KATHERINE E. ELLISON, as the parents of PATTON JUSTUS ELLISON, is lawfully entitled to ownership and possession of the excess blood samples or spots taken solely for testing of diseases.

40.    Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES lacks any right of ownership of the excess blood samples and/or spots taken solely for testing of diseases.

<div align="center">5</div>

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

41. Plaintiff PHILIP L. ELLISON and/or Plaintiff KATHERINE E. ELLISON, as the parents of PATTON JUSTUS ELLISON, seek and demand an order of judgment for the return of the blood sample(s)/spot(s), and the paper collection device, the Dried Blood Spot ("DBS") card, on which the blood is held.

**COUNT II**
**DESTRUCTION OF SAMPLES AND DBS CARD**
**(ASSERTED BY BOTH PLAINTIFFS AGAINST DEFENDANT)**

42. The previous allegations are re-alleged within this Court as if pled word for word herein.

43. This claim is made in the alternative to Count I.

44. Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES has publicly promised, upon request by a legal guardian, to destroy all samples stored by Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES and its contractee, Michigan Neonatal Biobank.

45. Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES is not entitled to keep and/or use the blood or test results of PATTON JUSTUS ELLISON when the same was never requested by or authorization provided by Plaintiff PHILIP L. ELLISON and/or Plaintiff KATHERINE E. ELLISON, as the parents of PATTON JUSTUS ELLISON.

46. On October 25, 2017, a destruction request was made, see Exhibit A.

47. To date and on information and belief, Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES and its contractee, Michigan Neonatal Biobank has not destroyed all samples, the DBS card, and/or the test results of PATTON JUSTUS ELLISON.

48. Plaintiff PHILIP L. ELLISON and/or Plaintiff KATHERINE E. ELLISON, as the parents of PATTON JUSTUS ELLISON, seek and demand an equitable order of this Court for the complete and full destruction of PATTON JUSTUS ELLISON's sample(s)/spot(s), and the paper collection device, the Dried Blood Spot ("DBS") card, on which the blood is held.

**COUNT III**
**WRONGFUL NON-DISCLOSURE OF RESPONSIVE RECORDS – MCL 15.240**
**(ASSERTED BY PLAINTIFF KATHERINE E. ELLISON AGAINST DEFENDANT)**

49. The previous allegations are re-alleged within this Court as if pled word for word herein.

50. Plaintiff KATHERINE E. ELLISON made a proper request labelled as Request No. 15 to Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES for copies of records, not a newly made MD word document, under Michigan's

Freedom of Information Act and is entitled to receive copies of all responsive records under that statute and its case law progeny.

51.    Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES has failed to produce responsive records.

52.    Plaintiff KATHERINE E. ELLISON is expressly not pleading a "costs claim" under MCL 15.240a, but a wrongful denial claim under MCL 15.240.

53.    To the extent that Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES would argue for the first time in the trial court (i.e. post suit initiation) an exemption under MCL 15.243(1)(d) and/or MCL 333.2631, 333.2632, and/or 333.2638 to provide any records/information to law enforcement who are not involved in any aspect of the research, the ability to invoke that exemption is waived by prior disclosure.

54.    To the extent that Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES would argue for the first time in the trial court (i.e. post suit initiation) an exemption under MCL 15.243, its failure to issue, pursuant to MCL 15.235(2)(b) or (c), the required "written notice" makes its actions unlawful under FOIA.

55.    To the extent that Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES would argue for the first time in the trial court (i.e. post suit initiation) an exemption under MCL 15.243, its failure to provide, pursuant to MCL 15.235(5)(a) the required "explanation of the basis under this act or other statute for the determination that the public record, or portion of that public record, is exempt from disclosure, if that is the reason for denying all or a portion of the request" makes its actions unlawful under FOIA.

### COUNT IV
### VIOLATION OF ART I, SECTION 11 OF THE MICHIGAN CONSTITUTION
### (ASSERTED BY BOTH PLAINTIFFS AGAINST DEFENDANT)

56.    The previous allegations are re-alleged within this Court as if pled word for word herein.

57.    Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES caused, by its agents and/or conscripted health care professionals, the extraction and seizure of the six blood spots of PATTON JUSTUS ELLISON prior to seeking and/or obtaining any consent and/or authorization from Plaintiff PHILIP L. ELLISON and/or Plaintiff KATHERINE E. ELLISON, as the parents of PATTON JUSTUS ELLISON.

58.    Michigan's Constitution expressly provides that "[t]he person... shall be secure from unreasonable searches and seizures. No warrant to search any place or to seize any person or things shall issue without describing them, nor without probable cause, supported by oath or affirmation."

59.    When presented with a card which asked whether or not Plaintiff PHILIP L. ELLISON and/or Plaintiff KATHERINE E. ELLISON, as the parents of PATTON JUSTUS

7

ELLISON, wanted to donate blood spots for "research," the card never provided an option to decline allowing Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES to take, seize, store, or rest the blood of PATTON JUSTUS ELLISON *in the first place*.

60.    By the time Plaintiff PHILIP L. ELLISON and/or Plaintiff KATHERINE E. ELLISON, as the parents of PATTON JUSTUS ELLISON, were presented with the "research" request card, Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES, by its agents and/or conscripted health care professionals, had *already* taken and seized the blood of PATTON JUSTUS ELLISON without consent or a warrant.

61.    The extraction and seizure of the blood of PATTON JUSTUS ELLISON prior seeking, obtaining, and/or having any consent and/or authorization from Plaintiff PHILIP L. ELLISON and/or Plaintiff KATHERINE E. ELLISON, as the parents of PATTON JUSTUS ELLISON, or without first obtaining a warrant by fulfillment of probable cause supported by oath or affirmation, renders MCL 333.5431 unconstitutional under the Michigan Constitution, specifically in violation of Article I, Section 11.

62.    The lack of consent and/or a warrant by fulfillment of probable cause supported by oath or affirmation makes the search/seizure of the blood of PATTON JUSTUS ELLISON unreasonable, and thus is unlawful.

<div align="center">

**COUNT V**
**VIOLATION OF ART I, SECTION 11 OF THE MICHIGAN CONSTITUTION**
**(ASSERTED BY BOTH PLAINTIFFS AGAINST DEFENDANT)**

</div>

63.    The previous allegations are re-alleged within this Court as if pled word for word herein.

64.    Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES caused, by its agents and/or conscripted health care professionals, the extraction and seizure of the blood of PATTON JUSTUS ELLISON prior to seeking and obtaining any consent and/or authorization from Plaintiff PHILIP L. ELLISON and/or Plaintiff KATHERINE E. ELLISON, as the parents of PATTON JUSTUS ELLISON.

65.    For the period of time between the initial seizure through the ultimate destruction of all six blood spots of PATTON JUSTUS ELLISON without first seeking, obtaining, and/or having any consent and/or authorization from Plaintiff PHILIP L. ELLISON and/or Plaintiff KATHERINE E. ELLISON, as the parents of PATTON JUSTUS ELLISON, or without first obtaining a warrant, renders MCL 333.5431 unconstitutional under the Michigan Constitution, specifically in violation of Article I, Section 11 for that period of time.

66.    The lack of consent and/or a warrant by fulfillment of probable cause supported by oath or affirmation for the period of time between the initial seizure through the ultimate destruction of all six blood spots makes the search/seizure unreasonable, and thus is unlawful.

<div align="center">8</div>

**COUNT VI**
**VIOLATION OF ART I, SECTION 17 OF THE MICHIGAN CONSTITUTION**
**(ASSERTED BY BOTH PLAINTIFFS AGAINST DEFENDANT)**

67.    The previous allegations are re-alleged within this Court as if pled word for word herein.

68.    Michigan's Constitution expressly provides that "[n]o person shall... be deprived of life, liberty or property, without due process of law."

69.    Under our State Constitution, PATTON JUSTUS ELLISON, by and through Plaintiff PHILIP L. ELLISON and/or Plaintiff KATHERINE E. ELLISON, as his parents, has a secured liberty right under Article I, Section 17 in refusing unwanted or undesired medical procedures, or at least alternatively has the right to the right of full and complete informed consent before any medical procedure is undertaken in a non-emergency situation.

70.    To the extent that MCL 333.5431(2) purports to cause PATTON JUSTUS ELLISON, by and through Plaintiff PHILIP L. ELLISON and/or Plaintiff KATHERINE E. ELLISON, as his parents, to waive or otherwise not have the right of informed consent prior to undertaking a medical procedure, MCL 333.5431(2) is unconstitutional under the Michigan Constitution, specifically in violation of Article I, Section 17.

**RELIEF REQUESTED**

71.    WHEREFORE, Plaintiff PHILIP L. ELLISON and Plaintiff KATHERINE E. ELLISON requests, based upon their respective claims, that this Court take the following action—

a. enter an order assigning this matter hearing and trial or for argument at the earliest practicable date and be expedited in every way pursuant to MCL 15.240(5);

b. enter an order declaring the various aspects of MCL 333.5431 unconstitutional under Article I, Sections 11 and 17 of the Michigan Constitution as outlined above, and enjoin its continued use as facially unconstitutional or unconstitutional as applied, and award nominal damages in the amount of one dollar ($1.00) for the state constitutional violations;

c. enter an order enjoining Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES from continued use on the unconstitutional portions of MCL 333.5431 related the programs operated by Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES unless and until the program becomes lawful under the Michigan Constitution;

d. enter an order or judgment compelling the return of all original information, records, reports, statements, notes, memoranda, and/or other data (regardless of its location), including medical records consisting of the tests results, as well as destruction of all copies thereof, whether in paper or electronic form, regarding PATTON JUSTUS

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

9

ELLISON which are in the possession of and/or stored by Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES and/or its contractee, Michigan Neonatal Biobank (over whom it has control), and all other third parties as being the product of its unconstitutional acts;

e. enter an order or judgment compelling the full and complete return of all blood samples or spots, together with the DBS Card, taken from PATTON JUSTUS ELLISON which are in the possession of and/or stored by Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES and/or its contractee, Michigan Neonatal Biobank (over whom it has control) pursuant to MCL 600.2920;

f. in the alternative, enter an order or judgment commanding the full and complete destruction of all blood samples or spots, together with the DBS Card, taken from PATTON JUSTUS ELLISON which are in the possession of and/or stored by Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES and/or its contractee, Michigan Neonatal Biobank (over whom it has control) and submit sworn proof under the pains of perjury within 15 days to guarantee to this Court and the Plaintiffs that this has been done in full;

g. enter an order or judgment compelling the return of all original medical records, reports, statements, notes, memoranda, and/or other data consisting of the tests results, and the destruction of all copies, whether in paper or electronic form, regarding PATTON JUSTUS ELLISON which are in the possession of and/or stored by Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES and/or its contractee, Michigan Neonatal Biobank (over whom it has control), and/or any other third party which is not authorized to keep, possess, or have the same;

h. enter an order commanding Defendant to advise Plaintiffs for what purposes Defendant is using or has used the blood samples and spots of PATTON JUSTUS ELLISON and permanently enjoin any on-going or planned use of the blood samples and spots which Defendant caused to be seized and stored indefinitely without informed parental consent;

i. enter an order or judgment against Defendant MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES compelling the disclosure of all responsive public records sought pursuant to FOIA Request No. 15;

j. enter an order awarding all reasonable attorney fees, costs, and disbursements required by MCL 15.240(6), and any other statute, rule, or legal basis;

k. enter an order awarding all punitive damages and imposing all civil fines authorized by Michigan's *Freedom of Information Act*; and

l. grant all other relief that Court deems equitable and just.

## VERIFICATION

1.   Each Plaintiff has reviewed the above-pled complaint.

2.   Regarding the allegations of which Plaintiff PHILIP L. ELLISON or Plaintiff KATHERINE E. ELLISON has personal knowledge, he or she believes them to be true.

3.   Regarding the allegations of which Plaintiff PHILIP L. ELLISON or Plaintiff KATHERINE E. ELLISON, does not have personal knowledge, he or she believes them to be true based on specified information, documents, or both.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____          _____
Philip L. Ellison                                        Date   2/27/2018

_____          _____
Katherine E. Ellison                                   Date   2-27-18

*<<CONTINUE ON NEXT PAGE>>*

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

Date: February 27, 2018

RESPECTFULLY SUBMITTED:

OUTSIDE LEGAL COUNSEL PLC
BY PHILIP L. ELLISON (P74117)
**Attorney for Plaintiffs**
PO Box 107 · Hemlock, MI 48626
(989) 642-0055
(888) 398-7003 - fax
pellison@olcplc.com

*\*\*Electronic signature authorized by MCR 2.114(C)(3) and MCR 1.109(D)(1)-(2)*

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing document(s) was served on parties or their attorney of record by mailing the same via US mail to their respective business address(es) as disclosed by the pleadings of record herein with postage fully prepaid, on the

27th day of February, 2018.

PHILIP L. ELLISON
Attorney at Law

OUTSIDE LEGAL COUNSEL PLC
www.olcplc.com

*Adam Kanuszewski, et al., v Michigan Department of Health and Human Services, et al.,*
No. 23-1733

# EXHIBIT 2

# STATE OF MICHIGAN

# COURT OF CLAIMS

PHILIP L. ELLISON, as legal guardian of
PATTON JUSTUS ELLISON

and

KATHERINE E. ELLISON, individually and as
legal guardian of PATTON JUTUS ELLISON,

        Plaintiffs,

v                                   Case No.  18-000011-MZ

MICHIGAN DEPARTMENT OF HEALTH AND     Hon. Brock A. Swartzle
HUMAN SERVICES, formerly known as
Michigan Department of Community Health,

        Defendant.

_____/

## ORDER DENYING MOTION TO LIFT STAY

      In this Court of Claims action, plaintiffs challenge the constitutionality of Michigan's newborn-screening program, MCL 333.5431, and assert a related FOIA challenge. At the same time, plaintiff Philip L. Ellison, acting as counsel, has made substantially identical claims in a federal lawsuit for other plaintiffs. In the interest of judicial economy, a prior judge who was first assigned this state case entered a stay "pending resolution" of the federal lawsuit. Plaintiffs now move this Court to lift the stay because, in their view, there has been a resolution of that federal case. But, the federal case is now on appeal, and, therefore, there is no final judgment in that case. Accordingly, for the reasons set forth by defendant in its brief in response on pages 10-14, plaintiffs' motion to lift the stay in this case is DENIED.

      IT IS SO ORDERED.  This order does not resolve the final claim in this case nor does it close this case.

Date: <u>September 5, 2023</u>

                              _____
                              Brock A. Swartzle
                              Judge, Court of Claims

