No. 23-1733

_____

# IN THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

_____

ADAM KANUSZEWSKI; ASHLEY KANUSZEWSKI; D.W.L., Minor Child; R.F.K., Minor Child; C.K.K., Minor Child; SHANNON LAPORTE; M.T.L., Minor Child; E.M.O., Minor Child; LYNNETTE WIEGAND; L.R.W., Minor Child; C.J.W., Minor Child; H.J.W., Minor Child; M.L.W., Minor Child,

*Plaintiffs - Appellees*,

v.

MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES; MICHIGAN NEONATAL BIOBANK, INC a/k/a MICHIGAN NEONATAL BIOREPOSITORY; NICK LYONS, in his individual capacity; SANDIP SHAH, in his individual capacity; SARAH LYON-CALLO, in her individual capacity; MARY KLEYN, in her individual capacity; ANTONIO YANCEY, in his individual capacity,

*Defendants* *

and

ELIZABETH HERTEL, in her official capacity; SANDIP SHAH, in his official capacity; SARAH LYON-CALLO, in her official capacity; MARY KLEYN, in her official capacity; and CHRISTOPHER KRAUSE, in his official capacity,

*Defendants - Appellants*

_____

* These parties in these capacities were previously dismissed due to this Court's prior *Kanuszewski* decision based upon state sovereign and qualified immunity. See Footnote 1, *infra*.

_____

On Appeal from the United States District Court
for the Eastern District of Michigan – Northern Division
Honorable Thomas L. Ludington, District Court Judge

_____

## APPELLEES' BRIEF

_____

PHILIP L. ELLISON (P74117)
OUTSIDE LEGAL COUNSEL PLC
530 West Saginaw St
PO Box 107
Hemlock, MI 48626
(989) 642-0055
pellison@olcplc.com

*Counsel for Appellees*

# CORPORATE DISCLOSURE STATEMENT

Appellees have no parent corporation and are not a publicly held corporation owning 10% or more of stock of a party. FRAP 26.1(a).

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................*iv*

STATEMENT IN SUPPORT OF ORAL ARGUMENT ...........................*x*

COUNTER STATEMENT OF JURISDICTION .....................................1

COUNTER STATEMENT OF QUESTIONS PRESENTED....................2

INTRODUCTION...................................................................................3

STATEMENT OF FACTS .......................................................................4

STANDARD OF REVIEW.....................................................................26

SUMMARY OF COUNTER ARGUMENT.............................................27

COUNTER ARGUMENT .....................................................................28

    I.    Substantive Due Process.........................................................28

        A.    Mootness...................................................................28

        B.    Medical ....................................................................30

        C.    Strict Scrutiny.........................................................33

            i.    No Compelling Interest.....................................34

            ii.    No Narrow Tailoring.........................................37

            iii.    Sufficient Consent Could Be Easily Sought.......38

    II.    Fourth Amendment................................................................39

        A.    Mootness...................................................................39

        B.    Unconstitutional Seizure .........................................40

        C.    Unconstitutional Search ..........................................42

            i.    Pled Violation....................................................43

         ii.     Unreasonable ..................................................... 44

  III.   Consent Processes ...................................................50

      A.    Mootness.................................................................50

      B.    Consent...................................................................50

         i.     Data Claims ................................................ 51

         ii.     Blood Spots Claims .......................................... 52

                1.     Pre-May 2010 ................................53

                2.     Post-May 2010 ...............................55

CONCLUSION ........................................................ 68

RELIEF REQUESTED ............................................... 71

CERTIFICATE OF COMPLIANCE....................................... 73

CERTIFICATE OF SERVICE............................................ 74

DESIGNATION OF RELEVANT
DISTRICT COURT DOCUMENTS ...................................... 75

# TABLE OF AUTHORITIES

### C<small>ASES</small>

*Akrawi v. Remillet*,
  504 F. App'x 450 (6th Cir. 2012) ..................................................... 28

*Bambach v. Moegle*,
  92 F.4th 615 (6th Cir. 2024) ........................................................... 46

*Beleno v. Lakey*,
  306 F. Supp. 3d 930 (W.D. Tex. 2009) ........................................... 20

*Bowles v. Russell*,
  432 F.3d 668 (6th Cir. 2005) .......................................................... 31

*Broadrick v. Oklahoma*,
  413 U.S. 601 (1973) ........................................................................ 55

*Bumper v. North Carolina*,
  391 U.S. 543 (1968) ........................................................................ 52

*Camara v. Mun. Ct.*,
  387 U.S. 523 (1967) ........................................................................ 44

*Constangy v. NLRB*,
  851 F.2d 839 (6th Cir. 1988) .......................................................... 28

*Coolidge v. New Hampshire*,
  403 U.S. 443 (1971) ........................................................................ 45

*Cruzan v. Director, Mo. Dep't of Health*,
  497 U.S. 261 (1990) ................................................... 14, 32, 50, 70

*Dubbs v. Head Start, Inc.*,
  336 F.3d 1194 (10th Cir. 2003) ........................................ *in passim*

*Ferguson v. City of Charleston (On Remand)*,
  308 F.3d 380 (4th Cir. 2002) ................................................... 24, 58

*Ferguson v. City of Charleston,*
   532 U.S. 67 (2001) ........................................................ 43

*Fisher v. Univ. of Tex. at Austin,*
   570 U.S. 297 (2013) ....................................................... 33

*Garrison v. Louisiana,*
   379 U.S. 64 (1964) ......................................................... 47

*Grutter v. Bollinger,*
   539 U.S. 306 (2003) ....................................................... 33

*Gulf, C. & S. F. R. Co. v. Redeker,*
   12 S.W. 855 (Tex. 1889) ................................................ 32

*Holt v. City of Battle Creek,*
   925 F.3d 905 (6th Cir. 2019) ........................................ 26

*Hudson v. Dennehy,*
   538 F. Supp. 2d 400 (D. Mass. 2008) ........................... 36

*Island Creek Coal Co. v. Wilkerson,*
   910 F.3d 254 (6th Cir. 2018) ........................................ 51

*Johnson v. City of Cincinnati,*
   310 F.3d 484 (6th Cir. 2002) ........................................ 33

*Kanuszewski v. MDHHS,*
   927 F.3d 396 (6th Cir. 2019) ............................... *in passim*

*Kolbe v. Hogan,*
   849 F.3d 114 (4th Cir. 2017) ........................................ 33

*Libertarian Party of Ohio v. Blackwell,*
   462 F.3d 579 (6th Cir. 2006) ........................................ 28

*LW v. Skrmetti,*
   73 F.4th 408 (6th Cir. 2023) ......................................... 31

*Memphis A. Philip Randolph Institute v. Hargett,*
   2 F.4th 548 (6th Cir. 2021) ........................................... 28

*Mozert v. Hawkins Cnty. Bd. of Educ.*,
   827 F.2d 1058 (6th Cir. 1987) ....................................... 36

*Norman-Bloodsaw v. Lawrence Berkeley Lab.*,
   135 F.3d 1260 (9th Cir. 1998) ....................................... 43

*Ohio v. EPA*,
   969 F.3d 306 (6th Cir. 2020) ........................................ 29

*Ondo v. Cleveland*,
   795 F.3d 597 (6th Cir. 2015) ........................................ 33

*OPERS v. Fed. Home Loan Mortgage Corp.*,
   64 F.4th 731 (6th Cir. 2023) ........................................ 30

*Ornelas v. United States*,
   517 U.S. 690 (1996) ................................................. 45

*Parham v. J.R.*,
   442 U.S. 584 (1979) ....................................... 16, 47, 54

*Patterson v. Haskins*,
   470 F.3d 645 (6th Cir. 2006) ........................................ 31

*Pierce v. Society of Sisters*,
   268 U.S. 510 (1925) ............................................ 16, 34

*Planned Parenthood of Central Missouri v. Danforth*,
   428 U.S. 52 (1976) .................................................. 69

*Quilloin v. Walcott*,
   434 U.S. 246 (1978) ................................................. 34

*Resurrection Sch. v. Hertel (En Banc)*,
   35 F.4th 524 (6th Cir. 2022) ..................................... 1, 29

*Schneckloth v. Bustamonte*,
   412 U.S. 218 (1973) ............................................. 50, 52

*Scottsdale Ins. v. Flowers*,
   513 F.3d 546 (6th Cir. 2008) ........................................ 31

*Tarter v. Raybuck,*
    742 F.2d 977 (6th Cir. 1984) .................................................. 52, 53

*Taylor v. City of Saginaw,*
    922 F.3d 328 (6th Cir. 2019) ............................................. 44, 45, 52

*Thomas v. Collins,*
    323 U.S. 516 (1945) .................................................................... 36

*Tri Cty. Wholesale Distrib., Inc. v. Labatt USA Operating Co.,*
    828 F.3d 421 (6th Cir. 2016) ......................................................... 26

*Troxel v. Granville,*
    530 U.S. 57 (2000) ................................................................ 32, 34

*U.S. Safety Specialty Ins. Co. v. Genesee Cnty.,*
    53 F.4th 1014 (6th Cir. 2022)....................................................... 39

*U.S. v. Brandon,*
    158 F.3d 947 (6th Cir. 1998) ........................................................ 38

*U.S. v. Castillo,*
    864 F. Supp. 1090 (D. Utah 1994) ................................................. 67

*U.S. v. McCaleb,*
    552 F.2d 717 (6th Cir. 1977) ........................................................ 52

*U.S. v. Scott,*
    578 F.2d 1186 (6th Cir. 1978) ....................................................... 52

*U.S. v. Worley,*
    193 F.3d 380 (6th Cir. 1999) ........................................................ 50

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989) .................................................................... 37

*Whalen v. Roe,*
    429 U.S. 589 (1977) .................................................................... 31

*Wisconsin v. Yoder,*
    406 U.S. 205 (1972) ................................................................ 33, 34

*Zenith Radio Corp. v. Hazeltine Res., Inc.*,
    395 U.S. 100 (1969) ...................................................................... 49

*Zoski v. Gaines*,
    260 N.W. 99 (Mich. 1935) .......................................................... 32

CONSTITUTIONAL PROVISIONS

U.S. Const. amend. IV ................................................................ 44

STATUTES

28 U.S.C. § 1291 ............................................................................ 1

M.C.L. § 333.5431 .............................................................. 5, 15, 16

M.C.L. § 333.17520 ....................................................................... 16

SECONDARY SOURCES

Anne Hart, *An Insufficient Screening: The Constitutionality of
    Michigan's Newborn Screening Program*, 61 BOSTON
    COLL. L. REV. E.Supp. II.-213 (2020) available at
    http://olcplc.com/s/owlq .............................................................. 69

Dana DiFilippo, *Civil Rights Group Sues New Jersey to Stop
    Secret Storage, Use of Baby Blood Spots*, N.J. MONITOR,
    Nov, 2, 2023, available at https://newjerseymonitor.com/
    2023/11/02/civil-rights-group-sues-new-jersey-to-stop-
    secret-storage-use-of-baby-blood-spots/ ........................................ 60

Emily Mullin, *Police Used a Baby's DNA to Investigate Its Father
    for a Crime*, WIRED, Aug. 15, 2022, available at
    https://www.wired.com/story/police-used-a-babys-dna-to-
    investigate-its-father-for-a-crime/ ................................................. 48

Orin S. Kerr, *Executing Warrants for Digital Evidence:
    The Case for Use Restrictions on Nonresponsive Data*,
    48 TEX. TECH L. REV. 1 (2015) ...................................................... 42

*Remarks by the President in Apology for Study Done in Tuskegee*,
US Archive, May 16, 1997, available at https://clintonwhite
house4.archives.gov/textonly/New/Remarks/Fri/19970516-
898.html ................................................................................... 70

*The President's News Conference*, Ronald Reagan Presidential
Library, available at https://www.reaganlibrary.gov/archives/
speech/presidents-news-conference-23 ................................... 49-50

*The U.S. Public Health Service Untreated Syphilis Study at
Tuskegee*, US Centers for Disease Control and Prevention,
Sept. 4, 2024, available at https://www.cdc.gov/tuskegee/
about/index.html .......................................................................... 70

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Appellees, by counsel, request oral argument on this case and its collection of issues of major constitutional significance so as to answer any questions the panel may have.

## COUNTER STATEMENT OF JURISDICTION

This Court does not have full jurisdiction. While this Court has jurisdiction to review the data-related claims from the District Court's final judgment, 28 U.S.C. § 1291, the blood spots themselves have been disposed of and therefore this Court lacks Article III authority to render what would be an advisory opinion on the now-moot blood spots portions of the appeal. *Resurrection Sch. v. Hertel (En Banc)*, 35 F.4th 524 (6th Cir. 2022).

**COUNTER STATEMENT OF QUESTIONS PRESENTED**

I.    Is this appellate challenge to the blood spots policies and practices against the current  infants moot?

II.   Should this Court affirm the District Court's judgment?

*Appellees say "yes" to both.*

## INTRODUCTION

Under its Newborn Screening Program (NSP), public health officials effectuate the collection of samples of newborns' blood (i.e., "spots") and medically test them for various genetic conditions. After that is completed, Defendants have an unconstitutional practice of storing, utilizing, and distributing the newborns' negative-resulted blood samples and extracted data without informed parental consent. The case has been the first comprehensive challenge to these policies and practices that cause, *without sufficient parental informed consent*, the ongoing retention, storage, and non-consensual use of newborn infants' physiological and biological materials and deeply private medical and genetic information. The District Court reviewed Michigan's "keep mum" practices and correctly found the government impinged upon the infants' and their parents' personal autonomy, control, and privacy by either replacing the government's self-made judgment for the parents' self-determination or simply never asking for consent with sufficient clarity in the first place. In other words, the government eviscerated privacy and then stole these competent parents' right to make their own fully informed choice *for their children* in the first instance. The Constitution

3

protects against such improprieties. Following this Court's prior *Kanuszewski* decision, the District Court found Defendants violated the Fourth and Fourteenth Amendments. **Judgment, RE 262, PageID# 6991-6993**. Because a portion of this case became moot on appeal, the Court should dismiss the appeal in part and affirm as to the rest.

## STATEMENT OF FACTS

Plaintiffs are four parents of nine minor children who have been involuntarily subjected to Michigan's Newborn Screening Program and have had the infants' blood spots retained, stored, and made available for use (at any time and without notice) by state public health officials.

| Child (Plaintiffs) | Parent (Plaintiffs) | Birth Year |
|---|---|---|
| D.W.L. | Adam/Ashley Kanuszewski | 2008* |
| R.F.K. | Adam/Ashley Kanuszewski | 2013 |
| C.K.K. | Adam/Ashley Kanuszewski | 2016 |
| M.T.L. | Shannon Laporte | 2008* |
| E.M.O. | Shannon Laporte | 2017 |
| L.R.W. | Lynnette Wiegand | 2011 |
| C.J.W. | Lynnette Wiegand | 2013 |
| H.J.W. | Lynnette Wiegand | 2014 |
| M.L.W. | Lynnette Wiegand | 2017 |

*born before BioTrust program*

Each sued defendant helps direct, control, and/or manage the problematic parts of the NSP, including the Michigan Neonatal

Biobank.[1]

## *Background*

After an infant is born, a medical staffer from the birthing hospital has been ordered by the state public health officials to deploy a skin-piercing device to involuntarily extract five or six blood drops via a heel-prick test on to a Guthrie or dried blood spot ("DBS") card that form "blood spots." **RE 135-32, PageID# 2369-2370.** No consent is ever sought ahead of time, M.C.L. § 333.5431, and parents are then charged (currently more than $150.00) for these non-requested medical tests. **Trial-Transcript, RE 243, PageID #6246-6247**.

But it is not just the marshalled blood that is transmitted when the hospital hands over the blood-filled DBS card; it also passes along highly personal/private information and data the hospital staff has collected and is sharing without the knowledge or consent of patient/parents. **NBS**

---

[1] The Notice of Appeal (**RE 266, PageID# 7040**) was filed incorrectly as only certain officials (or successors) in their official capacities remained after the prior appeal – i.e., Elizabeth Hertel as the successor director of the Michigan Department of Health and Human Services ("MDHHS"); Dr. Sandip Shah as the director of the Bureau of Laboratories; Dr. Sarah Lyon-Callo as the director of the Bureau of Epidemiology and Population Health; Mary Kleyn as the section manager of Michigan's NSP; and Christopher Krause as the successor director of the Biobank.

**Card, RE 135-18, PageID# 2203**; see also **Cards, RE 160-11, PageID# 5498-5506**. This includes the infant's name; gender; birth date and time; race; ethnicity; weight; gestation period; whether single or multiple births (like twins); and receipt of postnatal antibiotics, transfused with red blood cells, or total parenteral nutrition (TPN); and affirmative disclosure if the newborn was in the NICU or special care nursery. **Data Collection, RE 135-20, PageID# 2206-2207**; see also **Cards, RE 160-11, PageID# 5498-5506**. Michigan NSP also requires nonconsensual disclosure of the mother's information too. *Id.*, **PageID# 2208.** After delivery to the governmental testing facility, **FAQs, RE 135-13, PageID# 2186**, state laboratory technicians warrantlessly withdraw, by scientific extraction, the deeply-private personal medical data regarding each infant. **RE 135-32, PageID# 2369-2370.** This includes over 160 biomarkers and in-blood compounds. **Letter, RE 135-9, PageID# 2167.** Later, the highly private data is non-consensually saved to and indefinitely stored in the state government's databases without first securing any informed parental consent. **Shah Dep., RE 135-42, PageID# 2439**; **Trial-Transcript, RE 244, PageID# 6290**.

The remaining "residual" blood spots could simply be destroyed but each DBS card is instead cut apart and delivered to a governmental nonprofit for indefinite government storage. **RE 135-32, PageID# 2369-2370; Yancey Dep., RE 135-40, PageID# 2389.** The individual samples now-cut apart are assigned a code for identification at the Biobank while the master cross-index is kept by the State Defendants. **RE 135-35, PageID# 2373-2374.** MDHHS calls this separation its "honest brokering" scheme. **Trial-Transcript, RE 243, PageID# 6200-6202**.

Originally one of the four or five remaining spots was sent to a government warehouse operated by MDHHS' BioTrust for Health. This lawsuit ended that dubious practice. **Partial Consent Judgment, RE 209, PageID# 5803**. The other remaining blood spots are sent to the Biobank, an "arm of the state"[2] non-profit, located in Detroit. **RE 135-34, PageID# 2372; Yancey Dep., RE 135-40, PageID# 2388.** The Biobank, now headed by Christopher Krause, **Yancey Dep., RE 135-40, PageID# 2386**; **Order, RE 238, PageID# 6107**, never obtains permission or has consent from parents to transfer the samples from the State Defendants to the Biobank. **Kanuszewski Decl., RE 135-25**; **Laporte Decl., RE**

---

[2] *Kanuszewski v. MDHHS*, 927 F.3d 396, 413 fn.8 (6th Cir. 2019)

**135-26**; **Wiegand Decl., RE 135-27; Trial-Transcript, RE 243, PageID# 6139-6140, 6144-6145**; **Trial-Transcript, RE 243, PageID# 6139-6140, 6172-6179; Trial-Transcript, RE 243, PageID# 6445-6457;** see also **Admissions, RE 135-21, PageID# 2217-2219, ¶¶9-11, 13.**

### *Retention*

Defendants' data and biospecimen retention practices are shocking. Literally *millions* of non-consensually seized blood samples are stashed, after the completion of the newborn screening medical tests, at the Biobank.[3] **RE 135-4, PageID# 2081**; **RE 135-36, PageID# 2375**. Regardless of the parent's choice on the directive form, the Biobank stocks the blood spots indefinitely. **RE 135-6, PageID# 2086**; see also **Order, RE 214, PageID# 5832; Trial-Transcript, RE 243, PageID# 6240.** In other words, spots are used and stored "even when consent for medical research is refused." **Order, RE 214, PageID# 5832**. At the Biobank, the blood spots are deposited until they can be sold to researchers as part of for-profit or public-based scientific research

---

[3] Officials lack an exact number. **Yancey Dep., RE 135-40, PageID# 2400**. It is in the multiple *millions*. E.g. **RE 135-36, PageID# 2375**.

projects. **Biobank Price List, RE 135-16, PageID# 2200; Yancey Dep., RE 135-40, PageID# 2389.** As correctly observed, "private researchers pay the State and the Biobank for DBS." **RE 214, PageID# 5832**; see also **Purchasers List, RE 151-3, PageID# 5137.** No further consent is ever sought when samples are selected and sold for use in scientific studies by businesses or other non-NSP entities. **Yancey Dep., RE 135-40, PageID# 2395-2396.** At trial, one of the NBS directors testified that he keeps increasing the record retention schedule cutoffs so Defendants can effectively keep all the data for at least 100 years. **Trial-Transcript, RE 244, PageID# 6294.**

### *Critical Concerns*

"For decades, experts and scholars from medicine to law have criticized state-run NSPs," but a legal challenge had not made it into court (until now). **Order, RE 214, PageID# 5813** (collecting literature). One expert is Professor Sonia Suter.[4] In her scholarly article, *Did You*

---

[4] Professor Suter is a law professor at George Washington University Law School who has served for five years on the expert panel of the NSP at the American College of Medical Genetics. **Opinion and Order, RE 200, PageID # 5757**. Before obtaining a Master of Science in Human Genetics, she was a Genetic Counselor in obstetrics and pediatrics for two years at Henry Ford Hospital. ***Id.* at PageID # 5756**. "[H]er focus on bioethics only makes her testimony even more unique and

*Give the Government Your Baby's DNA? Rethinking Consent in Newborn Screening*,[5] Professor Suter explained that NSPs "raise important privacy and policy concerns" because "samples are retained for long periods or indefinitely" with "few, if any, limits" that "prevent potentially invasive uses of these samples by the government or third parties." **RE 135-30, PageID# 2298**. "[T]here is little oversight" of state public health officials' decisions and operation of these programs. ***Id*., PageID# 2309**. And the future is now – "[w]ith the possibility of ever-cheaper whole genome sequencing, it is not hard to imagine a time, in the not too distant future, when NBS will be expanded to include whole genome sequencing" of every infant. ***Id.***

The preeminent concern about state-run NSPs is the lack of consensus about or commitment to obtaining parents' informed consent. ***Id*., PageID# 2298.** The heart of this case is about that lack of sufficient consent and answering the legal question of "whether Plaintiffs consented to any aspect of Defendants' retention, storage, or future use

---

therefore valuable" for this case. ***Id.* at PageID # 5761**. The District Court found Professor Suter to be "an expert in the costs and benefits of alternative methods to obtain consent for genetic research." ***Id.* at PageID # 5757**.

[5] 730 Minn. J. L. Sci. & Tech. 729 (2014).

of the blood samples" and data. *Kanuszewski*, 927 F.3d at 425. Against blood spots and data being seized and secretly stored, the parents were never asked for (or themselves provided) informed consent, i.e. granting permission after being sufficiently informed of the risks, benefits and alternatives. **Kanuszewski Decl., RE 135-25, Laporte Decl., RE 135-26**; **Wiegand Decl., RE 135-27.** Michigan law has no legal protections or limitations in place for these stored blood samples or data. Law enforcement intermittently accesses the Biobank too. **RE 135-12, PageID# 2180-2185.** There is the constant ongoing threat of misuse of everyone's blood spots, the private medical and genetic information extracted (or is further extractable upon demand), and of future discrimination, **RE 135-43,** whether intentional or accidental, **RE 135-24, PageID# 2232**.

An interesting example of this privacy-eviscerating insolence revealed itself midway through this litigation. Defendants unexpectedly self-decided to publicly share the private medical records and data of the millions of the then-infants with thousands of doctors (i.e. "providers") across Michigan via the Michigan Care Improvement Registry (MCIR). **Trial-Transcript, RE 243, PageID# 6215-6216**. They did it "to reduce

the burden" on health care providers and, in their judgment, "improve the service that children are receiving." ***Id.*, PageID# 6216**. Now, literally, any third-party doctor for any reason can go to MCIR and "pull that [private medical data] down." ***Id.*** Not a single parent was consulted to secure their consent to effectuate this never-before provided access to deeply-private medical records. ***Id., PageID# 6219.*** This shows there are literally no guard-rails, legal protections, or checks in this scheme against bureaucrats self-rendering important privacy decisions that rightly belong with moms and dads. If parents want to rein in the shocking distribution of their child's private data, it "is not 'doable.'" **Opinion, RE 263, PageID# 6997.**

### *History*

Michigan was first introduced to newborn screening in 1965 when laboratory technology became available to identify newborns with phenylketonuria (PKU). **RE 135-4, PageID# 2072.** From the success of the voluntary[6] newborn "screening,"[7] other screens were developed and

---

[6] Massachusetts was the first state to launch a newborn PKU screening program that demonstrated the feasibility of mass genetic screening and it was voluntary. **Suter Article, RE 135-30, PageID # 2304-2305.**

[7] As its name suggests, newborn screening is a *screening* program

added as part of created *involuntary* screening schemes. Today there are nearly sixty diseases as part of Michigan's screening panel. **Disorders List, RE 135-11, PageID# 2179.** In prior years, any remaining samples were destroyed. **RE 135-6, PageID# 2086.** That arbitrarily changed starting in July 1984 when – without parental knowledge or any parental consent – Defendants began indefinitely retaining the four or five residual blood spots. **RE 135-4, PageID# 2081.** No parent was informed.

Then in the 1990s the Human Genome Project gained considerable international attention and caused concerns for genetic privacy and potential discrimination. Michigan's governor created the Commission on Genetic Privacy and Progress to recommend ways to protect genetic privacy, prevent discrimination, and maximize the beneficial uses of new medical knowledge resulting from new discoveries from scientific developments, like the Human Genome Project. **Final Report, RE 135-2.**

As part of its final report, the Commission recognized that the

---

in which an abnormal result does not necessarily identify the presence of disease. It merely indicates an increased risk that the child *potentially* has the condition, necessitating confirmation through diagnostic testing. **Suter Article, RE 135-30, PageID # 2304.**

"informed consent doctrine" mandates that health care professionals may not perform medical tests or do studies involving patients without first informing them of the nature of the procedure—including its "risks, benefits and alternatives." ***Id., PageID# 2009.*** The law's "notion of bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment." *Cruzan v. Director, Mo. Dep't of Health*, 497 U.S. 261, 2694 (1990). Personal autonomy is the "right to determine what shall be done with his own body." *Id.* The Commission correctly explained that "[o]ne important way to provide [patient autonomy] protection is through an informed consent… [and] is an important way to protect individuals' privacy." **Final Report, RE 135-2, PageID# 2009**.

Without any privacy experts or advocates involved, the Commission problematically ignored these bedrock principles when later expounding that Michigan's NSP "is mandated under state law [and thus] parental consent is not required." ***Id., PageID# 2015.*** It also explained that "[t]he [S]tate has developed informational booklets describing newborn screening" but conceded "these are not always available to or read by parents." ***Id.***

14

Despite its deep prior discussion on informed consent, the Commission surprisingly recommended that "parental consent not be required for newborn screening for diseases" but parents be "given an opportunity to opt out of having their newborn's screening test card used in future research." ***Id.*, PageID# 2017.** It did not explain what it meant by "research." The Commission, consisting largely of public health officials who wanted a biospecimen repository, also recommended that the blood spots be retained indefinitely. ***Id.*** In short, informed consent was only lip service against the desire to create a biobank of generic samples and collected data.

### *Section 5431*

Thereafter the Legislature amended Section 5431 of Michigan's Public Health Code. M.C.L. § 333.5431 (**RE 135-3**). A health professional, under threat of criminal prosecution (**Admissions, RE 135-21, PageID# 2220, ¶15**), is required to "administer or cause to be administered" certain medical tests on newborn Michigan infants. M.C.L. § 333.5431(1), (5). Conscripted healthcare professionals involuntarily extract blood from Michigan newborns usually 12 to 36 hours post-birth by piercing the skin of the newborns and extracting six blood spots. State officials have

15

renounced[8] any legal need for informed consent from parents before doing any of this. M.C.L. § 333.5431(2); see also M.C.L. § 333.17520(1). These officials have also demanded that their agency *alone* must conduct these medical screening tests in their government laboratories.

The medical tests undertaken involve extracting deeply private medical and genetic information/data from the extricated blood spots to screen for the existence of certain non-communitive heredity-based diseases existing in an extremely-tiny minority of the general Michigan population. State officials also required personal data about the infant and the birth mother to be disclosed. Yet the officials have never obtained informed consent from the infants (obviously, given their age) or their parents before searching and seizing the infants' blood spots, keeping the samples indefinitely, or extracting and storing the personal data from the

---

[8] There is difficulty conceptualizing, legally, what the Legislature precisely did here. In one view, Michigan waived the need for informed consent. But that fails because a government cannot waive a constitutional right on behalf of a citizen. In another sense, the State in a *parens patriae* role granted consent, without deference or concern to parents, to undertake medical testing. But competent parents, not governmental officials, have a fundamental right to speak for and are empowered to make decisions for their minor children in matters of medical treatment. *Parham v. J.R.*, 442 U.S. 584 (1979); *Pierce v. Society of Sisters*, 268 U.S. 510, 535 (1925).

blood.

Despite statutory changes in the 2000s, the same problems continued – the lack of sufficient parental knowledge and understanding. And the lack of sufficient knowledge means a lack of informed consent. For example, the informational brochures regularly trumpeted in this case by Defendants describing newborn screening are not and were not made available to parents. **Kanuszewski Decl., RE 135-25, PageID# 2235; Laporte Decl., RE 135-26, PageID# 2251**; **Wiegand Decl., RE 135-27; PageID# 2265.** Each Plaintiff-Parent here was never informed about the "risks, benefits and alternatives" of participating in the post-testing portion of either newborn screening (i.e. the transfer of the spots to a private, third-party entity), the storage of their infants' medical data, or the post-screening uses of their infants' blood spots (medical research by non-State of Michigan researchers for a fee). **Admissions, RE 135-21, PageID# 2214-2219, ¶¶2, 4, 6, 9, 10, 11, 13.** All aver that if they were fully informed of or understood the full scope of this unusual program, including all the risks, benefits and alternatives, none would have consented. **Kanuszewski Decl., RE 135-25, PageID# 2240; Laporte Decl., RE 135-26, PageID# 2255-2256**; **Wiegand Decl., RE**

17

**135-27; PageID# 2269.** This lack of understanding has happened countless times across Michigan. **Eisenhauer Study, RE 135-28, PageID# 2281-2291**.

### *Biobank Formed*

Realizing that there was an opportunity to begin capitalizing on these stored blood spots, a working group was formed to create a government-affiliated non-profit entity outside the normal strictures of state government hierarchy and oversight. **Business Plan, RE 135-7, PageID# 2090**. The "Michigan Neonatal Biobank" was formed. **Articles, RE 135-8.** It is headed up by a Board of Directors, **Board Printout, RE 160-3, PageID# 5254**, whose role and authority are unclear and really only ritualistic because Dr. Shah and Dr. Lyon-Callo control the Biobank's policies, operations, and directives, **Lyon-Callo Dep., RE 135-41, PageID# 2411-2412.**

The Biobank's institutional mandate, undertaken at the request of MDHHS, was to organize stored blood spots and actively market the availability of "linked data" from other databases operated by MDHHS to "greatly increase the value of the dried blood spots" and enjoy the "user fees" such would generate. **Business Plan, RE 135-7, PageID #2091,**

**2107**; see also **Biobank Price List, 135-16, PageID# 2200**; **Biobank User Fees Webpage, RE 135-38, PageID# 2379**; **Solicitation, RE 135-9, PageID# 2168.** This included creating two "product lines" – "data" and "biomaterial" – so as to be financially self-sustaining after five years. **Business Plan, RE 135-7, PageID# 2112, 2090.** The business plan also called for working with another Tech Town[9] company that is "the leader in supplying biological samples to large pharmaceutical companies and the biotechnology industry" with the goal of generating "a significant revenue stream of several million dollars for both parties." *Id.***, PageID# 2102.** The goal from the beginning was to make money by developing sellable products for academic and commercial researchers using the excess blood spots of newborn infants. *Id.***, PageID# 2107.** Such was even being sought through the commencement of this lawsuit. **TransHit Bio Emails, RE 135-17, PageID# 2201-2202.** As marketed, the Biobank is a "rare archive" of infant blood samples from "nearly every child born in Michigan since 1985," **Solicitation, RE 135-9, PageID# 2166**, where *millions* of blood spots are stored and made-ready for potential sale by Defendants.

---

[9] See **RE 135-34, PageID# 2372.**

19

Currently, the Biobank is responsible for receiving, cataloging, and storing excess newborn blood spots. Only upon the discretionary direction of two of the State Defendants, Dr. Lyon-Callo and Dr. Shah, will the Biobank then decide whether to distribute spots to third parties upon the payment of monies. **Lyon-Callo Dep., RE 135-41, PageID# 2421-2422.**

### *Texas Lawsuit*

Then a watershed event happened. In 2009, a lawsuit challenged Texas' retention and storage of blood spot samples. **Belano Lawsuit, RE 135-15**. In December 2009, Texas announced it would sua sponte destroy more than five million blood samples collected from Texas newborn infants without parental consent under its newborn screening program. **Article, RE 135-14, PageID# 2189**. Michigan officials rightfully panicked because its newborn screening program was much like Texas' program. See *Beleno v. Lakey*, 306 F. Supp. 3d 930 (W.D. Tex. 2009).

As the *Beleno* lawsuit progressed, Defendants started changing its long-standing practices. When no consent was obtained from parents before keeping bloodspots retained from extracts dating July 1984 through May 1, 2010, Defendants simply assert that "alternative consent" was obtained from an internal MDHHS committee known as its

Institutional Review Board. **Lyon-Callo Dep., RE 135-41, PageID# 2412; RE 135-35, PageID# 2374.** Yet this "IRB" does not have (and never had) any legal authority to waive parental consent in the place of parents—it is simply a made-up proposition.

This supposed new assent process began under an intra-department program called the BioTrust for Health (the "BioTrust"). Launched in June 2009 after the formation of the Biobank, the BioTrust is MDHHS' appointed overseer as to the storage and use of retained blood spots held at the Biobank that operates alongside the NSP to coordinate transactions with third parties, such as research institutions and law-enforcement agencies. **Opinion, RE 263, PageID# 6997.** The BioTrust is operated by Dr. Shah and Dr. Lyon-Callo. **Lyon-Callo Dep., RE 135-41, PageID# 2409-2410; Shah Dep., RE 135-42, PageID# 2432.** These BioTrust coordinators instruct the Biobank which specific blood spots to give to the third parties. **Opinion, RE 263, PageID# 6997.**

Starting October 2010, Defendants, under the flag of the BioTrust, began to implement what is characterized as an "opt out" process. **RE 135-33, PageID# 2371.** This concept consists of indefinitely storing all blood spots without first asking for consent. If a parent does not want the

blood spot stored, they must later petition to pull out the samples from the Biobank. At no point are parents told about the third-party Biobank, biobanking, and outside fourth-party researchers. **Kanuszewski Decl., RE 135-25; Laporte Decl., RE 135-26**; **Wiegand Decl., RE 135-27**. Nothing is mentioned about data and, outside of this lawsuit, no administrative method exists for parents to end or opt out of permanent data retention.

The 2010 restructuring also created a complicated administrative maze of boards, committees, and entities decentralizing control and decision-making as to what was happening or who was in charge of the program for the retention, storage, or future use of the blood samples. **Diagram, RE 135-5, PageID# 2085.** Moreover, full honesty has been regularly missing. The BioTrust expounds in a FAQ on its website that—

> Do law enforcement officials or insurance companies have access to the BioTrust?
>
> *No. The BioTrust has been designated a medical research project by the MDHHS Chief Medical Executive. Under state law, the samples, data and other information included as part of this medical research project are protected and are not subject to forced disclosure to third parties.*

**RE 135-33, PageID# 2371.** But we know that is simply a false and

untrue statement. **Subpoenas, RE 135-12**; see also **Lyon-Callo Dep., RE 135-41, PageID# 2424-2425.**

### *The New "Consent" Process*

Starting October 1, 2010, Defendants began what it calls its consent process. The remaining seven infants born after 2010 (see *supra*) were subject to this process. The pattern is the same. Around 12 hours after birth, a hospital worker approaches a parent (usually the exhausted, still-hospitalized mother) and presents a single page "directive" form for signature. Directives for seven of the nine infants are in the record. **RE 141-15, PageID# 2988; RE 141-16, PageID# 2990; RE 141-17, PageID# 2992; RE 141-18, PageID# 2994; RE 141-19, PageID# 2996; RE 141-20, PageID# 2998; RE 141-21, PageID# 3000**. Interestingly, there is not an option to simply destroy all residual samples after newborn screening testing is complete. Why not is unexplained. And most shockingly of all, even "if a parent declines participation in the BioTrust blood spots" via the signed directive, blood spots are still permanently kept anyway. **RE 135-6, PageID# 2086**; see also **Order, RE 214, PageID# 5832**. This makes little sense.

23

One of the key experts in this case was Dr. Elizabeth Eisenhauer.[10]
Her study revealed that eight in ten decisions in Michigan to donate blood
spots were uninformed because mothers, as the consenter, lacked
knowledge of biobanking research as well as misunderstood the entity
conducting the search and what was patient autonomy. **Eisenhauer
Study, RE 135-28, PageID# 2281-2291.** The study matches with the
actual experience suffered by the parents in this case. It makes real-
world sense as these mothers are exhausted, depleted, and in some cases
still heavily medicated from childbirth. *Ferguson v. City of Charleston
(On Remand)*, 308 F.3d 380, 403 (4th Cir. 2002) ("the physical strain of
labor, birth, or serious illness will have a deleterious effect on the
patient's mental process, limiting her ability to rationally consider
whatever choices she has."). When the hospital worker presents a form
which seeks supposed "consent," the scope and understanding of post-
testing blood retention, storage, and uses of blood spots and extracted
data is largely veiled in a shroud of secrecy and vague language. At no

---

[10] Dr. Eisenhauer, the lead author of the study, was a named and
deposed expert witness in this case whom the Court declared "is an
expert in biobanking and informed consent." **Opinion and Order, RE
200, PageID# 5755.**

later point do Defendants attempt to subsequently contact the infants (if now at the age of majority) or their parents to seek their consent to participate in a particular authorized study which will use their blood spots or the data therefrom. **Lyon-Callo Dep., RE 135-41, PageID# 2420-2421.**

### *This Case*

This case was started six years ago by the four parents of nine children. In a prior published decision, this Court affirmed in part and reversed in part the District Court's dismissal and set various important standards that is now the law-of-the-case. *Kanuszewski*, 927 F.3d 396.

On remand and following discovery, two major outcomes occurred. First, a partial consent judgment was entered where Defendants agreed to return to Plaintiffs' counsel the Parent Spots of the nine infant-plaintiffs in this case. **Partial Consent Judgment, RE 209**. When that occurred, that only left in contention 1.) the private medical data being retained by MDHHS in its databases and 2.) the residual blood spots being retained by the Biobank but controlled by the State Defendants. The District Court "followed the Sixth Circuit's directive" and largely found in favor of Plaintiffs after both granting summary judgment and

having a five-day bench trial. **Opinion and Order, RE 263**. The District Court ordered Defendants draft and later issue notice providing an opportunity to destroy the infants' blood samples and data. **Judgment, RE 262, PageID# 6993**; **Order, RE 279, PageID# 7335.** The parties thereafter acted in accordance with the stipulated partial stay agreed upon and entered below. **Stay, RE 269, PageID# 7049**; see also **RE 281-1**. Defendants have returned all the blood spots but have not destroyed the data. **6 Cir. Case No. 23-1733, Dk. No. 27 at page 10**. From Plaintiffs' perspective, the portion of the appeal involving the blood spot is now moot. All that remains active for appeal purposes are the data-related claims.

## STANDARD OF REVIEW

After a bench trial, the district court's factual findings are reviewed for clear error and its conclusions of law de novo. *Holt v. City of Battle Creek*, 925 F.3d 905, 909 (6th Cir. 2019). Questions of law at the pre-trial stage are reviewed de novo. *Tri Cty. Wholesale Distrib., Inc. v. Labatt USA Operating Co.*, 828 F.3d 421, 430 (6th Cir. 2016).

26

## SUMMARY OF ARGUMENT

Michigan's Newborn Screening Program could be operated in a constitutional manner. It currently isn't – and Defendants now challenge whether the District Court's findings that Michigan NSP violated Plaintiffs' Fourth and Fourteenth Amendment rights were correct in light of the standards established in *Kanuszewski*. This District Court obeyed *Kanuszewski* and reached the right result. This Court should affirm where it has jurisdiction and dismiss the balance of this case because of mootness.

## COUNTER ARGUMENT

### I.    Substantive Due Process

Defendants first challenge various aspects of the District Court's finding of violations of the Fourteenth Amendment substantive due process regarding the blood spots. The challenge is moot or otherwise fails.

#### A.    Mootness

As a threshold matter, any challenge regarding the blood spots has been rendered moot. "Under Article III, federal courts may only adjudicate 'actual, ongoing controversies.'" *Memphis A. Philip Randolph Institute v. Hargett*, 2 F.4th 548, 557 (6th Cir. 2021). When a defendant complies with the trial court's injunctive judgment without securing or seeking a stay, any covered appellate challenge becomes moot. *Constangy v. NLRB*, 851 F.2d 839, 841-842 (6th Cir. 1988); *Akrawi v. Remillet*, 504 F. App'x 450, 452 (6th Cir. 2012) (to prevent mootness, an appealing party "should have sought a stay..."). When an appellate issue becomes moot, this Court no longer has Article III jurisdiction to adjudicate the now-moot portion of the challenge. *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 584 (6th Cir. 2006).

These principles were present recently in *Resurrection School* regarding a statewide mask mandate. This Court explained even "when a case at first presents a question concretely affecting the rights of the parties, but—as a result of events during the pendency of the litigation —the court's decision would lack any practical effect, the case is moot." 35 F.4th at 528 (quoting *Ohio v. EPA*, 969 F.3d 306, 308 (6th Cir. 2020)). Unquestionably the parent-challengers in *Resurrection* wanted a decision on the legality of the facemask mandate that became moot to help guide future operations of facemask mandates and the future invocation of qualified immunity by state employees involved in facemask mandates. But this Court has found that when events transpired making facemasks no longer in dispute, the case is moot and the Court declined to review the merits.

Here, the State self-stipulated to a less-than-full stay and then fully disposed of the nine infants' spots (by returning them back to Plaintiffs). That rendered the case moot and thus this Court lacks jurisdiction to consider that particular portion of the appeal. This panel is requested to

29

so determine.[11] In any event and out of an abundance of caution, the arguments will be pressed.

## B.   Medical

Defendants' first allegation of error is that the substantive due process claim fails because the post-testing activities are not "medical" in nature and thus unprotected by substantive due process. As a threshold issue, this argument violates the law-of-the-case doctrine. In *Kanuszewski*, this Court reconfirmed that "parents possess a fundamental right to make decisions concerning the medical care of their children." 927 F.3d at 418. Specifically, when "Defendants retain the samples, transfer the samples to the Neonatal Biobank, and store the samples indefinitely for further use by the state or third parties... without informed parental consent," such "actions constitute a denial of the parents' fundamental right to direct *the medical care* of their children, and their actions must survive strict scrutiny." *Id.* at 420. *Kanuszewski* "should continue to govern the same issues in subsequent

---

[11] Even when a party moves this Court to dismiss the appeal for lack of jurisdiction and the motion panel denies such sought relief, the merits panel can make an independent assessment of jurisdiction anew. *OPERS v. Fed. Home Loan Mortgage Corp.*, 64 F.4th 731, 734 (6th Cir. 2023).

stages in the same case." *Patterson v. Haskins,* 470 F.3d 645, 660-661 (6th Cir. 2006). It constitutes the law-of-the-case. 6 Cir. R. 32.1(b). It's been reconfirmed too. *LW v. Skrmetti*, 73 F.4th 408, 418 (6th Cir. 2023) ("this compulsory storage program, we held, *violated* nonconsenting *parents' rights 'to make decisions concerning the medical care of their children'*"). The only issue on remand was the counter-veracity of Plaintiffs' factual allegations, i.e., whether Defendants *had not* retained the samples, *had not* transferred the samples to the Biobank, or *had not* stored the samples indefinitely for further use by the state or third parties. The District Court confirmed all three were occurring as pled. Defendants' argument fails.

Defendants further defy its law-of-the-case obligations by arguing that *Whalen v. Roe*, 429 U.S. 589 (1977) rejected *Kanuszewski'*s holding suggesting that the prior panel conflated privacy and decision-making. Yet Defendants never raised or argued that before or below so it is not preserved. *Scottsdale Ins. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008) ("an argument not raised before the district court is waived on appeal to this Court"). They also cannot collaterally attack the law-of-the-case set by the first appeal. *Bowles v. Russell*, 432 F.3d 668, 676 (6th Cir. 2005)

31

("once an appellate court either expressly or by necessary implication decides an issue, the decision will be binding upon all subsequent proceedings in the same case."). Had the *Kanuszewski* panel gotten it wrong (which it did not[12]), Defendants needed to petition for en banc relief or seek relief from the Supreme Court. Raising an argument for the first time during the second appeal is improper. After all, the District Court and Plaintiffs (and Defendants too) relied on *Kanuszewski's* holding on remand.

Nevertheless, Defendants defy their own arguments. They expressly conceded one of the purposes for keeping millions of blood spots

---

[12] The District Court took a jab at this Court when suggesting it did not address the Nation's history or tradition of parents' right to direct their children's medical care or how that right is implicit in the concept of ordered liberty. That is untrue. *Cruzan*, 497 U.S. at 278 (the "principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions"); *Troxel v. Granville*, 530 U.S. 57, 65 (2000) ("the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court"). *Kanuszewski* easily satisfied the history and tradition framework when citing to *Glucksberg*, *Meyers*, *Pierce*, *Parham*, *Cruzan*, *Schall*, and *Troxel*, all which lay the foundation for the parents' fundamental right over "decisions 'concerning the care, custody, and control'" of their children, including medical decisions. Common law courts have also long and historically established the need for parental consent for their children's care. *Gulf, C. & S. F. R. Co. v. Redeker*, 12 S.W. 855, 856 (Tex. 1889); *Zoski v. Gaines*, 260 N.W. 99, 102 (Mich. 1935).

and related data is to "help with a [future] diagnosis." **Appellants-Br. at 13**. In other words, it is kept for *medical* purposes.

### C.    Strict Scrutiny

Defendants argue that transferring to and storing samples at the Biobank indefinitely for further use by the state or third parties passes strict scrutiny. It doesn't. Strict scrutiny is "the most demanding test known to constitutional law." *Kolbe v. Hogan*, 849 F.3d 114, 133 (4th Cir. 2017). It also "requires legislative clarity and evidence demonstrating the ineffectiveness of proposed alternatives." *Johnson v. City of Cincinnati*, 310 F.3d 484, 504 (6th Cir. 2002). When strict scrutiny applies, the government has the burden to show that the challenged state action is narrowly tailored to achieve a compelling public interest. *Ondo v. Cleveland*, 795 F.3d 597, 608 (6th Cir. 2015); *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 308 (2013). A compelling interest is an interest "of the highest order." *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972). Once a compelling interest is established, the government must also show that "the means chosen to accomplish the government's asserted purpose [are] specifically and narrowly framed to accomplish that purpose." *Grutter v. Bollinger*, 539 U.S. 306, 333 (2003).

### i.    No Compelling Interest

Here, Defendants define their compelling interest as "safeguarding the well-being of a minor." That is too vaguely asserted. At best, Defendants need to demonstrate a compelling governmental interest of safeguarding the well-being of minors *when the health of the tested infant is no longer at stake after being fully vetted against having any tested-for genetic diseases. Kanuszewski*, 927 F.3d at 421; **Shah Dep., RE 135-42, PageID# 2432.** And that government interest is further constrained when pressed against the legal bulwark that one's "child is not the mere creature of the State," *Pierce*, 268 U.S. at 535, but that it is parents who serve in the "primary role… in the upbringing of their children" which is "now established beyond debate as an enduring American tradition." *Yoder*, 406 U.S. at 232. This matches the "history and culture of Western civilization." *Id.* As such, "the relationship between parent and child is constitutionally protected," *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978), as one of its oldest, *Troxel*, 530 U.S. at 65.

Plaintiffs' position is simple – once the newborn blood spots are fully analyzed and are found to be negative, any further seizure and long-term retention is not directly related to nor necessary for discovery of what are

now confirmed non-existing diseases. Parental decision-making on what happens next to the infants' blood spots returns to its zenith (assuming arguendo the Constitution even permits such involuntary medical screenings in the first place[13]).

Defendants' framing of its purported interest is deeply flawed. As Professor Suter correctly observes, "newborn screening initially began as a population health endeavor but is rapidly becoming a resource for population research." **RE 135-30, PageID# 2325**. Because this case is postured as only challenging Defendants' *post-testing* biobanking activities,[14] Defendants do not have a compelling government interest in the retention and storage of blood spots for future unspecified uses by commercial or academic researchers or to subject the same to the State's own biomedical work in improving the NBS tests for future screenings.[15]

---

[13] This Court has refused to answer the questions on whether the nonconsensual blood extractions themselves violate the US Constitution. *Kanuszewski*, 927 F.3d at 416 (declining "to rule on whether the initial drawing of blood violated the parents' substantive due process rights"); *id.* at 423 (declining "to rule on whether the initial drawing of blood violated the children's Fourth Amendment rights"); see also *Dubbs v. Head Start, Inc.*, 336 F.3d 1194 (10th Cir. 2003).

[14] See Footnote 13, *supra.*

[15] Defendants pontificate how much they desire to keep any blood sample with a "positive" result flagged with a rare disease. **Appellants- Br. at 11-12.** But such is a red-herring because all the samples and data

35

A compelling interest requires far more than speculations on possible needs and future evils. *Mozert v. Hawkins Cnty. Bd. of Educ.*, 827 F.2d 1058, 1077 (6th Cir. 1987). To be compelling, "[o]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation." *Id.* Post-testing specimen availability and convenience through the sale of blood spots is not a compelling enough governmental interest when measured against the significant encroachments visited upon citizens' personal liberty and autonomy. While there is a strong *desire* to vacuum up the remaining blood samples to advance their professional and future NSP goals, such is not a legally *compelling* one. A compelling state interest must be more than a colorable interest, or an interest serving the convenience of the State. *Hudson v. Dennehy*, 538 F. Supp. 2d 400, 410 (D. Mass. 2008); *Thomas v. Collins*, 323 U.S. 516, 530 (1945). Post-testing biobanking practices that result in the non-consensual retention, storage, and use of flagged-negative samples along with deeply-private medical and genetic data fails to be a sufficient

---

retained here for the nine infants were negative for any diseases – as are more than 99.75% of all tested blood spots. Even assuming there was a compelling interest to keep *positive*-result samples, there is not a similar compelling interest for *negative*-result samples *without consent*.

"compelling" interest.[16]

### ii.    No Narrow Tailoring

Defendants' argument related to narrow tailoring, i.e., "the means chosen are not substantially broader than necessary to achieve the government's interest," *Ward v. Rock Against Racism*, 491 U.S. 781, 800 (1989), also fails. Narrow tailoring fails when the government could adopt a narrower regulation that would reduce the negative impact on protected activity without substantially interfering with its legislative goals. Here, all medical screenings are fully and completely accomplished without the post-screening biobanking and without any reduction of effectiveness of disease detection for newborn screening. The non-consensual *post-testing* retention and storage of samples and data is a means substantially broader than necessary to achieve the government's interest of screening infants for the 58 identified newborn metabolic

---

[16] Telling characteristics of the post-testing activities cuts against a proclaimed benevolent interest claimed. For example, the District Court confirmed "private researchers pay the State and the Biobank for DBS." **RE 214, PageID# 5832.** The goal was to create profit, not to singularly promote benevolent public health goals. **Biobank Business Plan, RE 135-7, PageID# 2107**. In fact, samples have been sold to profit companies that are developing new products for public sale. E.g. **Research Studies, RE 160-10, PageID# 5493** (Genomics USA "develop[ing] a new technology to perform very-low-cost genetic testing").

abnormalities that flag potential diseases. Defendants are just incorrect in falsely suggesting that retention of *all* residual DBS into the millions and keeping data kept forever in its databases is the least harmful and least restrictive means available that furthers its claimed interest of medical screenings. Moreover, general public health research is not directly connected to the specific care of the peculiar newborn Michigan children and also fails to advance a compelling governmental interest.

### iii.      *Sufficient Consent Could Be Easily Sought*

A strict scrutiny standard of review normally defeats challenged regulations or laws because the process selected by the government is usually not "the least restrictive and least harmful means of satisfying the government's goal." *U.S. v. Brandon*, 158 F.3d 947, 960 (6th Cir. 1998). This case is, again, no different. A narrower alternative process can easily include obtaining needed samples by tailoring its program to secure sufficient informed parental consent. *Dubbs*, 336 F.3d at 1206. Current practices fail to obtain such legally sufficient informed consent. This existence of a consent-based process is easily a less restrictive means of testing newborn infants, so meeting strict scrutiny fails.

## II.    Fourth Amendment

Next, Defendants argue that the finding of Fourth Amendment violations was in error. That issue is partially moot. For the data portion that is not moot, the appeal fails.

### A.    Mootness

The Fourth Amendment appellate challenges are moot, in part. The appellate challenge under the Fourth Amendment regarding the retention of blood spots (rather than the data retention) has been rendered moot and Defendants are seeking an advisory opinion. The appeal is in contradiction to the limits of Article III. This Court "cannot issue" the "advisory" opinion that Defendants seek regarding the blood spots portion of the Fourth Amendment claims. *U.S. Safety Specialty Ins. Co. v. Genesee Cnty.*, 53 F.4th 1014, 1021 (6th Cir. 2022). Dismissal is warranted.

However and correctly, the *data retention* portion of the Fourth Amendment claims are a different story. The partial stay "suspend[ed] the actual destruction of Plaintiffs' associated data pending appeal," **Partial Stay, RE 269, PageID# 7052**, and such issues are not moot on appeal.

### B.    Unconstitutional Seizure

Defendants argue that the Fourth Amendment violations were premised as a seizure and no seizure occurred here. They add that even if a seizure occurred the warrantless nonconsensual process was "reasonable" under the Fourth Amendment. They are wrong.

In *Kanuszewski*, this Court explained (and is the law-of-the-case) that "Plaintiffs allege that Defendants conduct research on children's stored blood samples and seek to derive profit from the children's samples by selling them to third parties." 927 F.3d at 425. "If this is indeed Defendants' purpose in retaining the children's blood samples, then their ongoing, indefinite seizure of the samples is unreasonable." *Id.* This is not an accountancy question – Plaintiffs only needed to show Defendants "*seek* to derive profit," not actually *realize* a profit. Defendants concede they charge fees for the spots. The business plan confirmed the goal was to create profit. **Biobank Business Plan, RE 135-7, PageID# 2107.** Under *Kanuszewski*, this easily establishes that the "indefinite seizure of the samples [was] unreasonable" and thus unconstitutional. Defendants cannot ignore *Kanuszewski*'s law-of-the-case as it keeps repeatedly trying

40

to do. See **Appellants-Br at 57-58** (no mention of controlling holding from *Kanuszewski*).

There can be little doubt that Defendants seized the infants' blood samples after the testing was complete. When this suit was filed, Defendants had ongoing possession of the infants' already-tested samples and never gave them back until ordered to do so. While Defendants purported only purpose in taking possession of the blood spots via the hospital staff was for disease-flagging, once that was done, Defendants permanently kept (i.e., seized) them to add more 'product' into their bank of blood samples for various non-consensual activities, including academic and for-profit researchers' uses and for uses in other unrelated disease screenings (like machine calibration, crime victim identification, and more). Such is a seizure and the law-of-the-case. 927 F.3d at 424 ("what begins as a lawful seizure can become unlawful if it continues for an unreasonable amount of time" or for new unrelated reasons). This Court was right – the "health of the child" fails to justify "taking any actions with respect to the blood samples *after it has finished screening the samples for diseases*." *Id.* at 425 (emphasis added).

The State is also seizing medical data. The District Court found (and Defendants do not challenge) that Defendants "indefinite[ly]" "saves all the data from the screening, including the newborn's demographic details, disease diagnoses, and genetic markers, in a computerized laboratory information management system." **Opinion, RE 263, PageID# 6996**. That too is an unreasonable seizure. See Orin S. Kerr, *Executing Warrants for Digital Evidence: The Case for Use Restrictions on Nonresponsive Data*, 48 TEX. TECH L. REV. 1, 24–25 (2015) ("any use of digital data beyond the scope of a warrant [or an exception] becomes unreasonable under the Fourth Amendment").

### C.    Unconstitutional Search

Next, Defendants incorrectly argue there was no search and thus no Fourth Amendment violation. And, like before, they erroneously assert that even if there were a warrantless nonconsensual search, it was reasonable.

There is a "constitutionally protected privacy interest in avoiding disclosure of personal matters [that] clearly encompasses medical information and its confidentiality" and such "non-consensual retrieval of previously unrevealed medical information that may be unknown even

to plaintiffs" are "searches in violation of Fourth Amendment rights that require Fourth Amendment scrutiny." *Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1269 (9th Cir. 1998). The Fourth Amendment's protections include "avoiding disclosure of personal matters" that "clearly encompasses medical information and its confidentiality." *Id.* Individuals enjoy a reasonable expectation of privacy from any warrantless searches of medical test results and that "the results of those tests will not be shared with nonmedical personnel without consent." *Ferguson v. City of Charleston*, 532 U.S. 67, 78 (2001). It was confirmed (and practically conceded) at trial that the infants' samples are immediately exploitable by the government (at its own whims) without pre-obtained sufficient parental consent. E.g. **Trial-Transcript, RE 244, PageID# 6433.**

### i.   *Pled Violation*

Confusingly, Defendants now unfaithfully argue that a "search" claim was never pled by Plaintiffs and thus they cannot "maintain a search claim that was never pleaded." **Appellants-Br. at 63**. That is nonsense. Throughout the operative complaint, Plaintiffs regularly pled and referred to the illegal searching undertaken and conducted by

Defendants. E.g. **First Am. Compl., RE 26, PageID# 314 (¶54)**; **#326 (¶¶103, 105), #327 (¶109).** Notice was clear and the theory pressed was transparent. It is impossible to accept Defendants' cries of ignorance when their own proposed findings focused on Fourth Amendment searches. See e.g. **RE 226, PageID# 6015**. The argument is vexatious.

### ii.    *Unreasonable*

That said, Defendants argue that the searches they conducted were reasonable. The Fourth Amendment protects "persons" from "unreasonable searches and seizures." U.S. Const. amend. IV; **Opinion, RE 263, PageID# 7000**. It stands guard against objectively unreasonable incursions by government officials. **Opinion, RE 263, PageID# 7000** (citing *Camara v. Mun. Ct.,* 387 U.S. 523, 528 (1967)).

When determining whether a Fourth Amendment violation has occurred, "we ask two primary questions: first, whether the alleged government conduct constitutes a search within the meaning of the Fourth Amendment; and second, whether the search was reasonable." *Taylor v. City of Saginaw,* 922 F.3d 328, 332 (6th Cir. 2019). On appeal, Defendants press under the second question. What constitutes constitutional reasonableness is not balance of personal

policies or government-desired preferences but is an objective constitutional measurement. "[W]e must begin with the basic rule that searches conducted outside the judicial process, without prior approval by a judge or magistrate, are per se unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions." *Id.* at 334. There is a "strong preference for searches conducted pursuant to a warrant.'" *Ornelas v. United States*, 517 U.S. 690, 699 (1996). Available exceptions for governmental agents to proceed warrantlessly are "few" and must be both "specifically established" and "well-delineated." *Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971). Exceptions are "jealously and carefully drawn." *Id.* Where no warrant was obtained for a search, the government solely bears the burden of identifying and establishing the specific "carefully drawn" exception. *Taylor,* 922 F.3d at 334.

Below, Defendants pressed the de minimis exception, administrative search, and consent. The District Court rejected all three. The rejection of the first two are not challenged here and consent

(addressed in Part III, *infra*) fails, thus Defendants do not establish any applicable recognized exception.[17] That fails their burden.

Rather than following the *Taylor* framework, Defendants try a different tactic by providing a laundry list of certain characteristics regarding their biobanking program and then pronounce that all the potential public policy positives outweigh the individual citizenry's privacy interests they are eviscerating (but fail to even acknowledge), i.e., the potential benefits of the many outweigh the constitutional rights of few individuals. But that is not how the Fourth Amendment works. "The focus of the [Fourth] Amendment is thus on the security of the person, not… the purpose of the search." *Dubbs*, 336 F.3d at 1206. This Court does not "water down the Bill of Rights" by "'balancing of what the

---

[17] In an interesting approach, the District Court fashioned "a 'warrant' in this context would be the parents' informed consent" and such "is not impracticable or absurd based on the record." **Opinion, RE 263, PageID # 7016** (citing *Dubbs,* 336 F.3d at 1214-1215). Plaintiffs are skeptical of the analytical shortcut that parental consent is a de facto issued warrant, but the sentiment is right. Consent is more properly conceptualized a "jealously and carefully" recognized exception to the warrant mandate. *Bambach v. Moegle*, 92 F.4th 615, 629 (6th Cir. 2024). If Defendants are invoking consent as their exception to the warrant requirement, it is their burden to meet the exception's jurisprudential yardsticks. *Taylor,* 922 F.3d at 334.

Constitution says and what judges think [or the government proclaims] is needed for a well-ordered society." *Garrison v. Louisiana*, 379 U.S. 64, 81-82 (1964) (DOUGLAS, J., concurring). Here, the Newborn Screening Program can be constitutionally operated. Defendants just need to structure their program to secure properly obtained informed parental consent. See *Dubbs*, 336 F.3d at 1206-1207 ("adequate consent is elemental to proper medical treatment"). Yet, they keep refusing to do so. Not obtaining informed consent from moms and dads makes the post-testing activities unreasonable. Competent parents, not the state, get to make the decisions on whether to voluntarily be part of such an after-testing public health research project and biospecimen bank. *Parham*, 442 U.S. at 602 (parents are presumed to be acting in the best interest of their children). The District Court summarized it best: "while neither the importance of newborn screening nor the benefits of retention should be minimized, federal courts may not green light a policy or practice that leaves too much room for Fourth Amendment encroachments without due and proper safeguards—as is the case here." **Opinion, RE 263, PageID# 7017.**

But even looking to their list of positives, none are in furtherance of any applicable recognized exception under the Fourth Amendment and many are misframed while others are outright misrepresentations. For example, Defendants proclaim that *they* "have no law-enforcement purpose" in operating the NSP. But *others* in the same government do and are using the biobank. **Subpoenas, RE 135-12, PageID# 2180-2185.** The temptation for a warrantless shortcut is often just too great. Emily Mullin, *Police Used a Baby's DNA to Investigate Its Father for a Crime*, WIRED, Aug. 15, 2022, available at https://www.wired.com/story/police-used-a-babys-dna-to-investigate-its-father-for-a-crime/. This is why the idea that "the Fourth Amendment does not apply in the 'noncriminal' and 'noninvestigatory' context is without foundation." *Dubbs*, 336 F.3d at 1205.[18]

And the trial court, sitting on the front-line hearing from the actual public health officials called to court, found that the proffered

---

[18] Defendants also proclaim and promise they will "resist any demands" by law enforcement, yet offered precisely zero evidence of any actual resistance to any of the times law enforcement demanded access to the private physiological data and spots held in the Biobank. Their proclamations are thusly a pie crust promise—easily made, easily broken.

justifications from their own lips to be "sanctimonious." **Opinion, RE 263, PageID# 7006**. So when Defendants argue to this Court to trust they won't ever lapse, we know from the District Court what their credibility is – poor. See, e.g., *Zenith Radio Corp. v. Hazeltine Res., Inc.*, 395 U.S. 100, 123 (1969) (appellate courts defer to the trier of fact "who is usually in a superior position to appraise and weigh the evidence."). Defendants simply refuse to recognize that "the retention and usage of blood samples" and extracted data "bear implications that tread on personal privacy rights" and "obfuscate[] the serious nature of the situation." **Opinion, RE 263, PageID# 7007**. They flat refused to voluntarily change. **Trial-Transcript, RE 243, PageID# 6248-6249**. Their preferred policy and program operational desires "fail to absolve the fundamental Fourth Amendment concerns inherent in the retention of these blood samples and the information they contain and produce." **Opinion, RE 263, PageID# 7007**. The Fourth Amendment is to protect the citizen from the government, not help the government help itself. See *The President's News Conference*, Ronald Reagan Presidential Library, available at https://www.reaganlibrary.gov/archives/speech/presidents-

news-conference-23 ("the nine most terrifying words in the English language are: I'm from the Government, and I'm here to help").

## III.   Consent Processes

Lastly, Defendants argue that the consent it obtained from the various Plaintiff-mothers resolves everything and causes the post-testing activities they have conducted to pass constitutional muster. It does not.

### A.   Mootness

As noted above, the only non-moot issue is the Fourth Amendment data retention claims. See Parts I(A) and II(A), *supra*. The same lack of jurisdiction over the blood spots portion of the appeal applies to the issue of consent.

### B.   Consent

Consent is an exception to the warrant requirement under the Fourth Amendment. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). It is also an exception to the substantive due process claim too. *Dubbs*, 336 F.3d at 1203-1204. "Informed consent" is the required standard in this context. *Cruzan*, 497 U.S. at 269. The question begged is whether sufficient informed consent was faithfully and fully obtained? After all, "not any [ole] type of consent will suffice." *U.S. v. Worley,* 193 F.3d 380, 386 (6th Cir. 1999).

### i.    Data Claims

For all nine children, Defendants are indefinitely retaining their deeply private medical and genetic *data* without their or their parents' consent of any type. Nowhere on any of the seven of nine available directive forms do Defendants provide any disclosure, let alone secures consent, about the indefinite seizure and later in-lab and third-party uses of the newborn infants' deeply private medical and genetic data that Defendants can access and use at their own whims and discretion. See **RE 141-15, PageID# 2988; RE 141-16, PageID# 2990; RE 141-17, PageID# 2992; RE 141-18, PageID# 2994; RE 141-19, PageID# 2996; RE 141-20, PageID# 2998; RE 141-21, PageID# 3000**. Problematically, Defendants do not even brief about the data-portion of the case in its appeal (likely because it hopes this Court confusingly merges the blood spot challenges with the data challenges). On that vein, the argument for consent for data retention and use is forfeited. *Island Creek Coal Co. v. Wilkerson*, 910 F.3d 254, 256 (6th Cir. 2018). To the point, however, the crux of Defendants' argument is that they secured sufficient consent from the infants' parents regarding deeply private medical and genetic data. Yet they have proffered no evidence to support that assertion *regarding*

51

*the data* – and that is their burden to fulfill. *Taylor,* 922 F.3d at 334. Because they fail that burden, the District Court did not commit any error.

### ii.    *Blood Spots Claims*

The other question involves "whether Plaintiffs consented to any aspect of Defendants' retention, storage, or future use of the blood samples." *Kanuszewski*, 927 F.3d at 425. Constitutionally sufficient consent must be obtained in a "voluntary and free" fashion. *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968). It is only voluntary when it is "unequivocal, specific and intelligently given, uncontaminated by any duress or coercion." *U.S. v. McCaleb*, 552 F.2d 717, 721 (6th Cir. 1977); *Worley*, 193 F.3d at 386. The burden of proving that the consent obtained was voluntary is on the government, *Tarter v. Raybuck*, 742 F.2d 977, 980 (6th Cir. 1984), and such "must be proved by clear and positive testimony" (i.e., evidence), *U.S. v. Scott*, 578 F.2d 1186, 1188-1189 (6th Cir. 1978). Moreover, all the circumstances surrounding the obtainment of consent must be considered for "more subtle forms of coercion that might flaw [an individual's] judgment." *Schneckloth*, 412 U.S. at 227.

The Court starts from the presumption *against* any waiver of constitutional rights. *Tarter,* 742 F.2d at 980.

### 1.    *Pre-May 2010*

For D.W.L. (Kanuszewski) and M.T.L. (Laporte) born before May 2010, no parental consent of any type was attempted or ever obtained. **Opinion, RE 263, PageID# 5834**. Defendants simply fail to have any needed evidentiary support or "positive testimony" confirming consent for these pre-May 2010 infants who have had their blood spots taken and stored, for nonconsensual future research purposes, at the bio-specimen warehouse in Detroit. As such, Defendants' arguments fail.

To avoid this required result, Defendants argue that MDHHS's Institutional Review Board (IRB) could self-provide parental consent in place of moms or dads. E.g. **RE 135-35, PageID# 2374**. That is nonsense. IRBs do not have that kind of authority whatsoever. This type of board never is, was, or has been a substitute for obtaining parental informed consent or waiving consent on behalf of others. The District Court observed that "Defendants provide no authority that an informed consent waiver from an IRB is sufficient to waive the constitutional requirement of informed parental consent." **Opinion, RE 171, PageID# 5590**.

Defendants similarly provide no such authority on appeal either. In truth, competent *parents* get to make the decisions to direct their children's medical care. *Kanuszewski*, 927 F.3d at 419; see also *Parham*, 442 U.S. at 602. As such, any good faith sentiments, opinions, and decisions of an IRB about Defendants to prove compliance with any IRB regulation is *constitutionally* inconsequential. Defendants' challenge thusly fails.

Defendants do make one admittedly meaningful argument – the District Court "searched *state law* for informed-consent standards and evaluated whether Defendants had complied with those laws" to measure constitutional consent. But Defendants' alternative suggestion of using the federal administrative Common Rule instead of state law to determine whether sufficient constitutional consent was secured, equally misses the mark. The only standards derive from Fourth Amendment jurisprudence, not a federal research oversight regulation. Sufficient *constitutional* consent obtainment must be measured by a *constitutional* yardstick, not the Common Rule administrative guidelines.[19]

---

[19] This is especially true when the Common Rule regulation that Defendants are seeking to substitute in for constitutional consent states it is "not intended to preempt any applicable federal, state, or local laws

54

## 2.    *Post-May 2010*

Finally, Defendants argue that District Court erred because MDHHS' post-May 2010 "opt-in" process "is constitutionally adequate" regarding the blood spots. **Appellants-Br. at 43**. The District Court characterized the consent obtained as a "farce." **Opinion, RE 263, PageID# 7017.** But, again, this issue is moot. However, should this Court take up the challenge, Defendants simply self-conclude that its consent forms, "taken together, show that Plaintiffs who opted into health research[20] did so on an informed basis." **Appellants-Br. at 43**. They are wrong.

Constitutional rights are personal, *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973), and their waiver is never presumed or treated lightly. Like they did below, Defendants simply self-conclude, without analysis, that they have obtained sufficient consent from each infant's

---

which require additional information to be disclosed in order for informed consent to be legally effective."

[20] But on the record, at least four infants (by their parents) never even could be deemed to have possibly "opted in." That includes the D.W.L. (Kanuszewski) and M.T.L. (Laporte) who were born before May 2010 and those who expressly said "no," including E.M.O (Laporte), **RE 141-17, PageID# 2992,** and M.L.W. (Wiegand), **RE 141-21, PageID# 3000.**

parent. Yet they offer no clear and positive testimony (evidence) of the same. They also offer no evidence of the circumstances surrounding the obtainment of consent from each parent or offer sufficient evidence that consent was "unequivocal, specific and intelligently given" by each parent without duress or coercion. Instead, they present what they call "directives" cards for only seven of the nine children-plaintiffs and nothing more (despite rifling through literally thousands of pages of highly-private medical records of each infant and their mothers over their objections, see **Order, RE 121**).

Unlike Defendants, the seven infants born after 2010 and their parents provided evidence of the relevant circumstances. **Kanuszewski Decl., RE 135-25**; **Laporte Decl., RE 135-26**; **Wiegand Decl., RE 135-27; Joint Decl., RE 151-6.** First, each parent averred that no one (including state officials, agents, or partners or these Defendants) communicated with them regarding the risks or benefits (medical, legal, etc) or provide any alternatives regarding the post-testing biobanking retention, storage, or uses of the blood samples by third parties like Biobank or its customers like third-party scientists and researchers. **Kanuszewski Decl., RE 135-25, Laporte Decl., RE 135-26; Wiegand**

**Decl., RE 135-27.** Second, each parent averred none were provided any information describing the post-testing BioTrust for Health program or the samples-storing Biobank, and were never provided a copy of any informational brochure about the Newborn Screening Program. *Id.* They did "not know, realize, or understand that these Defendants had seized and indefinitely retained [their] children's blood samples or "blood spots" in a warehouse… in Detroit with a private non-profit entity known as the Michigan Neonatal Biobank." *Id.* They also confirmed they never knew the Defendants (including its partners like the Biobank) "marketed and made [their] children's blood spots available for distribution, use, testing, and other uses, including by for-profit and academic researchers and scientists, who extract and use children's personal and deeply-private medical and genetic information/data for their own research projects— whether for-profit or otherwise." *Id.* This fails informed parental consent.

Defendants point to various signed versions of their directives. However, the circumstances of how each were obtained reveals a disqualifying "subtle form of coercion" that flawed each parent's judgment. Each parent has zero memory of signing any these forms. **Kanuszewski Decl., RE 135-25, PageID# 2237**; **Laporte Decl., RE**

135-26, PageID# 2253; **Wiegand Decl., RE 135-27, PageID# 2266**. None were provided or received a copy of the brochure. **Kanuszewski Decl., RE 135-25, PageID# 2235**; **Laporte Decl., RE 135-26, PageID# 2251**; **Wiegand Decl., RE 135-27, PageID# 2265**.[21] The reason there is no memory of parents signing the documents is because the timing of sought consent occurred in the immediate hours followed the arduous, body-damaging, stressful, tiring, and painful experience of child birth (which includes receiving and being under the influence of powerful medications related to birthing). It is the worst possible time to have a parent make a fully informed, reasoned decision. *Ferguson*, 308 F.3d at 403 ("the physical strain of labor, birth, or serious illness will have a deleterious effect on the patient's mental process, limiting her ability to rationally consider whatever choices she has"); see also **Kanuszewski Decl., RE 135-25, PageID# 2237-2238**; **Laporte Decl., RE 135-26, PageID# 2253-2254**; **Wiegand Decl., RE 135-27, PageID# 2267**. Asking for consent at such a poor time "appears to intentionally seek consent when full information is not and cannot be made available to

---

[21] It was conceded by the NSP's co-director that the lack of brochure means a lack of informed consent. **Shah Dep., RE 135-42, PageID# 2433.**

mothers and fathers, and when the person being asked, normally the mother, is in no condition to make such a decision, i.e. in the postpartum recovery process in the hospital." **Id.** We know that even speaking with parents during the period cannot provide sufficient informed consent under the then-existing circumstances. **Eisenhauer Study, RE 135-28.** And Defendants offer no evidence or explanation as to why they are not using the far more sensible time in the months or weeks leading up to (or alternatively in the weeks and months after) the birth of the children, when most parents would have had the opportunity to consult medical and legal experts one-on-one, conduct research, investigate the program's assertions, and secure fully and complete answers on whether to participate in the Newborn Screening Program, the BioTrust for Health, and the Biobank.[22] **Shah Dep., RE 135-42, PageID# 2434.** The real reason is because Defendants seemingly fear many parents will be

---

[22] Undoubtedly, the State Defendants could alternatively seek consent in weeks *after* the newborn screening tests when moms and dads have comfortably settled in back at home following the birth of their new child. While maybe a bit sleep deprived, parents would have a better opportunity to make an informed choice. The current contact information of every mother is fully secured by the State Defendants via the hospital as part of the NBS data-extraction process. **Cards, RE 160-11, PageID# 5498-5506**; see also **RE 135-18, PageID # 2203** (requiring address).

properly informed and simply say "no" if the entire scope of the "creepy"[23]
program — from extraction to sale of the infants' blood spots and deeply-private medical and genetic information/data — were revealed. And there
would be a number of parents, like these plaintiff-parents, who would
simply decline any participation. As these parents all confirm, had they
"known the full and complete scope of the Newborn Screening Program,
the Michigan BioTrust for Health, and Michigan Neonatal Biobank,
[they] would have never provided any consent or authorization for any
part of this program as it is both invasion and evisceration of [their]
children's personal and medical privacy and personal autonomy, and
improperly invades our rights as parents to make all decisions concerning
the medical care of our children." **Kanuszewski Decl., RE 135-25,
PageID# 2240; Laporte Decl., RE 135-26, PageID# 2255-2256**;
**Wiegand Decl., RE 135-27; PageID# 2269.** So any ongoing retention of
their infants' spots and the deeply-private medical and genetic
information/data extracted from the newborn screening tests is contrary

---

[23] Dana DiFilippo, *Civil Rights Group Sues New Jersey to Stop Secret Storage, Use of Baby Blood Spots*, N.J. MONITOR, Nov, 2, 2023, available at https://newjerseymonitor.com/2023/11/02/civil-rights-group-sues-new-jersey-to-stop-secret-storage-use-of-baby-blood-spots/ (calling similar NSP "creepy")

to the expressed wishes of these competent caring parents—who were never sufficiently told of and explained the true scope and depth of Defendants' post-testing programmatic actions.

But even when looking to each card signed by mothers in immediate aftermath of arduous, body-damaging, stressful, tiring, and painful experience of child birth, the signature forms (no matter the version) provide essentially no information whatsoever. Here is a sample from 2011—

E.g. **RE 135-27, PageID# 2278**.

When this form is presented to postpartum mothers in the hospital, no one has communicated the risks, the benefits and any alternatives regarding the retention, storage, or uses of the blood samples by third parties like the Biobank or third-party researchers and scientists over whom parents will no longer have control. By signing the form, this simply asks for the "possibility" of the samples of "medical research" by Defendants "after newborn screening is complete." There is insufficient explanation that what Defendants really meant by "medical research" was indefinite storage of their blood spots at the Biobank who in turns sells them to outside researchers. There is no mention of the Biobank; no mention of the significant revenue stream of several million dollars; no mention of development of sellable products for academic and commercial researchers. Nor is there any consent sought or obtained to indefinitely or long-term retain the deeply-private medical and genetic data extracted from the newborn screening tests. This requested consent—coupled with the poor timing from when it was sought—fails to secure "unequivocal, specific and intelligent" consent. That fails Defendants' burden. And we can be sure that was not understood at the time because all the parents

have confirmed (and it has gone unrebutted) that had they know what they know now, they would have *never* consented. **Kanuszewski Decl., RE 135-25, PageID# 2240; Laporte Decl., RE 135-26, PageID# 2255-2256**; **Wiegand Decl., RE 135-27; PageID# 2269**.

In 2016, the form changes—



E.g. **RE 135-25, PageID# 2247.**

This time it is not for *medical* research but for "*health* research."

Why the change and what that means is unexplained. This version now references a "brochure" now entitled "Your Baby's Blood Spots." But again, no parent received it, **Joint Decl., RE 151-6, PageID# 5145, ¶2**, which is the normal practice, **Final Report, RE 135-2, PageID# 2009**.

Nor does this form explain what the BioTrust is or what it does. There is no mention of the Biobank or the outside researchers. There is no mention of the significant revenue stream of several million dollars and no mention of the development of sellable products for academic and for-profit commercial researchers. Also like before, there is also no consent sought or obtained to indefinitely or long-term retain the deeply-private medical and genetic data extracted from the newborn screening tests.

Finally, in 2017, the form changes again—

Before signing this form please read, *Your Baby's Blood Spots*. It gives details on how small drops of blood (blood spots) collected for newborn screening may be used in research through the Michigan BioTrust for Health. If you have questions, please call the Michigan Department of Health and Human Services (MDHHS) toll free at 1-866-673-9939.

☐ **Yes, my baby's leftover newborn screening blood spots *may* be used for health research.**
*By checking this box you understand:*

- After newborn screening, blood spots are coded only with a number and stored up to 100 years at a secure site (Biobank). MDHHS can link the coded blood spots to your baby. This allows use of specific spots for research. It also allows MDHHS to find the right spots if you, or your grown child, change your mind.
- Researchers only receive coded blood spots. Details that could identify you, or your baby, are not provided.
- The risk of using blood spots in research is that your baby could still be identified. This risk is very low because many steps are taken to protect privacy.
- Research using blood spots must be approved by MDHHS. Blood spots can only be used for studies to better understand disease or improve the public's health such as research on cancer, birth defects and diabetes.
- Many laboratory methods are used to study biological or environmental factors such as genes, infectious agents, toxins and metals.
- Blood spot research may not directly help you, your child or your family. This type of research aims to improve the health of communities.
- Participation is voluntary. You can call MDHHS at any time if you change your mind. There is no penalty or loss of benefits for saying no or changing your mind.

☐ **No, my baby's leftover newborn screening blood spots *may not* be used for health research.**
*By checking this box you understand:*

- Blood spots will be stored for up to 100 years but not used for research. The blood spots are stored so that the state lab can perform quality control tests and improve newborn screening.
- You must contact MDHHS if you do not want blood spots stored for any reason after newborn screening.

_____          _____
*Parent Signature*                    *Date*

Your choice applies to all blood spots collected for newborn screening. Please visit www.michigan.gov/biotrust for further information. For questions about your research rights or whom to contact in case of a research-related injury, please call the MDHHS IRB at 517-241-1928.

**RE 147-13, PageID# 4287**. This time the form has more details, but, characteristically, still is vague, misleading, and at times contains untrue statements. For example, the first bullet says that blood samples are stored for "up to 100 years." That is untrue – it is indefinitely.

**Newborn Screening General Policies, RE 160-7, PageID# 5364** ("After testing is completed the specimens are stored indefinitely."). There is no reference to the samples being used by law enforcement or for crime victim identification. It also speaks of research "through the Michigan BioTrust for Health" — an entity as part of MDHHS that

conducts no research itself. **Trial-Transcript, RE 244, PageID# 6297** ("DHHS does not do research. That's not our mission."). There is one vague reference to the "(Biobank)" while no mention of the significant revenue stream of several millions of dollars; and no mention of the development of sellable products from the excess samples for academic and commercial researchers outside of uses by the State laboratory. There is no disclosure of available sale of data linkages to health data. **MNBB Webpage, RE 160-12, PageID# 5507.** Interestingly, there is not an option to simply just *never* retain samples after newborn screening testing is complete.

Again, the government has the burden of proving the consent it did obtain was "unequivocal, specific and intelligent" secured. That simply did not happen and was designed not to happen in the hours after the arrival of a newborn following childbirth. These forms (and the timing by which they are presented) are purposely limited to a false and incomplete choice. There are always only two choices presented. There is no available option for a parent to decline altogether as to *any* post-screening retention, storage, transfer, or uses. Shockingly, even if a parent does select "no," the State still retains and uses the infants' personal and

deeply-private medical and genetic data extracted during the tests without parental consent.

On appeal (like below), Defendants never parse the differences between these separate versions of their forms to show that the informed parental consent was "unequivocal, specific and intelligently given, uncontaminated by any duress or coercion," as is their burden. The government's use of uninformed and insufficient consent, tainted by the coercion of the faux "ask" occurring during the immediate aftermath of child birth, is "too weak" to remove or cure the taint of unconstitutional action, especially when _un_informed consent is the intended product of such unconstitutional action. *U.S. v. Castillo*, 864 F. Supp. 1090, 1099 (D. Utah 1994). Nor do Defendants rationally explain why they seek to obtain consent when moms and dads are clearly not at their best to make informed, rational decisions, i.e., in the aftermath and fog-of-war of childbirth. The reason is not a secret – it is to reduce or eliminate an informed thoughtful parent asking pointed questions and then deciding no. Such tactics show how guileful and incomplete this consent process is. The defense of consent fails.

## CONCLUSION

In making this appeal, Defendants have the obligation to identify where the District Court committed legal error. Their approach is confusingly scattershot but still fails to establish any reversible error. Instead, the reality is that newborn screening programs have operated in secret for too long and are now finally being challenged in the light of day. Many are shocked and discomforted to find out what government has been "creepily" doing behind closed doors. But to be clear, this case is not a judicial referendum to end the very noble idea of early testing of children for identification of diseases. But NSPs, as structured, are not perfectly attuned. For example, false *negatives* "may create false reassurance and slow the process of diagnosis; because pediatricians know that NBS is done for all children, they may assume that the child does not have one of the NBS diseases based on the negative NBS result." **Suter Article, RE 135-30, PageID# 2310**. On the other hand, false positives also impart a negative health impact on the child by requiring follow-up testing and treatment until it is determined that the child is unaffected; further testing and treatment both pose potential medical risks. ***Id.*, PageID# 2311**. Amassing a global pool of newborn

biospecimens is not a right or privilege of the government to do without the informed consent of moms and dads.

"Minors, as well as adults, are protected by the Constitution and possess constitutional rights." *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 74 (1976). "Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority." *Id.* But what Defendants want to undertake regarding the infants' deeply-private physiological data and blood spots exceeds the narrow interest of appropriate[24] testing and instead wants to operate a large-scale medical research project "with eugenic ends," **Opinion, RE 263, PageID #6996**, where the subjects have been forced into the science and medical experiments without their full knowledge or informed consent. That is wildly improper. Our Nation had a sordid history of such

---

[24] Professor Suter outlines that "if the goal of NBS is to benefit the newborn, the panel of diseases should be limited to those for which we have effective treatments or early intervention and whose natural history we understand well." **Suter Article, RE 135-30 at PageID # 2307**; see also Anne Hart, *An Insufficient Screening: The Constitutionality of Michigan's Newborn Screening Program*, 61 BOSTON COLL. L. REV. E.Supp. II.-213 (2020) available at http://olcplc.com/s/owlq. Anything beyond that is a medical research study that contains its own separate risks, benefits and alternatives that parents should be informed of and consulted to make an appropriate decision for their child's participation.

impropriety. See *The U.S. Public Health Service Untreated Syphilis Study at Tuskegee*, US Centers for Disease Control and Prevention, Sept. 4, 2024, available at https://www.cdc.gov/tuskegee/about/index.html. It has been rightfully condemned and rejected. *Remarks by the President in Apology for Study Done in Tuskegee*, US Archive, May 16, 1997, available at https://clintonwhitehouse4.archives.gov/textonly/New/Remarks/Fri/19970516-898.html. And anything getting remotely close to it should never be allowed again.

Yes, medical research and expansion of knowledge of diseases together with its prompt diagnosis and treatment of those afflicted is of great personal and societal importance – but not at the constitutional expense of everyone's "physical freedom and self-determination." *Cruzan*, 497 U.S. at 287 (O'CONNOR, J., concurring). Our Constitution protects the right of everyone, including those only hours old, to be "secure in their persons" from government intrusion – even when the government agent is wearing a lab coat who trumpets as being "from the government" and "here to help." Citizens have the right to decline to ever participate from the start and that must be respected.

Sometimes the obvious is missed. Michigan's NSP law should never

require individuals to be forced into being part of a never-ending post-screening medical study without proper informed parental consent. Defendants can faithfully retain all the blood and data they want and desire after newborn screenings *but only if* sufficient informed consent is first obtained from moms and dads with clear heads. This is because the permissionless and warrantless taking and retaining post-screening samples and data takes away something else – individual privacy. While some might readily agree to such privacy-eviscerating requests after learning of all the details of the proposed uses and retention schedules, others, like these parents, will not. Permission ahead of time, rather than forgiveness afterward, is the proper standard. The Constitution requires it.

## RELIEF REQUESTED

This Court is requested to dismiss the blood spots portion of the appeal as moot and otherwise affirm the District Court's judgment on the remaining balance of the appellate challenge.

Date: November 28, 2024          s/ Philip L. Ellison
                                 PHILIP L. ELLISON
                                 OUTSIDE LEGAL COUNSEL PLC
                                 530 West Saginaw St
                                 PO Box 107
                                 Hemlock, MI 48626
                                 (989) 642-0055
                                 pellison@olcplc.com

                                 Counsel for Appellees

## CERTIFICATE OF COMPLIANCE

This brief has been prepared in proportional typeface using Century School Book 14-point font. The principal brief, including headers and footnotes, contains 12,999 words according to the Word Count feature in the Microsoft Word program.

The undersigned understands that a material misrepresentation in completing this certificate or circumvention of the type-volume limitations may result in the Court's striking the brief and imposing sanctions against the person signing the brief.

Date: November 28, 2024      s/ Philip L. Ellison
                                       PHILIP L. ELLISON
                                       OUTSIDE LEGAL COUNSEL PLC
                                       530 West Saginaw St
                                       PO Box 107
                                       Hemlock, MI 48626
                                       (989) 642-0055
                                       pellison@olcplc.com

                                       Counsel for Appellees

## CERTIFICATE OF SERVICE

I hereby certify that on the date stated below, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send notice of and a copy of such filing to counsel of record at their email address(es) of record.

Date: November 28, 2024          s/ Philip L. Ellison
                                 PHILIP L. ELLISON
                                 OUTSIDE LEGAL COUNSEL PLC
                                 530 West Saginaw St
                                 PO Box 107
                                 Hemlock, MI 48626
                                 (989) 642-0055
                                 pellison@olcplc.com

                                 Counsel for Appellees

## DESIGNATION OF RELEVANT
## DISTRICT COURT DOCUMENTS

| RE. | PageID Range | Description of the Document |
|---|---|---|
| 26 | #300-333 | First Amended Complaint |
| 121 | #1837-1840 | Order |
| 135-2 | #1951-2066 | Commission Final Report |
| 135-3 | #2067-2068 | M.C.L. § 333.5431 |
| 135-4 | #2069-2084 | 50th Anniversary "Success Story" |
| 135-5 | #2085 | Entities Diagram |
| 135-6 | #2086 | Consent Options |
| 135-7 | #2087-2158 | Biobank Business Plan |
| 135-8 | #2159-2165 | Articles of Incorporation |
| 135-9 | #2166-2177 | Solicitation Letter |
| 135-11 | #2179 | Disorders List |
| 135-12 | #2180-2185 | Subpoenas |
| 135-13 | #2186-2188 | Newborn Screening and BioTrust FAQs |
| 135-14 | #2189 | Article |
| 135-15 | #2190-2199 | *Belano* Lawsuit |
| 135-16 | #2200 | Biobank Price List |
| 135-17 | #2201-2202 | TransHit Bio Emails |
| 135-18 | #2203 | NBS Card |
| 135-20 | #2206-2209 | Data Collection |
| 135-21 | #2210-2225 | Admissions |
| 135-25 | #2234-2249 | Kanuszewski Declaration |
| 135-26 | #2250-2263 | Laporte Declaration |
| 135-27 | #2264-2280 | Wiegand Declaration |
| 135-28 | #2281-2291 | Eisenhauer Study |
| 135-30 | #2298-2359 | Suter Article |
| 135-32 | #2369-2370 | BioTrust FAQ - What Are |
| 135-33 | #2371 | BioTrust FAQ - What Is Biotrust |
| 135-34 | #2372 | BioTrust FAQ - What Is Biobank |
| 135-35 | #2373-2374 | BioTrust FAQ - How Does |
| 135-36 | #2375-2376 | Biobank Webpage Printout Research |
| 135-38 | #2379-2380 | Biobank User Fees Webpage |
| 135-40 | #2385-2406 | Yancey Deposition Transcript |

| 135-41 | #2407-2426 | Lyon-Callo Deposition Transcript |
| 135-42 | #2427-2441 | Shah Deposition Transcript |
| 141-15 | #2987-2988 | Directive |
| 141-16 | #2989-2990 | Directive |
| 141-17 | #2991-2992 | Directive |
| 141-18 | #2993-2994 | Directive |
| 141-19 | #2995-2996 | Directive |
| 141-20 | #2997-2998 | Directive |
| 141-21 | #2999-3000 | Directive |
| 151-3 | #5137-5140 | Purchasers List |
| 151-6 | #5145-5149 | Plaintiffs' Joint Declaration |
| 160-3 | #5254-5255 | Board of Directors Printout |
| 160-7 | #5321-5427 | Newborn Screening General Policies |
| 160-10 | #5471-5497 | Research Studies |
| 160-11 | #5498-5506 | Cards |
| 160-12 | #5507-5508 | MNBB Webpage |
| 171 | #5569-5613 | Opinion and Order |
| 200 | #5751-5762 | Opinion and Order |
| 209 | #5803-5806 | Partial Consent Judgment |
| 214 | #5811-5842 | Opinion and Order |
| 226 | #6001-6022 | State Defendants' Proposed Findings |
| 238 | #6107 | Order |
| 243 | #6129-6281 | Trial Transcript |
| 244 | #6282-6438 | Trial Transcript |
| 262 | #6991-6993 | Judgment |
| 263 | #6994-7025 | Amended Opinion |
| 266 | #7040 | Notice of Appeal |
| 269 | #7049-7058 | Partial Stay Order |
| 281-1 | #7340-7354 | Responses to Court Ordered Notices |