No. 23-1733

In the
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

ADAM KANUSZEWSKI, *et al.*,

      Plaintiffs-Appellees,

v.

MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,

      Defendants-Appellants.

Appeal from the United States District Court
Eastern District of Michigan, Northern Division
Honorable Thomas Ludington

**DEFENDANTS-APPELLANTS' JOINT REPLY BRIEF**

Daniel J. Ping (P81482)
Aaron W. Levin (P81310)
Assistant Attorneys General
Counsel of Record
Attorneys for Defendants-Appellants
Michigan Department of Attorney General
Corporate Oversight Division
P.O. Box 30736
Lansing, MI 48909
(517) 335-7632

Jeremy C. Kennedy (P64821)
Jerold Lax (P16470)
Pear Sperling Eggan & Daniels, P.C.
24 Frank Lloyd Wright Drive,
Ste. D-2000
Ann Arbor, Michigan 48105
Telephone:  734-665-4441
E-mail:  jkennedy@psedlaw.com
Counsel for Defendants-
Appellants Michigan Neonatal
BioBank & Christoper Krause

Dated:  December 19, 2024

# TABLE OF CONTENTS

Page

Table of Authorities ................................................................. iii

Introduction .............................................................................1

Argument ................................................................................2

I.    Plaintiffs offer no meaningful response to Defendants'
      Fourteenth Amendment arguments. ...............................2

      A.    The law-of-the-case doctrine does not apply beyond the
            pleadings. ...........................................................................2

      B.    No evidence in the record permits that re-identification
            is possible without fresh parental consent. ..........................7

      C.    If strict scrutiny applies, Plaintiffs have not rebutted
            Defendants' sufficient explanation for why NBS and
            the BioTrust satisfy that test. ...............................................10

            1.    The programs have compelling purposes. ..................10

            2.    The programs are narrowly tailored. ...........................14

II.   Plaintiffs have not established that post-screening activities
      even implicate the Fourth Amendment. .......................................16

      A.    No seizure can be found without a cognizable property
            interest, which Plaintiffs have never articulated. ................16

      B.    Any seizure was reasonable. .................................................19

      C.    No search occurred because rDBS and data cannot be
            re-identified without freestanding parental consent, no
            search occurred, and Plaintiffs offer no rebuttal. ................20

      D.    Any search was reasonable. ..................................................23

III.  Consent was constitutionally adequate. ......................................23

A. Pre-2010 consent waivers, issued based upon the lack of meaningful risk, were valid. ...............................................24

B. The validity of post-2010 affirmative consent is confirmed by valid signatures. ...............................................26

Conclusion and Relief Requested ...............................................30

Certificate of Compliance ...............................................33

Certificate of Service ...............................................34

# TABLE OF AUTHORITIES

Page

**Cases**

*Bakeman v. Citizens Ins. Co. of the Midwest,*
998 N.W.2d 743 (Mich. Ct. App. 2022) ................................................. 26

*Bruneau v. Michigan Dep't of Env't,*
104 F.4th 972 (6th Cir. 2024) ................................................................. 5

*Cistrunk v. Oakwood Heritage Hospital,*
No. 287457, 2010 WL 2384887 (Mich. Ct. App. June 15, 2010) .......... 28

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ........................................................................ 21, 22

*In re Rosebush,*
491 N.W.2d 633 (Mich. Ct. App. 1992) ................................................ 24

*Juckett v. Elluru,*
No. 260350, 2006 WL 2924664 (Mich. Ct. App.Oct. 12, 2006) ........... 28

*Kanuszewski v. Michigan Dep't of Health & Hum. Servs.,*
927 F.3d 396 (6th Cir. 2019) ........................................................ passim

*Pennhurst State Sch. & Hosp. v. Halderman,*
465 U.S. 89 (1984) ................................................................................. 8

*Rogalski v. Smith,*
No. 350120, 2020 WL 6111598 (Mich. Ct. App. Oct. 15, 2020) ........... 28

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
592 U.S. 14 (2020) ............................................................................... 11

*Whalen v. Roe,*
429 U.S. 589 (1977) ........................................................................... 6, 8

*Wlosinski v. Cohn,*
713 N.W.2d 16 (Mich. Ct. App. 2005) ............................................ 23, 24

**Statutes**

Mich. Comp. Laws § 333.17020 ................................................................ 25

Mich. Comp. Laws § 333.17020(1) .......................................................... 25

Mich. Comp. Laws § 333.17020(9) ................................................... 25, 29

Mich. Comp. Laws § 333.17520(1) .......................................................... 25

Mich. Comp. Laws § 333.17520(9) ................................................... 25, 29

Mich. Comp. Laws § 333.2631 .................................................................. 7

Mich. Comp. Laws § 333.2633 .................................................................. 7

Mich. Comp. Laws § 333.2637 .................................................................. 7

Mich. Comp. Laws § 333.5431(7)(b) ......................................................... 7

Mich. Comp. Laws § 600.2912a(1)(b) ...................................................... 29

## INTRODUCTION

Lost in Plaintiffs' sensational rhetoric is the simple crux of this case:  Prior to use of residual DBS ("rDBS")—indeed, prior even to mere storage—rDBS are de-identified.  They, and their associated data, remain separated, inaccessible, and protected from all the myriad harms Plaintiffs imagine.  These protections are required consistently by multiple sources of law, policy, and standards of care.  The limitations are consistent, and consistently applied, and there is not one whit of evidence suggesting exceptions, inadvertent gaps, malfeasance, or deviations occurring in practice or in isolation.  Neither the District Court nor Plaintiffs have, to date, portrayed a contrary reality as anything more than a speculative "fear."

By granting dispositive legal significance to such speculation, the District Court committed its most serious legal error.  On appeal, Plaintiffs do nothing to rehabilitate that line of reasoning or its factual basis.  Instead, they encourage this Court to repeat the District Court's second most critical error by construing this Court's prior decision on a motion to dismiss as dispositive of open questions of material fact.  This Court should instead take the proper fresh look, reverse, and remand.

# ARGUMENT

## I. Plaintiffs offer no meaningful response to Defendants' Fourteenth Amendment arguments.

Defendants have explained why the facts adduced at trial do not implicate "medical" treatment as that concept is understood in the context of the Fourteenth Amendment. The District Court did not make a single factual finding inconsistent with Defendants' position. Rather, its misstep occurred when it read this Court's prior decision as having decided these and other important questions of fact.

Plaintiffs offer no meaningful response to this whatsoever. Their critical allegations were not just unproved; they were disproved. They are left to invoke (1) the law-of-the-case doctrine and (2) a cherry-picked quote supposedly proving that Defendants consider post-testing use of rDBS to be "medical" in nature. For the reasons that follow, neither argument has any merit.

### A. The law-of-the-case doctrine does not apply beyond the pleadings.

In lieu of arguing substantively that Defendants' post-testing conduct effectuates "medical" care or treatment, or otherwise implicates parental decision-making, Plaintiffs try hanging their hat on this

Court's 2019 decision.  (Appellee Br., p. 30.)  That decision, however, went no further than the assumption that the allegations in the Amended Complaint were true.  *Kanuszewski v. Michigan Dep't of Health & Hum. Servs.*, 927 F.3d 396, 420 (6th Cir. 2019) ("Taking these allegations as true, Defendants' actions constitute a denial of the parents' fundamental right to direct the medical care of their children, and their actions must survive strict scrutiny.").

This is crucial.  One cannot overstate the gulf between the Amended Complaint's allegations and the undisputed facts adduced at trial.  Most significantly, Plaintiffs alleged a fictional scheme of post-testing "use," pursuant to which re-identifying the individual from whom rDBS was obtained was *"easily possible" upon "request."*  (Am. Compl. ¶ 63 (emphases added), PageID # 317; *see also id.* ¶ 71, PageID # 318–319 (alleging Defendants "do not resist any . . . demands for [medical] information"); *id.* ¶ 64 ("[T]here are no statutory legal protections on who may access, use, or utilize the private medical and genetic information of the Infants."), PageID # 317; *id.* ¶ 73 ("There is no legal contract, state statute, or administrative rule limiting the range of uses of the Infants' blood spots[.]"), PageID # 319; *id.* ¶ 82

(alleging "no legal protections" circumscribing rDBS use), PageID #
321.)  Defendants' practice of retaining and storing these rDBS and
data allegedly occurred in furtherance of this conception of post-testing
"use."

This Court's prior decision makes sense in that context.
Defendants readily acknowledge that the factual allegations previously
presented to this Court on a motion to dismiss—*i.e.*, running medical or
diagnostic analyses on an identifiable individual, with or without
safeguards—would implicate fundamental rights regarding medical
care.  (*See* Appellant Br., pp. 33–34 & n.10, 36.)  And, if those
allegations are assumed, they become all the more egregious upon an
allegation that the whole thing was just a money-making scheme.

This Court's holding in that regard is nigh-unimpeachable.  But
now that even Plaintiffs seem to have abandoned the core allegations, it
is all the more appropriate for this Court's prior decision to be limited to
the *allegations* it analyzed, and not extended to the *facts*.

Just this year, this Court rejected a similar appeal to the law-of-
the-case doctrine, stating, "All that [an earlier related decision] decided
was that another group sufficiently *pleaded* an inverse condemnation

4

claim against the state agency . . . . That is a distinction *with* a difference." *Bruneau v. Michigan Dep't of Env't*, 104 F.4th 972, 978 (6th Cir. 2024) (emphases in original). Where, "at the summary judgment stage, no material dispute remained after considerable discovery," this Court's prior decision did "not govern" the second appeal. *Id.* *Bruneau*'s holding is consistent with a long line of case law articulating this common-sense principle. (*See* Appellant Br., p. 31.)

This principle is relevant not only in this Court's treatment of the issues; its misapplication below was a but-for cause of the District Court's erroneous rulings. The District Court overlooked this Court's instruction that, *before* determining whether strict scrutiny applies, the threshold question on remand was "whether the evidence demonstrates that Defendants' actions interfered with the parents' right to direct their children's medical care." *Kanuszewski*, 927 F.3d at 421. Instead, the District Court stated, "[T]he Sixth Circuit's order requires this Court to apply strict scrutiny to any of Defendants' conduct that lacked informed consent under Michigan law." (PageID # 5817.)[1]

---

[1] The District Court's discussion of the Fourth Amendment claim signals that, had it analyzed the significance of de-identification of rDBS, it would have disregarded this Court's holding that speculative

5

Now that the facts are in, it is no longer appropriate to apply a legal analysis to the Amended Complaint's disproved articulation of post-testing "use." The pleadings' description of purpose, methodologies, governing law, safeguards, etc., are legally irrelevant at this stage.

Finally, Plaintiffs are incorrect that Defendants cited *Whalen v. Roe*, 429 U.S. 589 (1977), to support a claim "that the prior panel [of this Court] conflated privacy and decision-making," and that Defendants are re-litigating issues already decided. (Appellee Br., p. 31.) In general, Defendants take no issue with the correctness of this Court's prior decision *in its context as an analysis of the pleadings*. Defendants *do* take issue with the District Court's error in translating this Court's analysis of the pleadings into factual findings, and Plaintiffs' attempt to convince this Court to compound that error here.

---

harms founded upon potential misuse or malfeasance are non-cognizable, *Kanuszewski*, 927 F.3d at 411 (holding that alleged "fear about the misuse of . . . information . . . fails as an injury-in-fact"). (*See* PageID # 7010–7011.)

**B.   No evidence in the record permits that re-identification is possible without fresh parental consent.**

To be clear:  Defendants soundly disproved the allegations in Plaintiffs' Amended Complaint regarding post-screening activity.  There is no evidence in the record even suggesting that medical diagnoses of an identifiable individual could occur—at least not without parental consent *additional* to the consent implied or required at birth.

To the contrary, plenty of evidence demonstrates (and there is no material dispute) that re-identification is prohibited.  (*See, e.g.*, Appellant Br., pp. 16–18.)  This Court will not find any specific claim to the contrary in Plaintiffs' briefing on appeal.  Likewise, plenty of legal authority prohibits Defendants or any recipient of rDBS or data from behaving as Plaintiffs alleged was routine.  *E.g.*, Mich. Comp. Laws §§ 333.2631 to 333.2633 (rendering materials disclosed in facilitation of a "medical research project" confidential and inadmissible in court), 333.2637 (detailing confidentiality procedures), 333.2638 (imposing criminal penalties and requiring termination of employment for violating confidentiality provisions), 333.5431(7)(b) (requiring rDBS to be made available for only research "conducted in a manner that

preserves the confidentiality of the test subjects and is consistent to protect human subjects from research risks under [the federal Common Rule]").  (*See also* PageID # 4273 (designating BioTrust as "medical research project" under Michigan's Public Health Code, triggering aforementioned statutory protections).)  And when a plaintiff's alleged "injury" is merely a fear that cannot be realized without the defendant's misfeasance—or some other assumption that state law will not be followed—there is no injury.  *Whalen*, 429 U.S. at 600; *accord Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law.").

Storage and use of rDBS and data does occur—but only pursuant to a comprehensive protocol intended to protect against the very actions that the Amended Complaint claimed were run-of-the-mill.  Both justice and Michigan families are disserved by disregarding the copious fact-finding that clarified what, exactly, post-testing "use" means.  In holding that *any* "storage" or "use" of rDBS or data, no matter its characteristics, offends a parent's right to direct their child's medical

8

care, (PageID # 5586), the District Court read this Court's prior decision too broadly. These terms were freighted with the Amended Complaint's description of "use," which, again, described a fictional scheme of no-holds-barred, on-demand access to individuals' medical data that was never supported in the record.

Apart from their attempts to overextend this Court's prior decision, Plaintiffs raise only a single, misleading claim for why post-testing retention or use of rDBS and data translates to medical care: They claim that Defendants "expressly concede one of the purposes for keeping millions of blood spots and related data is to 'help with a [future] diagnosis.'" (Appellee Br., pp. 32–33 (quoting Appellant Br., p. 13).) Plaintiffs' apparent implication is that this diagnosis will occur without consent, and at the hands of someone other than the family's care provider.

In fact, Defendants stated that the benefits to retaining rDBS include that "it might be *requested by the parent* for help with a diagnosis." (Appellant Br., p. 13 (emphasis added).) By making this option available to parents, at their sole directive and with their

freestanding, affirmative consent, Defendants do not even remotely interfere with parents' right to direct their children's medical care.

### C. If strict scrutiny applies, Plaintiffs have not rebutted Defendants' sufficient explanation for why NBS and the BioTrust satisfy that test.

Defendants have delineated, with specificity, the compelling purposes and narrow tailoring distinct to each of the programs at issue. Plaintiffs have failed to engage with any of them.

### 1. The programs have compelling purposes.

In another appeal to this Court's prior decision on the pleadings, Plaintiffs seek to tie-bar the remaining issues to the newborn screens that occur shortly after an infant's birth.  Plaintiffs say, and the District Court agreed, that a program's purpose cannot be "compelling" if it does not immediately inure to the benefit of a newborn already born and screened—never mind that the programs demonstrably *do* inure to the benefit of the selfsame NBS program, and infants screened thereunder. And Plaintiffs say, and the District Court agreed, that the concept of narrow tailoring cannot encompass the improvement of NBS—never mind that the principal beneficiary of such improvement is NBS and

yet-unborn infants and families, whether they are born later that day or five years later.

Plaintiffs' lines of reasoning are flawed. The challenged conduct must have "*a compelling purpose*"; that purpose need not be directed to the individual plaintiff, *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (2020) (emphasis added) and may indeed be framed in terms of the benefit to society at large, *id.* ("Stemming the spread of COVID–19 is unquestionably a compelling interest[.]"). The compelling purposes and narrow tailoring of NBS and BioTrust are entitled to their own analysis.

That said, the compelling purpose of an infant's initial blood screen is very relevant to establishing that post-screening activity has a compelling purpose; NBS's post-screening activity and the BioTrust demonstrably support and improve that screen. But there is no legal or logical basis to discount the existence of a compelling purpose just because post-screening activity might not benefit the *same individual* from whom rDBS and data is obtained.

As if to emphasize the inappropriateness of using its analysis of the pleadings as answers to outstanding questions of fact, this Court

held only that, "[b]ased on Plaintiffs' allegations, it seems unlikely that Defendants will be able to demonstrate a compelling interest, as the health of the child is no longer at stake after the samples have been tested for life-threatening diseases." 927 F.3d at 421. In the same breath, it expressly permitted that, on remand, "Defendants may deny that they have a present or future commercial interest in the blood samples . . . and may present evidence demonstrating other purposes for retaining, transferring, and storing the samples." *Id.* Taken together, these statements reflect that post-screening retention for "commercial" purposes are likely improper, but more than one other purpose may suffice if compelling and supported by evidence.[2]

According to Plaintiffs, Defendants' only other argument in support of the two programs' compelling purposes is the State's vague interest in "safeguarding the well-being of a minor." (Appellee Br., p. 34.) In fact, Defendants carried their burden, proving through robust, unrebutted testimony that post-screening retention serves myriad

---

[2] Logically, it would make no sense for this Court to (1) affirm the dismissal of Plaintiffs' initial-screening claims; (2) hold that a compelling purpose can exist *only* at the initial screen; yet (3) remand the post-screening claims.

specific, compelling purposes.  (*See also* Appellant Br., pp. 10–13, 15–16,
51, 54–56.)[3]  These primarily inure to the benefit infants and families
served by NBS by "improving the program's accuracy and precision, as
well as discovering and implementing new ways to identify life-
threatening conditions."  (*Id.* at 54 (emphasis omitted).)  NBS, in
particular, engages in post-screening storage and use *exclusively* to
maintain and improve the screening process.  Other benefits to the
public health exist, too, and they are likewise compelling.  As discussed
in the context of "profit," *infra*, the BioTrust was conceived as an
invaluable tool in advancing the public health, and its precise
mechanics were exhaustively put into the record.  (PageID # 2092,
2094.)  Framing these specific proofs as nothing more than "vague"
appeals to the "well-being of a minor" is a misdirection.

---

[3] NBS's purposes in finding babies with rare but serious disorders
requiring prompt treatment comprises the following: maintaining and
calibrating existing screening equipment; onboarding new equipment;
improving existing screening protocols to minimize false negative and
false positives; conducting "method validations," *i.e.*, investigations into
why a screen yielded a false negative; onboarding screens for newly
added disorders; and making rDBS available to parents for their own
purposes.  BioTrust's purposes include the furtherance of invaluable
public-health research, not least of which comprises development of new
screens—which development, being "research," NBS does not undertake
itself.

Finally, Plaintiffs claim that Defendants' interests are not "compelling enough . . . when measured against the significant encroachments visited upon citizens' personal liberty and autonomy," which "encroachments" Plaintiffs continue to define as activities that occur "with deeply-private medical and genetic data." (Appellee Br., p 36.) As explained repeatedly, and again *infra*, sensitive data and material are held under the strictest privacy protections and never otherwise re-connected to an identifiable individual except upon request of the individual or their parent.

### 2.    The programs are narrowly tailored.

Plaintiffs' only quasi-substantive argument regarding narrow tailoring is their claim that "[c]urrent practices fail to obtain . . . legally sufficient informed consent" and "sufficient consent could be easily sought." (Appellee Br., p. 38.) In support of this claim, they leave it at their conclusion that "Defendants are just incorrect," and repeat the erroneous legal proposition that the compelling interest in post-screening activity must be a mirror-image of the compelling interest in an infant's initial screen. (*Id.*)

Defendants have shown that the programs are narrowly tailored, articulating and supporting the iron-clad privacy protections explained elsewhere at length. As for the scale of the programs, this, too, is in the record. (*See* Appellant Br., pp. 10–14.) The structure of these programs does not implicate the need for informed consent attendant to medical care or treatment, but that safeguard has been implemented as well. To the extent consent is relevant, it is discussed in Part III, *infra*.

Finally, Plaintiffs accuse Defendants of failing to analyze the "data portion" of the consent issue in their appeal. (Appellee Br., pp. 51–52.) The basis for this argument is inscrutable. The term "data" appears 61 times in the body of Defendants' appeal brief, nearly always (appropriately) coupled with a reference to rDBS. As Defendants have explained, and as should be obvious, this is because the utility of rDBS, in any context, requires accompanying data.

## II.    Plaintiffs have not established that post-screening activities even implicate the Fourth Amendment.

### A.    No seizure can be found without a cognizable property interest, which Plaintiffs have never articulated.

Plaintiffs' claim of an unreasonable seizure rests on the flawed premise that, by charging operational or cost-recovery fees to recipients of rDBS or data, "the goal was to create profit."  (Appellee Br., p. 40.) Their discussion contains no legal analysis beyond their appeal to this Court's decision on the pleadings.  (*See id.* at 40–41.)  Plaintiffs have therefore forfeited any opposition to Defendants' explanation for why Plaintiffs failed to establish a seizure.

As for the claim that Defendants' motivations are sufficient to establish a seizure:  Assuming *arguendo* that such motivations are relevant to this inquiry, Plaintiffs' position has been disproved.  As the District Court once concluded, "Defendants clearly demonstrate[d] that fees are charged to researchers for the use of the DBS to assist BioTrust to be financially independent, but the DBS are not sold 'for profit.' " (PageID # 5599 (*citing* PageID # 3280, 3327, 2094, 2107, 2168).)[4]

---

[4] Inexplicably, the District Court made a different finding not two months later on a motion for reconsideration, during which time no new

16

Rather than grapple with the testimony on this point, or the sole ruling below that was actually supported by relevant record evidence, Plaintiffs invoke pieces of the 72-page "Michigan Neonatal BioTrust Business Plan 2008." (PageID # 2087-2158.) The District Court made no factual findings regarding this document. Plaintiffs point to the portions of this plan that (necessarily) discuss its financial framework; in doing so, they suggest that, by including a plan for financial sustainability, Defendants betray that their primary motivation was profit-seeking, and that scientific advancements benefitting the public health were mere pretexts for a new source of revenue.

In discerning Defendants' *purpose* in retaining rDBS and data, however, it is appropriate to refer primarily to the parts of the plan entitled "The Problem and Opportunity" and "Mission and Vision." (PageID # 2092, 2094.) Each describes the BioTrust as a much-needed

---

evidence was submitted on this point. It stated Defendants retain rDBS and data "to make a substantial profit by selling it to private entities." (PageID # 5813.) The only potentially relevant citation offered in support was this Court's opinion, which, of course, held that profit-motivated retention was unreasonable only "[i]f this is indeed Defendants' purpose in retaining the children's blood samples." 927 F.3d at 425. The District Court's conclusion was manifestly erroneous and unreasoned.

tool to facilitate health research "into the origins, prevention and cures for diseases of public health concern with emphasis on the public health concerns of Michigan's citizens." (PageID # 2094.) In other words, the BioTrust was *not* conceived as a pretext for a revenue stream. At best, the "Mission and Vision" section notes that "revenue from user fees will generate cost recovery *for MNB* [*i.e., BioTrust*] *operations*." (*Id.* (emphasis added).) The fees result in less-than-total recoupment of the costs in facilitating this life-saving research, (*see* PageID # 6616), and their sole purpose is to support the program—not the other way around, (PageID # 6325 (testimony that the fee "is charged, otherwise the program will close")).

In addition, Plaintiffs clarify that their seizure claim rests upon a possessory interest in property. (Appellee Br., p. 41 ("Defendants had ongoing possession of the [rDBS] and never gave them back until ordered to do so.")[5].) Defendants pointed out that it is Plaintiffs' duty to

---

[5] Defendants would have destroyed or returned the Plaintiff-Children's rDBS upon request at any time, which is precisely why they could not ethically seek a stay as to this portion of the remedy. They have no interest in refusing such requests, and every interest in honoring them. It was Plaintiffs who insisted on this relief being accomplished by court order.

identify the property interest in question, including the legal source of that interest. (Appellee Br., pp. 58–60.) Plaintiffs have failed to do so. On this point, it bears repeating that Plaintiffs allege that Defendants should have destroyed these items. (Am. Compl. ¶ 113, PageID # 328; *see also id.* ¶ 10, PageID # 302; *id.* ¶ 14, PageID # 304.) Accordingly, the legal basis for Plaintiffs' seizure claim remains a mystery, and their burden remains unmet.

### B.   Any seizure was reasonable.

Plaintiffs have only two rejoinders regarding the reasonableness of Defendants' conduct if such is deemed a "seizure," and Defendants have addressed both. One is their unsupportable claim that Defendants' facilitation of life-saving medical research was a mere pretext for establishing a new source of revenue. (Appellee Br., pp. 40–41.) For reasons already stated, this finds no support in the record. The other is their legally baseless claim that Defendants can have no valid purpose with respect to residual DBS or data (let alone a compelling one) once it becomes "residual," *i.e.*, once stored. (*Id.*) Again, the germ of this argument originated in this Court's decision *on the pleadings*, which pleadings, in lieu of alleging Defendants' actual

19

purposes for post-screening retention and use, alleged that profit was Defendants' only motivation. Defendants' purpose in retaining thoroughly de-identified rDBS and data is not just valid; it is compelling. And it imposed no interference with Plaintiffs' interest in any articulable property right.

### C. No search occurred because rDBS and data cannot be re-identified without freestanding parental consent, no search occurred, and Plaintiffs offer no rebuttal.

Whether a search occurred is a threshold determination that can trigger further inquiry into whether the search was reasonable. Here, Defendants' undisputed facts explain why no search occurred. (Appellant Br., pp. 63–65.) In short, no privacy interests are implicated, and no search can occur, where no revelations from the challenged activity can possibly attach to any individual plaintiff.

As occurred in the due-process context, the District Court's most serious errors were legal, not factual. First, it made clear that it felt constrained not to analyze the threshold question at all, stating that this Court "has already answered the first question," *i.e.*, "whether the alleged government conduct constitutes a search within the meaning of the Fourth Amendment." (PageID # 7001.) As has been stated: The

Amended Complaint alleged—and this Court's 2019 opinion analyzed—a disproved scheme in which "use" of rDBS or data meant that an individual's personal, identifiable medical information was referenced, created, or delivered to third-parties in a for-profit scheme; and "storage" occurred to facilitate the same.  By interpreting this Court's prior decision as requiring it to adopt the truth of the Plaintiffs' allegations without further inquiry, the District Court rested its decision upon a manifest error of law.

Although the District Court purported to discuss some of Defendants' arguments regarding the occurrence of a "search," this dicta conflicted with the portions of this Court's decision that *are* the law of the case.  In particular, this Court expressed that Plaintiffs' speculative fears about future misuse of rDBS and data do not describe cognizable injuries. 937 F.3d at 409–11.  Even in the context of the Amended Complaint's allegations, this holding applied to the fear of future misuse or discrimination, and it would be true "even where the government has the power to do what a plaintiff fears it might." *Id.* (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013)).  This Court did hold that Plaintiff-Children had *alleged* a cognizable injury

with respect to their "protected privacy interests"; but, again, that was premised on disproved and abandoned allegations that rDBS and data are available to anyone on request, which neither the District Court nor Plaintiffs maintained. *See id.*; *see also id.* at 410 (explaining that "chemical analysis on blood samples" invades a person's privacy interests when it "can reveal a host of private medical facts *about an individual*, including whether *he or she* is epileptic, pregnant, or diabetic" (emphasis added) (brackets omitted)).  In other words, Plaintiff-Children had standing to invoke that future harm because Plaintiffs had alleged that it could occur pursuant to policy.  But factual development has revealed that such harm can be realized only if someone breaks the law.

On this point, the District Court explained that it found a search occurred because it had credible, but unspecified, "concerns about unwarranted government intrusion into individual privacy."  (PageID # 7005.)  It rejected the evidence Defendants' core factual and legal defense as meritless because "[t]he very act of retention implicates a potential intrusion: misuse or abuse," adding, "Control over society is

similarly at risk." (PageID # 7010.) This was an extreme error of law that this Court should correct.

### D.   Any search was reasonable

If this Court labels Defendants' post-testing "use" of rDBS or data as a "search," the search was nonetheless reasonable for reasons already stated at length. In short, the activities serve the State's compelling, and limited, interest in maintaining and improving public health. And, for the same reasons given for why no search occurred, any search was reasonable; the conduct is starkly limited with respect to scope, participants, goals, and—most importantly—the potential privacy implications.

## III.   Consent was constitutionally adequate.

The preceding discussion informs the issue of consent. "The doctrine of informed consent requires a physician to warn a patient of the risks and consequences of a medical procedure." *Wlosinski v. Cohn*, 713 N.W.2d 16, 20 (Mich. Ct. App. 2005). If a process is indeed "medical" in nature, a physician's request for informed consent need only include "risk information reasonably related to a patient's medical

procedure." *Id.*; *see also In re Rosebush*, 491 N.W.2d 633, 635 (Mich. Ct. App. 1992) ("Michigan recognizes and adheres to the common-law right to be free from nonconsensual physical invasions and the corollary doctrine of informed consent.").

Accordingly, the constitutional adequacy of consent appropriate to a medical context is relevant *only* upon this Court's decision that one of Defendants' distinct programs (NBS or the BioTrust) effectuated "medical care or treatment"; comprised a seizure of personal property; or comprised a "search" into a plaintiff's personal medical characteristics. Because none of these decisions is supported by law or fact, consent is not in issue. And the District Court erred by applying a Michigan statute expressly applicable only to treatment—and which expressly exempts the conduct in issue from its scope. Regardless, for the reasons that follow, the consent obtained was adequate.

### A.    Pre-2010 consent waivers, issued based upon the lack of meaningful risk, were valid.

Again, where no treatment occurs, obtaining the informed consent required to perform medical care is unwarranted. Rather, it is appropriate to apply the standard of care for *research*. This was

reflected in Defendants' pre-2010 framework, when the IRB approved of waivers of consent issued pursuant to the federal Common Rule.

Plaintiffs concede that the District Court erred in measuring sufficient consent against the yardstick of the facially inapplicable Michigan statutes. (*Id.* at 54.)[6]

As Defendants have explained, (1) constitutionally sufficient consent is measured against the relevant standard of care, (2) the relevant standard of care for medical *research* (as opposed to treatment) is embodied in the federal Common Rule, and (3) at all times Defendants either complied with the Common Rule or voluntarily held themselves to an even higher standard.

Weakly, Plaintiffs suppose that "sufficient consent could be easily sought" as "a less restrictive means of testing newborn infants." (Appellee Br., p. 38.)  Whatever this means—and setting aside the fact that initial testing is no longer at issue—this fails even to attempt to

---

[6] To make matters worse, the statutes invoked by the District Court were, by their terms, inapplicable to the non-diagnostic activities at issue.  (PageID # 5826 (citing Mich. Comp. Laws § 333.17020).)  The statutes in question apply exclusively to "presymptomatic or predictive genetic test[s]," which expressly do not implicate research covered by the federal Common Rule.  Mich. Comp. Laws §§ 333.17020(1), (9), and 333.17520(1), (9).

overcome Defendant's showing to the contrary.  (*E.g.*, Appellant Br., p.

48.)

**B.    The validity of post-2010 affirmative consent is confirmed by valid signatures.**

Since May 2010, consent to participate in the BioTrust for Health

has been an *opt-in* process requiring signed consent.  The parents of five

of the seven plaintiff-children born during this period chose to sign such

consent forms.  The parents of two plaintiff-children born during this

period declined.

Plaintiff-Parents give short shrift to the fact that they opted to

sign the relevant forms.  In Michigan, "the law is clear that one who

signs an agreement, in the absence of coercion, mistake, or fraud, is

presumed to know the nature of the document and to understand its

contents, even if he or she has not read the agreement."  *Bakeman v.

Citizens Ins. Co. of the Midwest*, 998 N.W.2d 743, 748 (Mich. Ct. App.

2022) (quotation omitted).

The District Court initially found that "Plaintiffs provide[d] no

evidence that [anyone] coerced Plaintiff-mothers into providing their

consent."  (PageID # 5588.)  It continued, "Plaintiffs were not required

26

to sign the consent form, and even if the hospital employee did not adequately explain the process, the form instructs new parents to ask for a pamphlet before signing the form.  However, Plaintiffs still chose to sign the form."  (PageID # 5589.)

True, the District Court later revised its holding.  But its amended analysis was premised on two critical legal errors.  First, it created, from whole cloth, a requirement that a signed agreement cannot effectively incorporate other writings by reference unless there is cumulative confirmation (such as a "checkbox") specific to those writings.  (PageID # 5833.)  There is no such legal requirement for "checkboxes," or similar writings duplicative of a signature, before an agreement can become effective, and the District Court cited no authority in support.  In fact, this conclusion was contrary to law. (Appellant Br., pp. 43–44.)

Second, the District Court conflated two distinct concepts: (1) the evidentiary value of a signature in determining whether the signatory read and signed the document, whatever it contained, and (2) whether that form's contents reflected the proper standard of care.  (*E.g.*, PageID # 5824-5826.)  In other words, the District Court disregarded the *effect*

27

of a signature—proof of the signatory's review and voluntary

agreement—based on its conclusion that the *contents* of the consent

forms were lacking.  Not one of the unpublished Michigan cases it cited

purports to undermine the common-sense understanding of what one

communicates when signing a document.[7]  The fact of the signatures

dispatches Plaintiffs' claims regarding voluntariness.

On the matter of the proper standard of care and the consent

forms' sufficiency:  Defendants have explained why the written, opt-in

---

[7] For example, the District Court cited *Cistrunk v. Oakwood Heritage Hospital*, No. 287457, 2010 WL 2384887, at *4 (Mich. Ct. App. June 15, 2010), for the proposition that "competing evidence on both sides . . . create[s] an issue of fact for the jury."  (PageID # 5825.)  In *Cistrunk*, however, the "competing evidence" related to the proper standard of care regarding a duty to warn; it had nothing to do with the validity of a signature.  The District Court also cited *Rogalski v. Smith*, No. 350120, 2020 WL 6111598, at *6 (Mich. Ct. App. Oct. 15, 2020), for the proposition that "despite a signed informed-consent form, informed consent is a triable issue of fact if plaintiffs testify that they did not give informed consent."  (PageID # 5825.)  But *Rogalski* rested on the physician's admission that a patient's specific oral request for a certain outcome would have triggered a specific, *additional* duty to warn, and there was a fact question whether that triggering request occurred.  Finally, in *Juckett v. Elluru*, No. 260350, 2006 WL 2924664, at *4 (Mich. Ct. App.Oct. 12, 2006), the court merely held that a defendant was entitled to rely on a signed consent form in which the patient agreed that risks and complications had been discussed.  At bottom, none of the District Court's justifications for disregarding Plaintiff-Parents' signatures were supported by its cited case law.

28

consent forms solicited more than what informed consent requires. (Appellant Br., pp. 46–47; *see also* PageID # 6626-6627 (confirming that federal Common Rule is generally accepted source of standards in research).)  The District Court erred as a matter of law, repeatedly applying a statute that facially has no application here.  (*See* note 2, *supra*; PageID # 5822-5823, 5827, 5830-5831, 5964.)[8]  Those statutes apply *exclusively* to diagnostic tests of an identifiable individual for clinical purposes.  *See* Mich. Comp. Laws §§ 333.17020 and 333.17520. They are relevant here only to the extent that they incorporate the federal Common Rule's requirements by reference for Defendants' non-clinical activities, Mich. Comp. Laws §§ 333.17020(9) and 333.17520(9). *Cf.* Mich. Comp. Laws § 600.2912a(1)(b) (establishing standard of care, for purposes of medical-malpractice actions, as the "recognized standard of acceptable professional practice or care").  As Defendants have already explained, the consent forms contained, or explicitly referenced available materials containing, all relevant information that *would*

---

[8] Plaintiffs' concession of error regarding the application of Michigan statutes purports to relate only to pre-2010 activities, but the cited decision below made no distinction.  (PageID # 5826–5828.)

*have been* required if the risk of the challenged activities was not minimal.

## CONCLUSION AND RELIEF REQUESTED

Collectively, Michigan's Newborn Screening Program and the BioTrust for Health are responsible for saving the lives of thousands of infants and, together, will save the lives of tens of thousands more. Thanks to these programs, and the necessary internal workings that drive them, countless happy families are getting on with the business of living their lives.

Plaintiffs feared and alleged that these programs lay bare the medical histories of identifiable individuals, and permit invasive experimentation on identifiable individuals—all to turn a profit. But those fears and allegations, far from being substantiated, were disproved. Affirming the District Court will subject families to the nightmare of a child falling suddenly ill, being rendered permanently disabled, or dying. And, far from protecting citizens from some articulable constitutional peril, affirmance will undermine the jurisprudential principle that cognizable harms must be actual and concrete.

Such a result is unwarranted.  Some of the allegations in
Plaintiffs' Amended Complaint were disturbing, and this Court rightly
allowed the search for truth to proceed.  But the evidence has revealed
that, after the initial screen, Defendants engage in no medical care or
treatment.  They neither perform nor facilitate research on identifiable
individuals.  And Defendants' motivations are not mere pretexts for
profit.  This Court should reverse or, at the very least, remand with
instructions to conduct a new trial.

Respectfully submitted,

/s/ Daniel J. Ping
Daniel J. Ping (P81482)
Aaron W. Levin (P81310)
Assistant Attorneys General
Counsel of Record
Attorneys for Defendants-
Appellants
Michigan Department of
Attorney General
Corporate Oversight Division
P.O. Box 30736
Lansing, MI 48909
(517) 335-7632

BY: /s/ Jeremy C. Kennedy
Jeremy C. Kennedy (P64821)

Pear Sperling Eggan & Daniels, P.C.
Attorneys for Defendants Michgian
NeoNatal Biobank and Christopher

Krause
24 Frank Lloyd Wright Dr., Ste. D-2000
Ann Arbor, MI 48105
(734) 665-4441
jkennedy@psedlaw.com

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type Style Requirements

1.     This reply brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(ii) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this reply brief contains no more than 6,500 words. This document contains 5,845 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word 2013 in 14-point Century Schoolbook.

*/s/ Daniel J. Ping*
Daniel J. Ping (P81482)
Assistant Attorney General
Counsel of Record
Attorneys for Defendants-Appellants
Michigan Department of
Attorney General
Corporate Oversight Division
P.O. Box 30736
Lansing, MI 48909
(517) 335-7632

Dated: December 19, 2024

## CERTIFICATE OF SERVICE

I certify that on December 19, 2024, the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record (designated below).

*/s/ Daniel J. Ping*
Daniel J. Ping (P81482)
Assistant Attorney General
Counsel of Record
Attorneys for Defendants-Appellants
Michigan Department of
Attorney General
Corporate Oversight Division
P.O. Box 30736
Lansing, MI 48909
Dated: December 19, 2024          (517) 335-7632

34